# NO. 23-2823

# In the
# United States Court of Appeals
# for the Seventh Circuit

CHARLES VAVRA,

*Plaintiff-Appellant,*

v.

HONEYWELL INTERNATIONAL INC., A DELAWARE
CORPORATION D/B/A HONEYWELL INTELLIGRATED,

*Defendant-Appellee.*

Appeal from the United States District Court for the N.D. Ill.,
the Eastern Division, Case No. 1:21-cv-06847

## BRIEF OF PLAINTIFF-APPELLANT
## CHARLES VAVRA

Alec J. Beck (#201133)
PARKER DANIELS KIBORT
888 Colwell Building
1213 North Third Street
Minneapolis, MN 55401
(612) 355-4119
beck@parkerdk.com

James V.F. Dickey (#393613)
UPPER MIDWEST LAW CENTER
8421 Wayzata Boulevard, Suite 300
Golden Valley, MN 55426
(612) 428-7000
James.dickey@umlc.org

*Attorneys for Plaintiff-Appellant
Charles Vavra*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2823

Short Caption: Vavra v. Honeywell International Inc.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Charles Vavra

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Parker Daniels Kibort; Upper Midwest Law Center; Mauck & Baker, LLC

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Alec J. Beck    Date: 12/1/23

Attorney's Printed Name: Alec J. Beck

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☑    No ☐

Address: 123 North 3rd Street, Suite 888, Minneapolis, MN 55401

Phone Number: 612-355-4100    Fax Number:

E-Mail Address: beck@parkerdk.com

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-2823

Short Caption: Vavra v. Honeywell International Inc.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Charles Vavra

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Parker Daniels Kibort; Upper Midwest Law Center; Mauck & Baker, LLC

(3)   If the party, amicus or intervenor is a corporation:

i)   Identify all its parent corporations, if any; and

N/A

ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ James V. F. Dickey     Date: 9/26/23

Attorney's Printed Name: James V. F. Dickey

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☐   No ☑

Address: 8421 Wayzata Blvd., Suite 300

Phone Number: 612-428-7002     Fax Number: 763-710-7429

E-Mail Address: james.dickey@umlc.org

rev. 12/19 AK

# TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................... i

TABLE OF AUTHORITIES ................................................................... iii

JURISDICTIONAL STATEMENT .......................................................... 1

STATEMENT OF LEGAL ISSUES ......................................................... 2

SUMMARY OF THE CASE ................................................................... 3

STATEMENT OF THE CASE ................................................................. 4

   I.    Appellant Was an Exceptional Employee with No History of Adverse
       Employment Actions Until February 2021 ................................... 5

   II.   Starting in the Fall of 2020, Appellee Began Promoting a Theory of Race
       Relations, Including the Unconscious Bias Awareness training, with
       Which Appellant Disagrees. ...................................................... 6

   III.  Honeywell Continued to Push the Unconscious Bias Training. ................... 9

   IV.  Vavra Issued a Formal Complaint to Human Resources About the Racist
       Email Sent by Honeywell CEO John Waldron and the Unconscious
       Bias Training. ...................................................................... 11

   V.   Soon After Vavra's Official Discrimination Complaint, Honeywell
       Escalated Its Pushes for Him to Complete the Training, and Ultimately
       Terminated Vavra's Employment. .............................................. 14

   VI.  Procedural History. ................................................................. 17

SUMMARY OF THE ARGUMENT ....................................................... 17

ARGUMENT ..................................................................................... 19

   I.    Standard of Review. ................................................................ 19

   II.   Honeywell Terminated Vavra Because of His Discrimination
       Complaints. .......................................................................... 20

      A. Vavra's termination came "on the heels" of his discrimination
         complaints. ..................................................................... 21

      B. Honeywell departed from its own policy by refusing to investigate,
         or even discuss, Vavra's discrimination complaint. ...................... 26

C. Honeywell's motive for terminating Vavra is still in dispute, and that factual dispute means summary judgment is inappropriate. ..........28

III.  In the Alternative, Vavra's Objection to the Implicit Bias Training Was Protected Activity Under the Act, and He Was Terminated Because of It. ........................................................................................................31

A. Vavra had a good-faith belief that the training was unlawful. ..............31

B. Vavra's sincere belief that the training was unlawful under Title VII was also objectively reasonable............................................................33

**CONCLUSION**................................................................................................**36**

**CERTIFICATE OF COMPLIANCE** ........................................................**37**

**CERTIFICATE OF SERVICE** ..................................................................**38**

# TABLE OF AUTHORITIES

**STATUTES**

42 U.S.C. § 2000e-3(a). ................................................................. 18, 20

**CASES**

*Benuzzi v. Bd. of Educ. of City of Chicago*, 647 F.3d 652 (7th Cir. 2011)..............20

*Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781 (7th Cir. 2007) .......................24

*Carlson v. CSX Trans., Inc.*, 758 F.3d 819 (7th Cir. 2014) ...................................30

*Castro v. DeVry Univ., Inc.*, 786 F.3d 559 (7th Cir. 2015). ..................................29

*Coleman v. Donahoe*, 667 F.3d 835 (7th Cir. 2012) ................................................24

*Daza v. Indiana*, 331 F. Supp. 3d 810 (N.D. Ind. 2018)...........................................35

*Devine v. Pittsburg Board of Public Education*, No. 2:13-cv-220,
    2015 U.S. Dist. LEXIS 74988 (W.D. PA June 10, 2015) ...................................34

*Garcia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010 (7th Cir. 2016) ...........................18

*Griggs v. Duke Power Co.*, 401 U.S. 424 (1971) .......................................................34

*Hammer v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701
    (7th Cir. 2000) .......................................................................................................31

*Hartman v. Pena*, 914 F. Supp. 225 (N.D. Ill. 1995)...............................................34

*Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307 (7th Cir. 1989)............ 34, 35

*Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.3d 1307 (7th Cir. 1989).................23

*Hudson v. Chi. Transit Auth.*, 375 F.3d 552 (7th Cir. 2004). .................................29

*Hutchinson v. Fiztgerald Equip. Co., Inc.*, 910 F.3d 1016 (7th Cir. 2018)..............28

*Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966
    (7th Cir. 2012) .......................................................................................................30

*Kidwell v. Eisenhauer*, 679 F.3d 957 (7th Cir. 2012)............................ 21, 23, 26, 28

*Lang v. Ill. Dep't of Children & Family Servs.*, 361 F.3d 416
    (7th Cir. 2004) .......................................................................................................24

*Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903 (7th Cir. 2022) ......................... 18, 19, 20

*Logan v. City of Chicago*, 4 F.4th 529 (7th Cir. 2021) ...................................... 31, 33

*Lord v. High Voltage Software, Inc.*, 839 F.3d 556 (7th Cir. 2016)..... 19, 20, 31, 33

*Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312 (7th Cir. 2011)............ 21, 22, 25

*Magyar v. St. Joseph Reg'l Med. Ctr.*, 544 F.3d 766 (7th Cir. 2008) .. 19, 22, 23, 24

*McClendon v. Indiana Sugars*, 108 F.3d 789 (7th Cir. 1997) ................................23

*McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273 (1976)...............................34

*Norgren v. Minn. Dept. of Hum. Servs.*, No. 22-489,
  2023 U.S. Dist. LEXIS 786 (D. Minn. Jan. 4, 2023)..............................................35

*Poullard v. McDonald*, 829 F.3d 844 (7th Cir. 2016) .............................................20

*Rowlands v. UPS*, 901 F.3d 792 (7th Cir. 2018) .....................................................24

*Rucker v. Higher Educ. Aids Bd.*, 669 F.2d 1179 (7th Cir. 1982)..................... 33, 36

*Scheidler v. Indiana*, 914 F.3d 535 (7th Cir. 2019) .......................................... 31, 33

*Silk v. Bd. of Trs.*, 795 F.3d 398 (7th Cir. 2015)......................................................23

*Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93 (7th Cir. 1985) ..................... 20, 30

*Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378 (7th Cir. 2016) .................20

## OTHER AUTHORITIES

EEOC, *Questions and Answers about Race and Color Discrimination in
  Employment*, (April 19, 2006), https://www.eeoc.gov/laws/guidance/questions-
  and-answers-about-race-and-color-discrimination-employment...........................34

Fed. R. Civ. P. 56(a).................................................................................................19

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction over this case because it presents a federal question. Plaintiff-Appellant's federal claim was brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), and the district court therefore had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. The district court had jurisdiction over Plaintiff-Appellant's state-law claims for violation of the Illinois Human Rights Act, 775 ILST § 5/2-101(A), and for wrongful termination, pursuant to 28 U.S.C. § 1367.

The district court dismissed the Amended Complaint and entered judgment on August 21, 2023. The entry of judgment disposed of all of Plaintiff-Appellant's claims. Appellants timely filed the notice of appeal on September 20, 2023. This Court therefore has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF LEGAL ISSUES

(1) Whether the district court erred by holding that there was no inference of causation between Vavra's discrimination complaint and his termination when Honeywell did not threaten Vavra with discipline until after Vavra sent his complaint email, terminated him only eight days after he sent a follow-up email about his complaint, and refused to follow its own policy and investigate the complaint.

(2) Whether the district court erred by holding that Vavra's refusal to take the training was not a protected activity under Title VII when Vavra sincerely believed that it was a racist and discriminatory program and Vavra's complaint reasonably could be considered a charge of racial discrimination in the workplace, which Title VII prohibits.

(3) Whether the district court erred by granting summary judgment to Honeywell.

## SUMMARY OF THE CASE

Plaintiff-Appellant Charles Vavra was an Estimating Manager at Honeywell, the Defendant-Appellee in this case. Vavra was an exceptional employee with no history of discipline at the company. Starting in September 2020, however, Honeywell began promoting its theory of race relations. First, in September 2020, Honeywell CEO John Waldron sent an email to employees about a Kentucky jury's decision not to indict the officers who shot Breonna Taylor. ECF 43, p. 4–5; Defendant's Statement of Facts ("SOF"), ¶ 12.[1] In his email, Waldron promised certain diversity changes in the company. *Id.* He also closed by stating that "[m]y hands and heart are open to each of our Black, Hispanic, Asian, and LGBTQ colleagues. I stand with you." *Id.* Next, in November, Honeywell announced an Unconscious Bias Awareness training that all employees were required to complete by February 25, 2021. ECF 43, p. 5; SOF ¶ 14.

Vavra did not agree with either communication and decided not to complete the training. He filed an official discrimination complaint with Honeywell in which he thoroughly explained why he thought both Waldron's email and the training were

---

[1] Defendant-Appellee's SOF (ECF 43) and Plaintiff-Appellant's responses to those facts (ECF 45) set out portions of the deposition testimony and referenced exhibits in their text. For ease of reference, to the extent the SOF or Plaintiff-Appellant's response directly states those quotes, Appellant cites to the SOF. To the extent further context is needed, Appellant provides a pincite to the specific portion of the exhibit attached to the SOF.

racist and discriminatory. ECF 43, p. 10–16; SOF ¶ 29. Honeywell never responded to Vavra's complaint but instead continued to remind Vavra to complete the training. Only eight days after Vavra sent a final follow-up email about his discrimination complaint, Honeywell terminated Vavra's employment. ECF 43, p. 19–20; SOF ¶¶ 40, 42. After his termination, Vavra filed an EEOC charge and then this lawsuit, alleging that Honeywell retaliated against his discrimination complaint by firing him. ECF 10, p. 10–12; Am. Compl. ¶¶ 24, 27–38.

Honeywell moved for summary judgment. The district court granted Honeywell's motion and entered judgment. Vavra timely appealed from the judgment by filing a notice of appeal. Vavra requests a total of 20 minutes of oral argument, 10 minutes per side.

## STATEMENT OF THE CASE

In the fall of 2020, Honeywell began promoting a theory of race relations which Vavra found to be offensive and discriminatory. First, company CEO John Waldron sent an email promising to promote diversity policies at Honeywell and support "our Black, Hispanic, Asian, and LGBTQ colleagues." ECF 43, p. 4–5; SOF ¶ 12. When the company mandated an Unconscious Bias Training soon after, Vavra did not want to be trained in a program that he thought was plainly designed to "mak[e] it clear to all of our non-white colleagues who the bad people are . . . all of us whit[e] folks of

4

course." ECF 43, p. 15; SOF ¶ 29. Vavra decided not to support a racially discriminatory program by participating in the training.

At first, Honeywell only sent Vavra emails asking him to complete the training. Then, Vavra sent an email to his supervision and HR explaining his objections to the training and to Waldron's email. *See* ECF 43, p. 11–16; SOF ¶ 29. Soon after, Honeywell threatened Vavra with discipline for not completing the training. ECF 43, p. 17; SOF ¶ 32. Despite its laser-focus on the training, Honeywell never directly responded to Vavra's discrimination complaint about that same training. Only eight days after Vavra sent another follow-up email seeking an update on his discrimination complaint, Honeywell terminated Vavra. ECF 43, p. 19–20; SOF ¶¶ 40, 42.

## I.  Appellant Was an Exceptional Employee with No History of Adverse Employment Actions Until February 2021.

Appellant was hired by Intelligrated Systems, Inc. ("Intelligrated") in July of 2008. ECF 43, p. 3; SOF ¶ 9. He was initially hired as a Project Manager in Intelligrated's Woodridge, Illinois Office, where he served as a liaison with customers during the equipment manufacturing, design, and project-implementation processes. ECF 43, p. 3–4; SOF ¶¶ 9–11; ECF 10, p. 3–4; Am. Compl. ¶ 11. Vavra was promoted in 2013 to Estimating Manager, and in that role he supervised engineers in the design and cost estimate of distribution systems for customers and provided sales support for the Sales Department. ECF 43, p. 4; SOF ¶ 10; ECF 10, p. 3–4; Am. Compl. ¶ 11.

5

Around July of 2016, Intelligrated was acquired by Honeywell, Inc., and began doing business as Honeywell Intelligrated, a division of Honeywell, Inc.'s Safety and Productivity Solutions ("SPS") division. ECF 43, p.3; SOF ¶ 9. Vavra's role did not officially change, although he became an employee of Honeywell International, Inc. ("Honeywell"). *Id.* In February 2021, Vavra was promoted again, this time to Principal Engineer. *Id.* In his new role, Vavra estimated large projects for Honeywell's key clients, and he received a commensurate raise in compensation. ECF 10, p. 3–4; Am. Compl. ¶ 11. Vavra reported directly to Jeffery Cortez, and Cortez reported to Brian Swinkola, who then reported to Justin Lieb. ECF 43, p. 4; SOF ¶ 10.

Throughout his entire period of employment for Intelligrated and Honeywell, Vavra received excellent performance reviews and was never subject to any negative employment actions through February 2021. ECF 10, p. 4; Am. Compl. ¶ 11. As Vavra's Supervisor Jeff Cortez stated, "[h]is performance was perfectly fine. He did very well in his performance." ECF 43-4, Ex. D p. 6; Cortez Dep. at p. 15:13–14.

## II.  Starting in the Fall of 2020, Appellee Began Promoting a Theory of Race Relations, Including the Unconscious Bias Awareness training, with Which Appellant Disagrees.

Following the death of George Floyd and the subsequent riots and protests in the summer of 2020, Honeywell began communicating with its employees on the Company's theory of race and racial relations. *See* ECF 10, p. 4; Am. Compl. ¶ 12. First, CEO of Honeywell's SPS Division, John Waldron, sent a company-wide email to

all employees with the subject line "Continue to Fight for Social Justice." ECF 43, p. 4–5; SOF ¶ 12. It read:

> Dear Friends and Colleagues,
>
> Yesterday's decision by the grand jury in Louisville, Kentucky not to indict the officers who killed Breonna Taylor is difficult for me to understand. I'm sure I don't have all the facts, and I'm struggling to process the many thoughts and emotions I have around this tragic situation. I can only imagine how our Black colleagues are feeling ... again. Each time these situations occur, they highlight how far we must go to create an equal and just society where all people have the same opportunities to succeed.
>
> Racial bias is real. Don't kid yourself. Each of us has unconscious bias within us. When these biases compound, they can evolve into institutional biases. Breaking out of this cycle is critically important for moving society forward. Breaking this cycle requires courage — the courage to discuss, the courage to admit our bias and to encourage and promote our differences, the courage to change.
>
> Words alone aren't sufficient. We must take tangible actions to make a difference. We have, and we will continue to do so. In SPS, we are committed to doubling our efforts on the agenda we have set forth previously which includes engaging our Employee Resource Groups (ERG) with another round of listening sessions, upping our game when hiring ensuring 100% of the time that the interview panel and candidates are diverse, and you can expect to hear of other actions we will be taking.
>
> Shortly after George Floyd's death, one of our Black colleagues reminded me that it was white people in America that freed the slaves and ultimately supported the civil rights movement and legislation of the 1960s. That time is upon us again — we, me included, must insist upon racial equality. We must demand it from ourselves. We must welcome dialogue about it. We must have zero tolerance for its absence.

My hands and heart are open to each of our Black, Hispanic, Asian, and LGBTQ colleagues. I stand with you.

John

*Id*. Vavra thought that the email contained racist and discriminatory statements. ECF 43-1, Ex. A p. 18; Vavra Dep. at p. 38:10–13.

And that email was only the beginning. In November 2020, Honeywell's Diversity, Equity and Inclusion office ("DEI") announced an initiative where all employees were required to complete an online "Implicit Bias Training," which Honeywell called "Unconscious Bias Awareness" training. ECF 43, p. 5; SOF ¶ 14. The DEI office set a deadline of February 25, 2021 for all employees to complete the training. *Id.* Vavra was told by numerous other employees that they felt the training was discriminatory, racist, or otherwise inappropriate, but they felt intimidated by Honeywell and unable to speak up. ECF 10, p. 5; Am. Compl. ¶ 13.

Based on his concerns regarding Implicit Bias Theory as well as the increasingly hostile racial and intellectual environment emanating from Honeywell's Management, Vavra was hesitant to take the proposed training. ECF 10, p. 5; Am. Compl. ¶ 15. Additionally, Vavra was no longer comfortable working as a manager for Honeywell because he "didn't want to push stuff like this on to my reports." ECF 43, p. 7; SOF ¶ 19.

8

### III. Honeywell Continued to Push the Unconscious Bias Training.

As the deadline to complete the training approached, Vavra began to receive a reminder every day. ECF 43-1, Ex. A p. 32; Vavra Dep. p. 53:15–18. On February 24, 2021, Louise Quilter-Wood, Honeywell's Vice President of HR and Communications, SPS, sent an email to Vavra and other employees who had not yet completed the training. ECF 43, p. 6; SOF ¶ 15. The subject line was: "TAKE ACTION TO-DAY: Unconscious Bias Awareness Training is Due Now." *Id.* The email stated: "You are receiving this message because you have not completed the Unconscious Bias Awareness training which is due Feb. 25, 2021. Please click the link at the bottom of this email and complete the training within the next 24 hours." *Id.* The email also contained the text of the original announcement for the training:

> As part of our commitment to Inclusion and Diversity, Honeywell has launched Unconscious Bias Awareness training, which is required for all employees.*

> While it's human nature to have biases, we must strive to overcome them to create an environment that values everyone's perspectives — a workplace based on trust, respect, and open communication. This training aims to equip you with the insights and tools needed to help spot and challenge the ways biases prevent us from creating an inclusive environment.

> When we work to eliminate our implicit biases, we not only treat each other better, but we become a better company. Combating unconscious bias allows us to build a culture that supports better customer service, stronger business results, and a more engaged workforce. If you want to learn more about unconscious bias, watch this video on Removing Bias from Our Everyday Decision Making.

> Please complete Unconscious Bias Awareness training by Feb. 25,
> 2021.

*Id.* After Vavra declined to complete the training by the deadline, he still received

daily email reminders. ECF 43, p. 8; SOF ¶ 21.

On March 2, 2021, Vavra's supervisor Jeff Cortez also forwarded Vavra an email

he received from Honeywell's DEI office asking him to ensure those that report to

him had completed the training. ECF 43, p. 8–9; SOF ¶ 22. In that email, Cortez

stated: "Chuck—know you are not a fan of this training module, however you are

currently the only one who hasn't completed this training so would ask that you do

this." *Id.* Cortez discussed with Vavra his concern that the training had "racist ele-

ments" and "told him [that] I don't see the concern," but realized that Vavra "had

that concern." ECF 43-4, Ex. D p. 24–25; Cortez Dep. at p. 24:20–24, 25:1–18.

Vavra received another email from Cortez that same day asking him to complete the

training which included forwarded emails from leadership at Honeywell asking Cor-

tez to get those under his supervision to complete the training. ECF 43, p. 9–10; SOF

¶ 25.

Also on March 2, Vavra received a separate email from Cortez's supervisor Brian

Swinkola asking him to "please complete the Unconscious Bias training." ECF 43,

p. 10; SOF ¶ 27. And later in the day, Vavra received another email from Katie

Becker with Human Resources. ECF 43, p. 10; SOF ¶ 28. That email was sent to an

undisclosed list of applicants who had not yet completed the training, asking them

to complete it, and asking if they had any issues completing it. *Id.* Vavra responded

"Yes, I do have issues completing this. I will be sending out an email shortly ex-

plaining why." *Id.* Becker emailed Vavra again on March 5 asking what "barriers"

were preventing him from completing the training. ECF 43, p. 10; SOF ¶ 29.

### IV. Vavra Issued a Formal Complaint to Human Resources About the Racist Email Sent by Honeywell CEO John Waldron and the Unconscious Bias Training.

Vavra initially did not file a formal complaint with Honeywell expressing his

concern that John Waldron's email was discriminatory. But once the email "led to

something more"—like the unconscious bias training—Vavra decided that he had to

"raise [his] voice about it." ECF 43-1, Ex. A p. 21; Vavra Dep. at p. 42:6–10. Vavra

thought he would be protected under the terms of Honeywell's anti-retaliation pol-

icy, which read as follows:

> It is important that you feel comfortable raising your questions and con-
> cerns. Honeywell will not tolerate any form of retaliation against you
> for making a good faith report of actual or potential misconduct. Mak-
> ing a report in "good faith" means your report is honest, sincere, and
> complete to the best of your knowledge.
>
> If you feel an act of retaliation has occurred, you should report your
> concerns via one of the methods outlined in "Asking for Advice and
> Voicing Concerns."

ECF 43, p. 3; SOF ¶ 6. Vavra sent an email on March 8, 2021 to Human Resources

Representative Katie Becker and his supervisors laying out his objections to the

training and John Waldron's email. ECF 43, p. 10–16; SOF ¶ 29. In part, his statement read:

> The reason I'm not taking [the training] is because it's absolutely ridiculous and it doesn't work. How do I know that? Because we have our own CEO to thank for proving to to [sic] all of us that it doesn't work. To be honest, if John Waldron's 9/24 email below hadn't preceded the training mandate a couple months earlier I probably would have just taken it… I'm going to explain in hopefully more than enough detail why I, and I'm sure many others found his email so offensive.…

> Today and for the past decade or so the only time I ever witness "systemic racism" or "racial bias" is when I turn on my TV.…or read emails like Waldron's. As a matter of fact, if the mainstream media would just shut up and John Waldron and others like him would quit sending out divisive emails, race relations would probably be better than ever. But we all know that things are going to get far worse and Waldron's email was just another brick in that road to hell.…

> My initial thought, after reading where he says "Racial bias is real, Don't kid yourself. Each of us has racial bias within us" was how dare he even suggest something like that. Says who, him? CNN? Xi Jinping? Klaus Schwab? 99% of some group of nameless psychologists that agree everyone has unconscious bias? Who? But after witnessing all of the lunacy taking place these days, nothing even surprises me anymore. Perhaps Mr. Waldron should take the red/yellow/green light training because to me, reading that email was bright red light. He didn't just cross a line, he did a cartwheel over it.…

> So let me make this perfectly clear, John Waldron nor anybody else gets to tell me I have unconscious bias.…

> If racial bias exists within some people, don't kid yourself. There is nothing unconscious about it. Just ask John Waldron. He made a "conscious" decision to race-bait all of his colleagues by suggesting the Breonna Taylor case was racially motivated. Some of his colleagues will actually buy that. People aren't inherently racist. It is learned. It is pushed into and absorbed in the heads of gullible victims that have had their trust betrayed by people in positions of power like greedy, self-

serving politicians, the media and even CEOs of global corporations that are all working in concert towards a common "political" goal. I'm here to work. I'm not here for an indoctrination into John Waldron's mindset or his ideologies that he feels empowered to shove down our thoughts just because he's in a leadership position in this organization.…

If someone has complained about any racist, misogynistic or homophobic behavior I'm associated with, only then would I consider taking the training. Until then, I have no intention of taking it.…

John Waldron's excluding and alienating an entire race of his colleagues was a passive aggressive way of making it clear to all of our non-white colleagues who the bad people are….all of us whit[e] folks of course.…

It seems a little counterintuitive to EXCLUDE an entire race of his colleagues "who his heart goes out to", especially when he's planning on following up with an "unconscious bias" training mandate….That is being headed up by the "INCLUSION" and diversity group. That's where the irony and hypocrisy come in. It's laughable. You can't make shit up. But you know, maybe he's right. Maybe SOME of us DO have unconscious bias. If John Waldron does, I think it would be best for him to just deal with it himself on a personal level rather than project his racial biases or his "white guilt" onto his employees. To say that "each of us has unconscious bias within us" is reckless and irresponsible. That's a pretty broad brush stroke.…

To reiterate, I AM NOT taking this training because it's a joke, and I'll use John Waldron's email as proof of it. I refuse to take part in this ridiculous charade. I feel John Waldron owes ALL of his colleagues an apology for even perpetuating this nonsense. Do whatever it is you feel you have to do to deal with my noncompliance, but I can tell you this...I am not a sellout to myself, my integrity, my convictions or to the tens of millions of freedom-loving, Constitution-loving Americans of ALL races and genders in this country that feel the same way I do. If I am expected to agree with John Waldron's opinions on social and political issues, I feel I am being forced into having to re-evaluate my working relationship with Honeywell. I shouldn't be made to feel that way. If

that's not the expectation, I'll get back to work and wait for my apology
to arrive. … He should keep his social and political opinions to himself.

*Id.* Vavra's email largely fell on deaf ears. Katie Becker responded that she had received the email and would "get back to [him]," but said nothing else. ECF 43, p. 16–17; SOF ¶ 30. Cortez only read the first page of Vavra's email and only skimmed the rest. ECF 43, p. 17; SOF ¶ 33. He told Vavra that he did not think the training was racist, but otherwise did not discuss the substance of Vavra's complaints. *Id.* In the meantime, Vavra continued to be peppered with daily email reminders to complete the training. ECF 43, p. 17; SOF ¶ 31.

**V.  Soon After Vavra's Official Discrimination Complaint, Honeywell Escalated Its Pushes for Him to Complete the Training, and Ultimately Terminated Vavra's Employment.**

On March 19, 2021, Vavra had a Teams video meeting with Chris Maines, Vice President of Engineering. Instead of acknowledging Vavra's discrimination complaint, Maines told Vavra that the training was "just another check box of things to do." ECF 43, p. 17; SOF ¶ 32. This was the first time Vavra was told that a failure to complete the training would be considered insubordination.

After this meeting, Vavra took the Implicit Association Test on a Harvard.edu website to learn more about the type of training he was being asked to take. ECF 43, p. 18; SOF ¶ 34. The first time he took the test, Vavra's results indicated that he had a bias in favor of African Americans and against White Americans. ECF 10, p. 8; Am. Compl. ¶ 19. He then took the same test three days later and was told that he

did harbor implicit biases against African Americans. *Id.* This confirmed to him what he had previously learned concerning the training, that it is generally considered to be unreliable and incapable of validation. *Id.*

Vavra emailed some of his results to Chris Maines on March 23, 2021. ECF 43-12, Ex. L p. 10. In his email, he remarked that John Waldron's email was "incredibly offensive, discriminatory and racist and I don't want to be 'trained' to be someone like that." *Id.* at 8. He also wrote that "I think a more valuable training that 'Unconscious Bias' would be training on Title VII of the Civil Rights Act." *Id.* Vavra concluded by writing that "I referenced John Waldron's discriminatory remarks in his 9/24 email in my last letter to HR. I am referencing it again today. I don't know what would be considered an 'official' discrimination claim, but both should be considered as such. I am still expecting an apology from John Waldron. I would prefer this be the end of any further requests for me to take the training." *Id.* at 10–11. Vavra forwarded this email to Katie Becker the next day. ECF 43, p. 18–19; SOF ¶ 38. In both of Vavra's emails he tried to be "as thorough as possible" in explaining why he was objecting to "discriminatory and racist" statements by Honeywell. ECF 43, p. 19; SOF ¶ 39.

After still receiving no response to his complaints, Vavra emailed Becker again on March 30, 2021. ECF 43, p. 19–20; SOF ¶ 40. He stated: "It has been three weeks since I sent my explanation on why I am refusing to take the training and I have not

15

heard anything back since 3/8, other than daily requests to take the training up until last Tuesday, 3/23 after my conversation with Chris Maines. Can you please give me an update as to where things stand? Can we schedule some time to discuss? Please let me know." *Id.* Becker gave no such update, but sent an email two days later informing Vavra that they would discuss sometime in the following week. *Id.* The call was scheduled for April 7. ECF 43, p. 20; SOF ¶ 41.

Honeywell had no plans for a discussion. Before the scheduled Teams meeting, Jeff Cortez again asked Vavra if he would take the training. ECF 43, p. 20; SOF ¶ 42. During the meeting, Vavra was told that he would be terminated if he did not take the training. After speaking to his wife in the other room, Vavra confirmed that he would not take the training and he was terminated. *Id.*

After his termination, Vavra emailed Becker: "I just wanted to let you know that I think I've got all my personal stuff off of the laptop. Richard and Chris were a big help. I'm sorry that things couldn't have worked out differently. I was hoping that a discrimination claim wouldn't have ended with getting terminated, but it's a different country we're living in these days. I wish you all the best and thanks for everything." ECF 43, p. 21; SOF ¶ 45. In another email to a co-worker, Vavra remarked that "I was hoping things would have worked out differently but I'm not surprised how they did. My leaving wasn't voluntary. I was fired for not complying with their 'Unconscious Bias' training mandate. I know to some that it was just another checkbox of

16

things to do but to me it was so much more to me. I feel very strongly about this corporate 'wokeism' crap. I sent HR a very detailed email as to why I wasn't taking the training, pointing out the hypocrisy and discrimination in John Waldron's 9/24 email." ECF 43, p. 21; SOF ¶ 46. Later, Vavra reached out to Becker again asking for a formal letter "stating the exact reason why I was fired." ECF 43, p. 21–22; SOF ¶ 47. He was told that no further information would be provided. *Id.*

### VI.  Procedural History.

After his termination, Vavra first filed a charge with the Equal Employment and Opportunity Commission. ECF 10, p. 10; Am. Compl. ¶ 24. He then sued Honeywell for race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 and the Illinois Human Rights Act, and wrongful termination in violation of Illinois Public Policy, on December 23, 2021. *See* ECF 1, Compl. Vavra filed his amended complaint on January 14, 2023. *See* ECF 10, Am. Compl.

He decided to only pursue his retaliation claims at the district court. App. 13. Honeywell moved for summary judgment on February 17, 2023. ECF 41. The district court granted Honeywell's motion and entered judgment on August 21, 2023. Vavra timely filed a notice of appeal.

### SUMMARY OF THE ARGUMENT

Vavra's claim is based on the "opposition clause" of Title VII's retaliation section, which makes it illegal "to discriminate against any individual . . . because he

has opposed any practice made an unlawful unemployment practice by the subchapter." 42 U.S.C. § 2000e-3(a). There are two ways to look at Vavra's claim. And no matter how you slice it, the district court got it wrong.

First, Vavra engaged in protected activity when he sent his emails to Honeywell HR reporting discrimination in John Waldron's email and in the training requirement. That means that if "a retaliatory motive was a 'but-for cause'" of Vavra's termination, Honeywell violated Title VII. *Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 915 (7th Cir. 2022) (quoting *Garcia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1019 (7th Cir. 2016)). There is ample circumstantial evidence in this case demonstrating that Vavra was terminated in retaliation for his discrimination complaint. The timing of Vavra's termination makes this clear. Initially, after he declined to complete the training, Vavra just received reminder emails. After he submitted his discrimination complaint, however, Vavra was threatened with termination and hauled into Zoom meetings to discuss the training. Within eight days after Vavra's third email about his discrimination complaint, he was terminated. Further, Honeywell refused to speak with Vavra about his discrimination complaint or conduct any investigation, in violation of Honeywell's own policy. This circumstantial evidence would allow a reasonable jury to conclude that Vavra was terminated because of his protected activity.

In the alternative, if the Court accepts Honeywell's assertion that it only terminated Vavra because of his refusal to take the training, then he was still terminated for engaging in protected activity. This time, the protected activity is Vavra's refusal to participate in a training program he sincerely and reasonably believed was unlawful under Title VII. A "retaliation claim isn't doomed simply because the complained-of-conduct was not in fact an unlawful employment practice;" rather, the focus is on "whether it falls into the category of conduct prohibited by the statute." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) (quoting *Magyar v. St. Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 771 (7th Cir. 2008)). In this case, the complained of conduct was Honeywell's decision to favor certain races at the expense of others, and make white employees feel guilty. These race-based distinctions certainly "fall[] into the category of conduct prohibited" by Title VII. Because Honeywell terminated Vavra for, by its own admission, refusing to participate in a discriminatory program, it retaliated against him for protected activity.

## ARGUMENT

### I.  Standard of Review.

This appeal comes from the dismissal of Appellant's claims on summary judgment. *See* Fed. R. Civ. P. 56(a). The Court "review[s] de novo the grant of summary judgment" and must "draw from the evidence all reasonable inferences in [Vavra's] favor." *Lesiv*, 39 F.4th at 911. Summary judgment is only "appropriate when there

19

is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law." *Id.* (quoting *Poullard v. McDonald*, 829 F.3d 844, 852 (7th Cir. 2016)). It is inappropriate, on the other hand, "in a discrimination case where a material issue involves any weighing of conflicting indications of motive and intent." *Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93, 97 (7th Cir. 1985). Reversal is warranted if Vavra can "show that a reasonable jury could return a verdict in [his] favor." *Lesiv*, 39 F.4th at 910 (quoting *Benuzzi v. Bd. of Educ. of City of Chicago*, 647 F.3d 652, 662 (7th Cir. 2011)).

## II. Honeywell Terminated Vavra Because of His Discrimination Complaints.

Title VII protects an employee from retaliation when "he has opposed any practice made an unlawful practice by this subchapter." 42 U.S.C. § 2000e-3(a).[2] To prove retaliation, a plaintiff must show that he "suffered an adverse employment action because of his statutorily protected activity; in other words, the plaintiff must prove that he engaged in protected activity and suffered an adverse employment action, and that there is a causal link between the two." *Lord*, 839 F.3d at 563. There is no dispute that Vavra suffered an adverse employment action when he was

---

[2]Vavra also raised Illinois Human Rights claims. These are analyzed under the same framework as Title-VII claims, *see Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016), so they need not be analyzed differently in this appeal.

terminated. Nor is there any dispute that Vavra's email on March 8 was a protected activity under Title VII.

To survive summary judgment, Vavra only needs to "produce sufficient evidence to show that his purportedly protected speech was at least a motivating factor in the defendants' alleged retaliatory employment actions taken against him." *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012). The burden then shifts to Honeywell to rebut the causal inference. *Id.*

Here, Vavra has submitted ample circumstantial evidence "from which a trier of fact may infer that retaliation occurred." *Id.* First, he was fired one month after his first complaint email, fourteen days after his second, and only eight days after his third. Additionally, it is clear that Honeywell entirely ignored his complaints, a violation of its own policy. Combined, there is sufficient evidence to conclude that Vavra was terminated *because of* his complaint emails. In other words, given the timing of events and Honeywell's failure to follow its own policies, a jury could easily conclude that Vavra's emails and subsequent communications factored into his termination.

### A.    Vavra's termination came "on the heels" of his discrimination complaints.

Sometimes suspicious timing is just suspicious. *See Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011). "Occasionally, however, an adverse action comes so close on the heels of a protected act that an inference of causation

is sensible." *Id.* Deciding when timing is close enough to give rise to an inference of causation "depends on context." *Id.* The district court, for its part, never considered the context of this case. Instead, it broadly stated that "timing is not enough." App. 18. "The district court's apparent belief that timing *never* supports an inference of causation is untenable." *Loudermilk*, 636 F.3d at 315.

The district court failed to appreciate, or even consider, how quickly Vavra's termination followed his discrimination complaint. Vavra sent his first complaint email on March 8. ECF 43, p. 10–16; SOF ¶ 29. He followed up with a second complaint email on March 23. ECF 43-12, Ex. L p. 10–11. And on March 24, he forwarded both emails to HR, asking that both be treated as "an 'official' discrimination claim." *Id.*; ECF 43, p. 18–19; SOF ¶ 38. On March 30, Vavra sent another email to HR Representative Katie Becker sharing a YouTube video in support of his position and asking for an update on "where things stand." ECF 43, p. 19–20; SOF ¶ 40. Honeywell turned around and scheduled the Teams call to terminate Vavra just two days later. *Id.*; ECF 43, p. 20; SOF ¶ 41. That termination came only eight days after Vavra's final email, fourteen days after Vavra's official-complaint email, and one month after his initial complaint.

As the court explained in *Magyar v. St. Joseph Regional Medical Center*, when there is an initial complaint and follow-up communications, the correct approach at summary judgment "is to assume that the suspicious-timing clock was restarted"

with the subsequent communications. 544 F.3d at 772. This conclusion also makes sense in the context of this case. It was only after Vavra's second email that he clearly made "an 'official' discrimination claim." And it was only after Vavra's third email that Honeywell scheduled a Teams call with him about the subject. Like in *Magyar*, Vavra's follow-up emails made clear that he "was not going to let the subject drop" and motivated Honeywell to terminate him. *Id.*

And the fact that only eight days passed between Vavra's final email and his termination supports an inference of causation in the context of this case. This Court has obviously held that shorter periods of time were sufficient. *See McClendon v. Indiana Sugars*, 108 F.3d 789, 797 (7th Cir. 1997) (two to three days sufficient); *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.3d 1307, 1315 (7th Cir. 1989) (one week sufficient). Longer periods, on the other hand, have been held to be insufficient. *See Silk v. Bd. of Trs.*, 795 F.3d 398, 710 (7th Cir. 2015) (a "few weeks" insufficient); *Kidwell*, 679 F.3d at 967 (five weeks and two months insufficient). Eight days clearly falls closer to the "sufficient" line of cases. Indeed, the timeline may be even shorter: Becker and Jeff Cortez scheduled the Teams call which was used to terminate Vavra *only two days* after his complaint, in a direct response to his email.

Even if the Court were to treat thirty days—the time from when Vavra sent his first complaint email to termination—to be the correct measure, there is still an inference of causation. Indeed, this Court has already "found a month short enough to

reinforce an inference of retaliation." *Magyar*, 544 F.3d at 772 (citing *Lang v. Ill. Dep't of Children & Family Servs.*, 361 F.3d 416, 419–20 (7th Cir. 2004); *see also Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 793 (7th Cir. 2007) (holding that an adverse action that "followed closely" one month after a discrimination complaint can raise an inference of causation for a jury)*; Rowlands v. UPS*, 901 F.3d 792, 802 (7th Cir. 2018) (finding that one-month interval plus evidence of pretext supported inference of causation); *Coleman v. Donahoe*, 667 F.3d 835, 861 (7th Cir. 2012) (same). In the context of this case, thirty days makes sense as a sufficient amount of time for higher-ups at Honeywell to read Vavra's complaints and decide to terminate him because of them. Katie Becker testified that she communicated Vavra's complaints "up the flagpole" at Honeywell, a large, global corporation. ECF 43-7, Ex. G p. 13; Becker Dep. at p. 43:15–16. If the Court were to only accept short delay periods of a couple of days, plaintiffs at small companies would have a huge advantage in Title VII cases over those at large companies, like Vavra, where decisions may naturally take longer. Retaliation takes time when Vavra's complaint has to first makes it way "up the flagpole."

Additionally, it is apparent in the context of this case that Vavra's email marked a *change* in how Honeywell responded to Vavra's noncompliance with the training. The training was due on February 25. After the deadline, Vavra received daily automated emails to complete the training and a few emails from his supervisor, Cortez,

and his HR representative, Becker. None of these emails contained any threats of termination or remarks that a failure to complete it would count as insubordination. It was not until *after* Vavra sent his email complaint that he had his first Teams meeting with an employee at Honeywell for not completing the training. ECF 43, p. 17; SOF ¶ 32. And it was during that call with Chris Maines, Vice President of Engineering, that Vavra was first threatened with insubordination for not completing the training. *Id.*

Finally, Becker and Cortez scheduled Vavra's termination call in direct response to his request for an update on his discrimination claim. ECF 43, p. 19–20; SOF ¶¶ 40–42. Instead of responding to his email with a message that the training was still required and that a failure to complete would result in termination, Honeywell remained silent for over a week until the scheduled call occurred. If the company's sole interest was in having Vavra complete the training, it seems likely that it would have told him a termination was coming if he continued to refuse. A company interested in punishing an employee for making a discrimination complaint, on the other hand, would likely stop trying to gain compliance. That is exactly what happened in this case: Becker promised to discuss the situation and instead surprised Vavra with no discussion and only termination. Properly considered in context, *Loudermilk*, 636 F.3d at 315, being terminated only eight days after asking about a discrimination complaint at a large company supports an inference of causation.

### B.    Honeywell departed from its own policy by refusing to investigate, or even discuss, Vavra's discrimination complaint.

Plus, there is more. In addition to suspicious timing, there is evidence that Honeywell "depart[ed] from established procedures." *Kidwell*, 679 F.3d at 966. So even if the short turnaround time between Vavra's complaint and termination is insufficient to give rise to an inference of causation, the combination of the two certainly creates an issue of fact regarding discriminatory intent. *See id.*

Honeywell's policy for discrimination complaints is short, but broad. First, the Code of Business Conduct states that "If you know or suspect that unlawful or inappropriate discrimination or harassment has occurred, you should report the situation immediately via one of the channels described in 'Asking for Advice and Voicing Concerns.'" ECF 43-2, Ex. B p. 18. Those channels include "Your Human Resources representative" and "Your manager or supervisor." *Id.* at 15. Vavra hit both by emailing Becker, his HR representative, and his supervisor Jeff Cortez. Honeywell's policy then promises to "promptly and thoroughly" investigate *all* complaints. *Id.* at 16.

There is no evidence that Honeywell did anything of the sort. Instead, Honeywell responded to Vavra's first email acknowledging receipt of the complaint and a promise to "review and get back to you." ECF 43, p. 16–17; SOF ¶ 30. But Honeywell never got back to Vavra. Instead, Honeywell employees continued to make clear that the company was not taking Vavra's complaint seriously. First, Vavra continued to

receive daily email reminders to complete the training. Next, Vavra's direct supervisor, Cortez, only "glanced through" the complaint email and only "read the first page." ECF 43-4, Ex. D p. 25; Cortez Dep. at p. 37:12–20. And Vice President of Engineering Chris Maines, who Vavra also forwarded his complaint to, told Vavra that the training was "just another check box of things to do." ECF 43, p. 17; SOF ¶ 32. Given that HR understood Vavra to have made an official complaint that "he considered the unconscious bias training to be racist," describing the training as a mere box to check indicates that Honeywell did not investigate the complaint. ECF 43-7, Ex. G p. 13; Becker Dep. at p. 43:13–14. Point being, the district court was factually wrong when it concluded that Vavra had "multiple conversations . . . with his supervisors." App. 19. There were certainly conversations where Honeywell pushed Vavra to take the training. But not a single conversation in the record actually concerned the merits of Vavra's complaint.

Honeywell's only answer to these facts is the empty assertion that it "undertook a prompt investigation and made an appropriate remedial response." ECF 14, p. 21; Defendant's Answer ¶ 6. If there was an investigation, no one actually working at Honeywell seems to know anything about it. HR Director Becker indicated that she was unconcerned about Vavra's complaint and never even reached out to talk to him about it. ECF 43-7, Ex. G p. 13–14; Becker Dep. at p. 43, 45. Even more tellingly,

*no* remedial response was ever issued. The most basic and minimal procedure of *responding* to a discrimination complaint is issuing a *response*.

The district court, for its part, claimed that there was "no deviation by Defendant from any established policy that led to his termination." App. 18. This assertion entirely ignored Honeywell's stated policy that it will investigate *all* complaints "promptly and thoroughly." Appellant does not argue that Honeywell must complete a certain type of investigation or send it to a certain supervisor. Instead, Vavra merely seeks to hold Honeywell to the standard it set for itself in its *own* policy. A "prompt[] and thorough[]" investigation means *some* investigation must take place. And a "remedial response" means that some response must actually be issued. To conclude that Honeywell met this low bar is contrary to Rule 56 because it fails to "construe the evidence and make all reasonable inferences" in Vavra's favor. *Hutchinson v. Fiztgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021 (7th Cir. 2018).

## C. Honeywell's motive for terminating Vavra is still in dispute, and that factual dispute means summary judgment is inappropriate.

The combination of suspicious timing and Honeywell's decision to entirely ignore Vavra's complaint, in violation of its own policy, gives rise to an inference that Vavra's email "was at least a motivating factor" for Vavra's termination. *Kidwell*, 679 F.3d at 965. With the evidence properly construed in Vavra's favor, the burden now shifts to Honeywell to rebut the inference of discrimination. *Id.* Summary judgment is inappropriate when "there is material issue of fact as to whether the

employer's non-invidious reason is pretext for retaliation." *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 559 (7th Cir. 2004).

Here, the material factual dispute is found in the fact that the claimed reason for Vavra's termination—his refusal to take the training—is the same as his objection to it. It is impossible at this stage for the Court to determine motivation or allocate responsibility. As this Court has explained, "[e]mployers cannot retaliate against employees who complain about violations of Title VII under the ruse that the employee was being 'disloyal' or 'insubordinate' by opposing the unlawful activity." *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 569 (7th Cir. 2015). The district court disregarded this clear statement of law by claiming that "there is no evidence that any decisionmaker viewed Plaintiff's complaints to HR as an act of 'disloyalty' or insubordination." App. 20. This conclusion misses the connection between Vavra's complaints and his refusal to take the training—it is an inference strongly in Honeywell's favor, which is improper under Rule 56.

And that connection is key to understanding why this case must go to a jury. The only way to determine if Vavra was fired for an illegal reason—in reaction to his email—or a supposedly lawful one—for not completing a mandatory training—is to determine Honeywell's intent. Did Honeywell intend to fire Vavra for not taking the training or for his complaints about the very same training? An issue of intent is inappropriate for summary judgment. *See Kasten v. Saint-Gobain Performance*

*Plastics Corp.*, 703 F.3d 966, 974 (7th Cir. 2012); *Stumph*, 770 F.2d at 97 ("Summary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles."). That means it is up to a jury to weigh the credibility of Honeywell's proffered reason.

There is also reason to doubt Honeywell's assertion that it terminated Vavra only because of his refusal to complete the training. First, despite Honeywell's claim that it is absolutely certain of why Vavra was terminated, no one seems to remember who decided to terminate him. ECF 43-7, Ex. G p. 11; Becker Dep. at p. 33:10–15. Further, the timing supports Vavra's theory. The training was "due" in February, but Vavra was not fired until April, closely following his complaints to HR. Before Vavra sent his complaint, he continued to receive daily automated emails to complete the training. It was not until after his email complaint was sent that the issue was escalated to a Teams call with a threat of discipline. This timing supports the inference that it was his complaint, not the refusal to take the training itself, that pushed Honeywell's decision to terminate. In other words, it was the complaint that pushed Honeywell's decision to fire Vavra over the top. *See Carlson v. CSX Trans., Inc.*, 758 F.3d 819, 828 n.1 (7th Cir. 2014) ("The requirement of but-for causation in retaliation claims does not mean that the protected activity must have been the only cause of the adverse action. Rather, it means that the adverse action would not have happened without the activity."). A reasonable juror could easily conclude that

Vavra would still be working at Honeywell to this day if it was not for his protected activity.

### III. In the Alternative, Vavra's Objection to the Implicit Bias Training Was Protected Activity Under the Act, and He Was Terminated Because of It.

If the Court agrees with Honeywell that Vavra was terminated because of his refusal to take the training, then Vavra still prevails in this appeal. The reason why is simple: Vavra engaged in protected activity by refusing to take the Unconscious Bias Training. This Court need not find that the training itself was in fact unlawful, rather Vavra need only have had "a sincere and *reasonable* belief that he [was] opposing an unlawful practice" in refusing to complete it. *Lord*, 839 F.3d at 563 (quoting *Hammer v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 704 (7th Cir. 2000)).

### A. Vavra had a good-faith belief that the training was unlawful.

The evidence clearly shows that Vavra had a "subjective (sincere, good faith) belief that he opposed an unlawful practice" in refusing to take the training. *Logan v. City of Chicago*, 4 F.4th 529, 538 (7th Cir. 2021) (quoting *Scheidler v. Indiana*, 914 F.3d 535, 542 (7th Cir. 2019)). Honeywell itself must agree; its own policy states that "[m]aking a report in 'good faith' means your report is honest, sincere, and complete." ECF 43, p. 3; SOF ¶ 6. And "Honeywell did not question whether Vavra made his objections to the Training in 'good faith.'" ECF 42, p. 7; Def.'s Mem. for Summ. J. at

p. 7. As Vavra's initial complaint email read, he had a good-faith belief that John Waldron's email and the Unconscious Bias Training was a method of "making it clear to all of our non-white colleagues who the bad people are . . . all of us whit[e] folks of course." ECF 43, p. 15; SOF ¶ 29. Similarly, Vavra stated in deposition that he thought the training would serve to "make [him] feel guilty for the color of [his] skin, that it was going to make people of color feel like victims for the color of their skin." ECF 43, p. 18; SOF ¶ 34. In other words, the goal was to vilify an entire race of people: an unlawful practice under Title VII.

In his first follow-up email to Chris Maines, Vavra was explicit again: "I found John Waldron's 9/24 [email] incredibility offensive, discriminatory and racist and I don't want to 'trained' to be someone like that." ECF 43, p. 18–19; SOF ¶ 38. His email went further and cited Title VII: "I think a more valuable training than 'Unconscious Bias' would be training on Title VII of the Civil Rights Act." ECF 43-12, Ex. L p. 8. In concluding, Vavra stated that both of his emails should be considered "an 'official' discrimination claim." *Id.* at 10–11.

The district court failed to appreciate any of Vavra's statements as evidence of his subjective intent. To be sure, Vavra certainly indicated that he thought the training would be ineffective, as the district court pointed out. App. 15. But these statements do not undercut his obvious belief that the training warranted an official discrimination claim. No one files such a complaint for an "ineffective" or

"unwarranted" training as the district court seemed to think. And it would be unreasonable to expect Vavra to complete a training he believed to be racist and discriminatory in order to properly object to it. To conclude otherwise would be to force employees to subject themselves to all sorts of unlawful treatment just to finally be able to complain about it later.

### B. Vavra's sincere belief that the training was unlawful under Title VII was also objectively reasonable.

A complaint is reasonable when it "involve[s] discrimination that is prohibited by Title VII.'" *Logan*, 4 F.4th at 538 (quoting *Scheidler*, 914 F.3d at 542). That means the court must look to "whether the complained-of-conduct entailed a motive that Title VII prohibits." *Id.* (quoting *Lord*, 839 F.3d at 563 (7th Cir. 2016)). In other words, Vavra's objection to the training was reasonable if it "falls into the category of conduct prohibited by the statute." *Id.* (quoting *Lord*, 839 F.3d at 563).

The district court, on the other hand, asked the wrong question. The court plainly stated that "[t]here is no evidence that the Training, or Defendant's requirement to complete the Training, constituted an unlawful employment practice proscribed by Title VII." App. 16. "But it is good faith and reasonableness, not the fact of discrimination, that is the critical inquiry in a retaliation case." *Rucker v. Higher Educ. Aids Bd.*, 669 F.2d 1179, 1182 (7th Cir. 1982).

In conducting the correct analysis, it becomes clear that Vavra was objecting to "the type of activity that, under some circumstances, supports a charge of" racial

discrimination, *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1315 (7th Cir. 1989), i.e., the "[d]iscriminatory preference for *any* [racial] group, *minority* or *majority*," *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 279 (1976) (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)); *see also* EEOC, *Questions and Answers about Race and Color Discrimination in Employment*, (April 19, 2006), https://www.eeoc.gov/laws/guidance/questions-and-answers-about-race-and-color-discrimination-employment ("Title VII prohibits race and color discrimination in every aspect of employment, including . . . training . . . and any other term, condition, or privilege of employment.").

In other cases, courts have held that diversity trainings can be the type of conduct supporting a valid Title VII claims. In *Hartman v. Pena*, 914 F. Supp. 225, 227 (N.D. Ill. 1995), a plaintiff sued after attending a cultural diversity workshop where male attendees "proceeded through a line of women while the women may have touched the men on the arm or may have given the man a 'little slap on the butt.'" The court denied summary judgment for the employer because the conduct in the program was "humiliating objectively" to the male attendees. *Id.* at 229–30. And in *Devine v. Pittsburg Board of Public Education*, No. 2:13-cv-220, 2015 U.S. Dist. LEXIS 74988, at *8 (W.D. PA June 10, 2015), the court denied summary judgment to a school district because a principal applied a different performance standard to teachers with "white privilege."

The district court focused on the fact that some different claims have failed on the merits. *See Norgren v. Minn. Dept. of Hum. Servs.*, No. 22-489, 2023 U.S. Dist. LEXIS 786, at *16–17 (D. Minn. Jan. 4, 2023), *appeal filed*, 8th Cir. Nos. 23-1207, 23-1208 (dismissing a retaliation claim concerning training); *Daza v. Indiana*, 331 F. Supp. 3d 810, 844 (N.D. Ind. 2018) (rejecting a race-discrimination claim because employer's requirement that plaintiff comply with certain policies was not motivated by racial animus). It is obvious that the plaintiffs in these cases had very different allegations than Vavra's. In *Norgren*, the plaintiff alleged retaliation after he "voiced dissent" to a diversity training, in addition to other employment practices. 2023 U.S. Dist. LEXIS 786, at *16–17. Besides one brief statement that requiring employees to attend diversity training "is not a discriminatory practice," there was no meaningful discussion in the court's opinion of whether a diversity training *could* violate Title VII. *See id.* The *Daza* plaintiff failed to exhaust his administrative remedies and failed to adequately allege adverse employment action. 331 F. Supp at 849–50.

Furthermore, the district court's assertion missed the point. The question is not whether the activity Vavra complained of was "independently actionable under Title VII." *Holland*, 883 F.2d at 1215. The Court must ask if Vavra's claim is of the type that could be actionable. And the fact that other courts have considered similar claims as racial discrimination demonstrates that Vavra's objection to the training was not "utterly baseless." *Id.* at 1316 (quoting *Rucker v. Higher Educ. Aids Bd.*, 669 F.2d

1179, 1182 (7th Cir. 1982)). The bottom line is that Vavra refused to take the training because he reasonably believed it was racially discriminatory. By purporting to fire him for not completing that same training, Honeywell committed retaliation in violation of Title VII.

## CONCLUSION

For the reasons set forth herein, Appellant Charles Vavra respectfully requests that this Court reverse the district court's grant of Appellee's motion for summary judgment and remand for further proceedings.

Dated:  November 30, 2023          */s/ James V. F. Dickey*

Alec J. Beck (MN #201133)
*Counsel of record*
**PARKER DANIELS KIBORT**
888 Colwell Building
123 North Third Street
Minneapolis, MN 55401
(612) 355-4119
beck@parkerdk.com

James V. F. Dickey (MN #393613)
**UPPER MIDWEST LAW CENTER**
8421 Wayzata Blvd., Suite 300
Golden Valley, Minnesota 55426
james.dickey@umlc.org
(612) 428-7000

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

1.  This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 9,241 words.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word Version 2310 in Times New Roman font, 14-point.

3.  The brief and appendix have been scanned for viruses and are virus free.

Dated:  November 30, 2023               */s/ James V. F. Dickey*

Alec J. Beck (MN #201133)
*Counsel of record*
**PARKER DANIELS KIBORT**
888 Colwell Building
123 North Third Street
Minneapolis, MN 55401
(612) 355-4119
beck@parkerdk.com

James V. F. Dickey (MN #393613)
**UPPER MIDWEST LAW CENTER**
8421 Wayzata Blvd., Suite 300
Golden Valley, Minnesota 55426
james.dickey@umlc.org
(612) 428-7000

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2023, I electronically filed the within brief and appendix with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service has been accomplished by the CM/ECF system.

Dated: November 30, 2023          */s/ James V. F. Dickey*

Alec J. Beck (MN #201133)
*Counsel of record*
**PARKER DANIELS KIBORT**
888 Colwell Building
123 North Third Street
Minneapolis, MN 55401
(612) 355-4119
beck@parkerdk.com

James V. F. Dickey (MN #393613)
**UPPER MIDWEST LAW CENTER**
8421 Wayzata Blvd., Suite 300
Golden Valley, Minnesota 55426
james.dickey@umlc.org
(612) 428-7000

*Attorneys for Plaintiff-Appellant*

# NO.  23-2823

# In the
# United States Court of Appeals
# for the Seventh Circuit

CHARLES VAVRA,

*Plaintiff-Appellant,*

v.

HONEYWELL INTERNATIONAL INC., A DELAWARE
CORPORATION D/B/A HONEYWELL INTELLIGRATED,

*Defendant-Appellee.*

Appeal from the United States District Court for the N.D. Ill.,
the Eastern Division, Case No. 1:21-cv-06847

## APPENDIX OF PLAINTIFF-APPELLANT
## CHARLES VAVRA

<div style="display:flex">

Alec J. Beck (#201133)
PARKER DANIELS KIBORT
888 Colwell Building
1213 North Third Street
Minneapolis, MN  55401
(612) 355-4119
beck@parkerdk.com

James V.F. Dickey (#393613)
UPPER MIDWEST LAW CENTER
8421 Wayzata Boulevard, Suite 300
Golden Valley, MN  55426
(612) 428-7000
James.dickey@umlc.org

</div>

*Attorneys for Plaintiff-Appellant*
*Charles Vavra*

# CERTIFICATION STATEMENT

Counsel certifies that all materials required by Circuit Rule 30(a) and (b) are in the appendix.

**UPPER MIDWEST LAW CENTER**

Dated:  November 30, 2023

 */s/ James V. F. Dickey*
Douglas P. Seaton (#127759)
James V. F. Dickey (#393613)
8421 Wayzata Blvd., Suite 300
Golden Valley, Minnesota 55426
doug.seaton@umlc.org
james.dickey@umlc.org
(612) 428-7000

*Attorneys for Appellants*

APPENDIX i

## TABLE OF CONTENTS

Certification Statement……..……………………………………………..i

Memorandum Opinion and Order of August 21, 2023 (ECF 53, p. 1–21)…………1

Judgment in a Civil Case of August 21, 2023 (ECF 55, p.1)…………………..22

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES VAVRA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21 C 6847 |
| | ) | |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| HONEYWELL INTERNATIONAL INC., | ) | |
| a Delaware corporation, d/b/a | ) | |
| HONEYWELL INTELLIGRATED, | ) | |
| | ) | |
| Defendant. | ) | |

### <u>MEMORANDUM OPINION AND ORDER</u>

Defendant Honeywell Intelligrated, Inc. ("Defendant" or "Honeywell") has moved for summary judgment on plaintiff Charles Vavra's ("Plaintiff") claims for retaliation and discrimination under the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/6-101(A), and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-3(a), and for wrongful termination. Plaintiff asserts that Defendant violated the IHRA and Title VII by terminating his employment because he stated his opposition to taking implicit bias training based on his conclusion that it was inherently racist. For the reasons that follow, Defendant's motion for summary judgment is granted.

### I.    BACKGROUND

Plaintiff, who is white, began working at Intelligrated in 2008 as a Project Manager. (DSOF ¶¶ 9-10.)[1] Plaintiff became a Honeywell employee when it acquired Intelligrated in

---

[1] Defendant's Local Rule 56.1 Statement of Undisputed Material Facts (ECF No. 43) shall be referred to herein as "DSOF," while Plaintiff's Local Rule 56.1(b)(2) Response to Defendant's

2016. (*Id*. ¶ 9.) Honeywell integrated Intelligrated into Honeywell's Safety and Productivity

Solutions ("SPS") business unit, and it became known as Honeywell Intelligrated. (*Id*.) At that

time, Plaintiff held the position of Estimating Manager and reported to Todd Bryant. (*Id*. ¶ 10.)

Plaintiff knew his employment with Honeywell was at-will. (*Id*. ¶ 9.)

On September 24, 2020, John Waldron, SPS's President and CEO at the time, sent an e-

mail to all SPS employees, with the subject line "Continue to Fight for Social Justice." (*Id*. ¶ 12.)

The entirety of the e-mail states:

> Dear Friends and Colleagues,
>
> Yesterday's decision by the grand jury in Louisville, Kentucky not to indict the
> officers who killed Breonna Taylor is difficult for me to understand. I'm sure I
> don't have all the facts, and I'm struggling to process the many thoughts and
> emotions I have around this tragic situation. I can only imagine how our Black
> colleagues are feeling ... again. Each time these situations occur, they highlight how
> far we must go to create an equal and just society where all people have the same
> opportunities to succeed.
>
> Racial bias is real. Don't kid yourself. Each of us has unconscious bias within us.
> When these biases compound, they can evolve into institutional biases. Breaking
> out of this cycle is critically important for moving society forward. Breaking this
> cycle requires courage — the courage to discuss, the courage to admit our bias and
> to encourage and promote our differences, the courage to change.
>
> Words alone aren't sufficient. We must take tangible actions to make a difference.
> We have, and we will continue to do so. In SPS, we are committed to doubling our
> efforts on the agenda we have set forth previously which includes engaging our
> Employee Resource Groups (ERG) with another round of listening sessions, upping
> our game when hiring ensuring 100% of the time that the interview panel and
> candidates are diverse, and you can expect to hear of other actions we will be taking.
>
> Shortly after George Floyd's death, one of our Black colleagues reminded me that
> it was white people in America that freed the slaves and ultimately supported the
> civil rights movement and legislation of the 1960s. That time is upon us again —
> we, me included, must insist upon racial equality. We must demand it from
> ourselves. We must welcome dialogue about it. We must have zero tolerance for its
> absence.

---

Statement of Material Facts (ECF No. 45) shall be cited to herein as "Pl. Resp." Plaintiff did not
file a Local Rule 56.1(b)(3) statement of additional material facts.

APPENDIX 2

My hands and heart are open to each of our Black, Hispanic, Asian, and LGBTQ colleagues. I stand with you.

John

(*Id.*) Plaintiff believed the e-mail contained racist and discriminatory statements, but he did not voice those concerns to Mr. Bryant or anyone in Human Resources ("HR") at the time. (*Id.* ¶ 13.) Plaintiff testified that this email "is basically the basis of this whole lawsuit." (*Id.* Ex. A, 37:10-11; 37:33-38:2.)

In November 2020, Honeywell's Diversity, Equity and Inclusion office ("DEI") announced an Unconscious Bias Awareness training ("UBA Training" or "Training") initiative whereby employees were required to complete on-line training by February 25, 2021. (*Id.* ¶¶ 14-15.) On February 24, 2021, Louise Quilter-Wood, Honeywell's Vice President of HR and Communications, SPS, sent an e-mail to certain Honeywell employees, including Plaintiff, with the subject "TAKE ACTION TODAY: Unconscious Bias Awareness Training is Due Now." (*Id.* ¶ 15.) The e-mail stated: "You are receiving this message because you have not completed the Unconscious Bias Awareness training which is due Feb. 25, 2021. Please click the link at the bottom of this email and complete the training within the next 24 hours." (*Id.*) Beneath the directive to complete the training, the e-mail also contained the content of the original e-mail that announced the training:

> As part of our commitment to Inclusion and Diversity, Honeywell has launched Unconscious Bias Awareness training, which is required for all employees.* While it's human nature to have biases, we must strive to overcome them to create an environment that values everyone's perspectives — a workplace based on trust, respect, and open communication. This training aims to equip you with the insights and tools needed to help spot and challenge the ways biases prevent us from creating an inclusive environment. When we work to eliminate our implicit biases, we not only treat each other better, but we become a better company. Combating unconscious bias allows us to build a culture that supports better customer service, stronger business results, and a more engaged workforce. If you want to learn more

APPENDIX 3

about unconscious bias, watch this video on Removing Bias from Our Everyday
Decision Making. Please complete Unconscious Bias Awareness training by Feb.
25, 2021.

(*Id.*)

The UBA Training was mandatory for all Honeywell employees within the United States,

and the consequence of not taking it was termination. (*Id.* ¶¶ 17-18.) Plaintiff was aware that the

e-mail contained a link he could click that would open the UBA Training video, but he never

clicked on that link during his employment at Honeywell. (*Id.* ¶ 16.) Plaintiff did not, however,

immediately raise any concerns about the training to his supervisor or HR. (*Id.* ¶ 19.)

After failing to take the UBA Training in response to the original announcement, Plaintiff

received several reminders from DEI about it. (*Id.* ¶ 21.) When only five days remained to the

February 25 deadline, Plaintiff began to receive daily reminders. (*Id.*) Plaintiff missed the

deadline and thereafter continued to receive daily e-mail notifications indicating how many days

he was past due. (*Id.*) Plaintiff testified that he "had no plans" to take the UBA Training. (*Id.* ¶

20.)

In response to the original announcement, Plaintiff requested to no longer be a manager

because he "didn't want to push stuff like this on my reports, the unconscious bias training." (*Id.*

¶ 19.) Plaintiff did not share the reason for his request with Mr. Bryant, who referred Plaintiff to

a jobs portal to apply for an alternative position. (*Id.*) In February 2021, Plaintiff's position

changed to Principal Application Engineer, and he held that position for the remainder of his

employment. (*Id.* ¶ 9.) As Principal Application Engineer, Plaintiff directly reported to Jeffrey

Cortez, Manager of Concepting and Estimating. (*Id.*) Mr. Cortez, in turn, reported to Brian

Swinkola, who reported to Justin Lieb. (*Id.*) Plaintiff had told Mr. Cortez over a year prior that

Plaintiff wanted to get out of a management role. (*Id.* ¶ 19.)

APPENDIX 4

In addition to the automatic reminders, several individuals from Honeywell reached out to Plaintiff and asked him to complete the Training. In the morning of March 2, 2021, Mr. Cortez forwarded Plaintiff an email he had received the prior evening from DEI in which Mr. Cortez was asked to ensure that his direct reports who had not completed the UBA Training complete it. (*Id*. ¶ 22.) In forwarding the email, Mr. Cortez wrote to Plaintiff, "Chuck – know you are not a fan of this training module, however you are currently the only one who hasn't completed this training so would ask that you do this." (*Id*.) Sometime prior to the email, Plaintiff had had a conversation with Mr. Cortez regarding the UBA Training, although neither Plaintiff nor Mr. Cortez recall when the conversation occurred or what was said. (*Id*. ¶ 23.) Mr. Cortez does not recall Plaintiff saying he thought the UBA Training was racist; Mr. Cortez's understanding was that Plaintiff felt the company was "pushing in political correctness issues" and that Plaintiff did not think the company had a right to do that. (*Id*.)

A few hours later, Mr. Cortez forwarded an email chain to Plaintiff and wrote, "Chuck – as I thought would happen, getting additional pressure to get this training completed. Please get completed today and let me know when done." (DSOF ¶ 24.) Shortly thereafter, Plaintiff received an email from Mr. Swinkola forwarding the same email chain and asking Plaintiff to "please complete the Unconscious Bias training." (*Id*. ¶ 27.) Plaintiff never had a conversation with Mr. Swinkola about the Training either before or after that email.

Later that afternoon, Katie Becker, the HR Director supporting Intelligrated business, emailed an undisclosed list of individuals reminding them that the Training was due, asking the recipient(s) to complete it asap, and encouraging them to let her know if anyone had any issues in completing the training. (*Id*. ¶ 28.) Plaintiff replied to Ms. Becker's email that afternoon,

stating, "Yes, I do have issues completing this. I will be sending out an email shortly explaining

why." (*Id*. ¶ 28.)

On March 5, 2021, Ms. Becker emailed Plaintiff, informing him that the UBA Training

was required for all Honeywell employees, and asking him what barriers he was having in

completing the Training. (*Id*. ¶ 29.) On March 8, 2021, Plaintiff sent a seven-page email to Ms.

Becker, cc'ing Mr. Cortez and Mr. Swinkola, stating his objections line-by-line to Mr. Waldron's

September 24 email. (*Id*.) Among other things, Plaintiff stated,

> The reason I'm not taking [the UBA Training] is because it's absolutely ridiculous
> and it doesn't work. How do I know that? Because we have our own CEO to thank
> for proving to to [*sic*] all of us that it doesn't work. To be honest, if John Waldron's
> 9/24 email below hadn't preceded the training mandate a couple months earlier I
> probably would have just taken it… I'm going to explain in hopefully more than
> enough detail why I, and I'm sure so many others found his email so offensive.
>                                          ***
> Why is he only concerned with our BLACK colleagues feelings? I suppose it's
> possible that a couple of our black colleagues were somehow related to Breonna
> Taylor…but all of them? If they didn't know her personally why would they feel
> anything other than maybe some compassion for Breonna Taylor's grieving friends
> and family? As the CEO of a division of a global company, I'm sure there is no
> way he would ever suggest that all of his black colleagues should somehow feel
> like victims in the Breonna Taylor case just because she was black. I'm sure he
> would never suggest that his colleagues of other races should have no feelings about
> the Breonna Taylor incident because they're NOT black, right? Because that would
> be kind of…. oh, I don't know…racist and discriminatory?
>                                          ***
> What does racial bias have to do with a couple police officers accidentally killing
> Breonna Taylor after they were shot at first? Is he implying that Breonna Taylor's
> death was somehow racially motivated? Because it sure sounds like it. I would
> expect that from the liberal media because they love to find just the right story,
> sensationalize it 24/7 for weeks or months on end it [*sic*] to continue their "systemic
> racism" narrative, create riots, destroy businesses (even businesses of black
> owners) and destabilize cities. But our CEO? I wouldn't expect that from him.
>                                          ***
> With regards to courage I found the courage to admit to myself that the CEO of
> SPS was a race-baiter. It appeared he was gaslighting his non-white colleagues into
> believing he is some sort of angelic empath that has taken it upon himself to be the
> spokesperson and apologist for all of his white colleague's [*sic*] and their evil ways
> by implying that we all are somehow tied to the killings of Breonna Taylor and
> George Floyd.

<div align="center">6</div>

***

Everything has only gotten better since the 1960s until the globalist's [*sic*] and their socialist mouthpieces recently needed to INVENT a new "systemic racism" problem to push their agenda....again. Then there is their media.

***

Today and for the past decade or so the only time I ever witness "systemic racism" or "racial bias" is when I turn on my TV….or read emails like Waldron's.

***

My initial though[t], after reading where he says "Racial bias is real, don't kid yourself. Each of us has racial bias within us" was how dare he even suggest something like that. Says who, him? CNN? Xi Jinping? Klaus Schwab? 99% of some group of nameless psychologists that agree everyone has unconscious bias? Who? But after witnessing all of the lunacy taking place these days, nothing even surprises me anymore. Perhaps Mr. Waldron should take the red/yellow/green light training because to me, reading that email was bright red light. He didn't just cross a line, he did a cartwheel over it.

***

Their so-called "systemic racism" is just another manufactured crisis to keep people at odds with each other and "unconscious bias" training is the decades old joke of a solution to a problem that doesn't even exist to anywhere near the extent they make it out to.

***

[Mr. Waldron is] making his non-white colleagues all victims and turning his white colleagues, that had absolutely nothing to do with those two incidents into villains.

***

So let me make this perfectly clear, John Waldron nor anybody else gets to tell me I have unconscious bias.

***

If racial bias exists within some people, don't kid yourself. There is nothing unconscious about it. Just ask John Waldron. He made a "conscious" decision to race-bait all of his colleagues by suggesting the Breonna Taylor case was racially motivated. Some of his colleagues will actually buy that. People aren't inherently racist. It is learned. It is pushed into and absorbed in the heads of gullible victims that have had their trust betrayed by people in positions of power like greedy, self-serving politicians, the media and even CEOs of global corporations that are all working in concert towards a common "political" goal. I'm here to work. I'm not here for an indoctrination into John Waldron's mindset or his ideologies that he feels empowered to shove down our thoughts just because he's in a leadership position in this organization.

***

If someone has complained about any racist, misogynistic or homophobic behavior I'm associated with, only then would I consider taking the training. Until then, I have no intention of taking it.

***

The most disturbing…..and somewhat laughable observation I made in Mr. Waldron's email was the exclusion of an entire race of his colleagues that his heart

went out to. And I quote, "My hands and heart are open to each of our Black, Hispanic, Asian, and LGBTQ colleagues". … So why did John Waldron give a nod to the Hispanics and Asians, but not us white people? To hell with all of our feelings, right? … It may surprise Mr. Waldron that I, being white and all, had feelings about the Breonna Taylor case as well. It was tragic what happened to her.

\*\*\*

John Waldron's excluding and alienating an entire race of his colleagues was a passive aggressive way of making it clear to all of our non-white colleagues who the bad people are….all of us whit[e] folks of course.

\*\*\*

It seems a little counterintuitive to EXCLUDE an entire race of his colleagues "who his heart goes out to", especially when he's planning on following up with an "unconscious bias" training mandate…. That is being headed up by the "INCLUSION" and diversity group. That's where the irony and hypocrisy come in. It's laughable. You can't make shit up. But you know, maybe he's right. Maybe SOME of us DO have unconscious bias. If John Waldron does, I think it would be best for him to just deal with it himself on a personal level rather than project his racial biases or his "white guilt" onto his employees. To say that "each of us has unconscious bias within us" is reckless and irresponsible. That's a pretty broad brush stroke.

\*\*\*

To reiterate, I AM NOT taking this training because it's a joke, and I'll use John Waldron's email as proof of it. I refuse to take part in this ridiculous charade. I feel John Waldron owes ALL of his colleagues an apology for even perpetuating this nonsense. Do whatever it is you feel you have to do to deal with my non-compliance, but I can tell you this...I am not a sellout to myself, my integrity, my convictions or to the tens of millions of freedom-loving, Constitution-loving Americans of ALL races and genders in this country that feel the same way I do. If I am expected to agree with John Waldron's opinions on social and political issues, I feel I am being forced into having to re-evaluate my working relationship with Honeywell. I shouldn't be made to feel that way. If that's not the expectation, I'll get back to work and wait for my apology to arrive.

\*\*\*

He should keep his social and political opinions to himself.

(*Id*. ¶ 29 (internal ellipses original).)

Plaintiff testified that his email set out all the reasons for his objection to the Training and that he left nothing out. (*Id*. ¶ 30.) Ms. Becker replied to Plaintiff's email acknowledging receipt and indicating she "will review and get back with you." (*Id*.) Ms. Becker communicated Plaintiff's concerns to other individuals within HR. (*Id*.)

Plaintiff continued to receive automated daily reminders about the Training. (*Id*. ¶ 31.) On March 19, Chris Maines, Vice President of Engineering, held a Microsoft Teams meeting with Plaintiff. (*Id*. ¶ 32.) During the meeting, Mr. Maines tried to convince Plaintiff to take the Training and said it was "just another check box of things to do" and Plaintiff should not read too much into it. (*Id*. ¶ 32.) Plaintiff responded that he would think about it over the weekend and get back to him the following week. (*Id*.) Mr. Maines told Plaintiff that not taking the Training would be considered insubordination. (*Id*.) Plaintiff does not recall whether he told Mr. Maines that he felt the Training was racist or discriminatory. (*Id*.)

Mr. Cortez recalls seeing Plaintiff's March 8 email but did not read it closely beyond the first page and did not discuss it with anyone. (*Id*. ¶¶ 30, 33.) Once Mr. Cortez saw the email, however, he understood the basis for Plaintiff's complaints. (Pl. Resp. ¶ 33.) Mr. Cortez underwent the Training and considered it to be a relatively simple, as well as balanced, fairly diverse, and innocuous. (DSOF ¶ 35.) It took between 20-30 minutes and contained short, pre-recorded videos about various scenarios, with a quiz at the end. (*Id*.) Trainees were not asked to sign a document stating that they agreed with the contents. (*Id*.) Mr. Cortez explained to Plaintiff that he did not see anything racist about it and mentioned an example from the video where a white male was being subjected to bias, as the holder of the bias had assumed a woman would be more capable of doing a specific task. (*Id*. ¶ 33.)

After Plaintiff's meeting with Mr. Maines, he found an Implicit Association Test ("IAT") on a Harvard.edu website, which he took four times with inconsistent results about whether he had any implicit biases and against what groups. (*Id*. ¶ 34.) Plaintiff does not know if the UAB Training would have had employees take an IAT. (*Id*.) He believes "unconscious bias" and "implicit bias" are "similar," that "unconscious bias" is a made-up term, and that people's biases

are more conscious than unconscious. (*Id*.) Plaintiff did not know what the content of the

Training was but had his "thoughts" on it based on Mr. Waldron's email. (*Id*.) Plaintiff testified

that he thought "it was going to try to make [him] feel guilty for the color of [his] skin, that it

was going to make people of color feel like victims for the color of their skin." (*Id*.)

On March 23, Mr. Maines emailed Plaintiff and asked him if he had changed his mind

about the Training. (*Id*. ¶ 37.) Plaintiff replied that he was going to get back to Mr. Maines soon.

(*Id*.) The next day, Plaintiff forwarded to Ms. Becker another email he had sent to Mr. Maines on

March 23. (*Id*. ¶ 38.) That five-page email stated, among other things, that he "had a little more

to say about the matter to hopefully provide more detail as to why I am not going to take the

training." (*Id*.) He also stated, "Whatever the consequences are of that decision, I will accept."

(*Id*.) He then provided links to media coverage of a mass shooting at an Atlanta spa, where the

victims were Asian, that he represented were examples of "how the media and politicians

sensationalize and twist the facts of certain stories to push their agendas which ultimately lead to

things like 'Unconscious Bias' training." (*Id*.) He stated, "I refuse to take training that was

developed as a result of, or perhaps in concert with nothing but lies and manipulation by the

media and corrupt public servants that insist on perpetuating division." (*Id*.) Plaintiff further

stated, "I found John Waldron's 9/24 [email] incredibly offensive, discriminatory and racist and I

don't want to be 'trained' to be someone like that. His email was meant to be offensive as far as

I'm concerned." (*Id*.) At the end of his e-mail to Mr. Maines, Plaintiff stated, "I referenced John

Waldon's discriminatory remarks in his 9/24 email in my last letter to HR. I am referencing it

again today. I don't know what would be considered an 'official' discrimination claim, but both

should be considered as such. I am still expecting an apology from John Waldron. I would prefer

this to be the end of any further requests for me to take the training." (*Id*; *Id*. Ex. L at

10

VAVRA000232-33.) Plaintiff testified that he "believed" he included everything and that he

tried to be "as thorough as possible" in his March 8 and 23, 2021 e-mails regarding why he

thought Mr. Waldron's e-mail was "discriminatory and racist." (*Id*. ¶ 39; Pl. Resp. ¶ 39.)

On March 30, 2021, Plaintiff emailed Ms. Becker, sharing the link to a YouTube video in

which, he claimed, an individual "very eloquently explains why I have taken such a strong stance

on not taking the unconscious bias training." (DSOF ¶ 40.) Plaintiff also requested "an update as

to where things stand" and to "schedule some time to discuss." (*Id*.) Ms. Becker replied on April

1, stating that she would schedule a time the following week to discuss the situation. (*Id*.)

Mr. Cortez scheduled a Teams call with Plaintiff and Ms. Becker for April 7. (*Id*. ¶ 41.)

Before the meeting, Mr. Cortez asked Plaintiff, "Chuck, are you sure you won't take the

training?" (*Id*. ¶ 42.) Plaintiff responded that he would not. (*Id*.) During the meeting, Mr. Cortez

told Plaintiff that he had to take the Training or be terminated. (*Id*.) Plaintiff responded that he

needed to speak with his wife, who was in another room. (*Id*.) After speaking with his wife,

Plaintiff confirmed to Mr. Cortez that he would not take the Training. (*Id*.) Plaintiff was then

terminated for refusing to undergo the Training. (*Id*.) Ms. Becker walked Plaintiff through the

final steps of ending Plaintiff's employment. (*Id*.) No individual other than Plaintiff refused to

undergo the Training. (*Id*. ¶ 36.) Honeywell considered Plaintiff's termination to be a "voluntary

separation," and one where Plaintiff was choosing to quit. (*Id*. ¶ 43; Pl. Resp. ¶ 43.)

Later that same day, Plaintiff emailed Ms. Becker, stating in part, "I'm sorry that things

couldn't have worked out differently. I was hoping that a discrimination claim wouldn't have

ended with getting terminated, but it's a different country we're living in these days." (*Id*. ¶ 45.)

Plaintiff also responded to a coworker's email, stating in part, "I was hoping things would have

worked out differently but I'm not surprised how they did. My leaving wasn't voluntary. I was

fired for not complying with their 'Unconscious Bias' training mandate. I know to some that it

was just another checkbox of things to do but to me it was so much more to me. I feel very

strongly about this corporate 'wokeism' crap. I sent HR a very detailed email as to why I wasn't

taking the training, pointing out the hypocrisy and discrimination in John Waldron's 9/24 email."

(*Id*. ¶ 46.)

On April 8, 2022, Plaintiff sent Ms. Becker another e-mail, asking "Are you going to

send something stating the exact reason why I was fired, or will that come from Jeff Cortez?"

(*Id*. ¶ 47.) On April 11, Ms. Becker replied, "There is not additional information sent regarding

your termination. You will however receive all of the benefits information in the mail within the

next 7 - 10 days." (*Id*.) Honeywell typically did not send out written notices of any kind to state

the reasons for involuntary termination. (*Id*. ¶ 48.)

Defendant maintains a number of policies in its Code of Business Conduct (the "Code")

that applied to all employees at all relevant times. (*Id*. ¶ 4.) Plaintiff received and was aware of

the Code throughout his employment. (*Id*.) The Code expressly prohibits discrimination, stating

in part, "Our workplace is one that reflects the diversity of the communities in which we operate

and we are committed to providing employees with a workplace that is free from unlawful

discrimination, harassment, or personal behavior that is not conducive to a productive work

climate. This pledge applies to all phases of the employment relationship, including . . .

termination . . . and selection for training or related programs." (*Id*. ¶ 5.) The Code also prohibits

retaliation, stating in part, "It is important that you feel comfortable raising your questions and

concerns. Honeywell will not tolerate retaliation against you for making a good faith report of

actual or potential misconduct. Making a report in 'good faith' means your report is honest,

sincere, and complete to the best of your knowledge. If you feel an act of retaliation has

<div align="center">12</div>

occurred, you should report your concerns via one of the methods outlined in 'Ask for Advice and Voicing Concerns.'" (*Id*. ¶ 6.) Defendant offers employees multiple methods by which they can report concerns of perceived harassment, discrimination and/or retaliation, including an independent third-party 24-hour Helpline. (*Id*. ¶ 7.) During his employment, Plaintiff was aware of each of these policies. (*Id*. ¶ 8.)

Plaintiff filed this suit, asserting that Honeywell's decision to terminate Plaintiff because he opposed the Training based on his conclusion that it was inherently racist constituted retaliation and discrimination in violation of the IHRA and Title VII, as well as wrongful termination. In Plaintiff's response filings, he withdraws his wrongful termination claim and denies that he alleges race discrimination. Accordingly, to the extent Plaintiff's First Amended Complaint asserts claims for wrongful termination and race discrimination, those claims are dismissed. The Court discusses only Plaintiff's retaliation claim, which is also dismissed for the reasons stated below.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the action raises claims involving a United States statute. (DSOF ¶ 3.) The Court further has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. (*Id*.)

## II.  LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021 (7th Cir. 2018). Summary judgment is appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial."

*Celotex v. Catrett*, 477 U.S. 317, 322 (1986). In other words, failure to support any essential element of a claim renders all other facts immaterial. *Id.* at 323. "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997).

### III.    DISCUSSION

The parties agree that Plaintiff's IHRA retaliation claim is analyzed under the same framework as Plaintiff's Title VII retaliation claim. *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) ("Illinois courts apply the federal Title VII framework to IHRA claims."). The Court accordingly proceeds with its analysis under Title VII.

Title VII protects an employee from discrimination when "he has opposed any practice made an unlawful employment practice by this subchapter[.]" 42 U.S.C. § 2000e-3(a). "A retaliation claim requires proof that the plaintiff suffered an adverse employment action because of his statutorily protected activity; in other words, the plaintiff must prove that [1] he engaged in protected activity and [2] suffered an adverse employment action, and that [3] there is a causal link between the two." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). There is no dispute that Plaintiff's termination constitutes an adverse employment action. Rather, the parties' disagreement lies in the first and third elements. Defendant concedes that Plaintiff's complaint emails were protected activity, but the parties dispute whether Plaintiff's refusal to take the UBA Training was itself protected activity. Additionally, Defendant argues that Plaintiff fails to make a *prima facie* showing that engagement in a protected activity caused his

14

termination, and that even if he did, Defendant has presented unrebutted evidence of a non-invidious reason for Plaintiff's termination—refusal to undergo mandatory training.

### A.  Protected Activity

The Court first considers the nature of the protected activity at the heart of this case. "For the first element—a statutorily protected activity—'[t]he plaintiff must not only have a subjective (sincere, good faith) belief that he opposed an unlawful practice; his belief must also be objectively reasonable, which means that the complaint must involve discrimination that is prohibited by Title VII.'" *Logan v. City of Chicago*, 4 F.4th 529, 538 (7th Cir. 2021) (quoting *Scheidler v. Indiana*, 914 F.3d 535, 542 (7th Cir. 2019)). Opposition to an unlawful employment practice need not consist of a verbal or written communication; rather, "an employee can oppose unlawful employment practices by his or her conduct." *Collazo v. Bristol-Myers-Squibb Mfg.*, 617 F.3d 39, 46-47 (1st Cir. 2010) (citing *Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271, 277 (2009)). Plaintiff argues that his refusal to take the UBA Training itself was protected activity. As the argument goes, Plaintiff sincerely believed that the Training was racist and discriminatory, and so by refusing to take it he was "oppos[ing]" an "unlawful employment practice[.]" 42 U.S.C. § 2000e-3(a).

As an initial matter, it is far from clear from the undisputed facts that Plaintiff even subjectively believed that an unconscious bias training requirement was a racially discriminatory employment practice. He admits that he had no knowledge of the actual contents of the Training other than that it included an example of unconscious bias against a white man. His stated objections to the Training seemed to have more to do with his belief that the Training would be ineffective, unwarranted to the extent it was not directed at any misconduct among employees at the company, and counterproductive because it would prove divisive, than with a belief that the

15

Training itself was racist. But even if the Court assumes that the basis for his refusal to take the UBA Training was based on a subjective belief that the training was racially discriminatory, his belief was not objectively reasonable.

"The objective reasonableness of the plaintiff's belief is not assessed by examining whether the [employer's] conduct was persistent or severe enough to be unlawful, but merely whether it falls into the category of conduct prohibited by the statute." *Logan*, 4 F.4th at 538 (quoting *Lord*, 839 F.3d at 563) (cleaned up). "That assessment requires [the court] to ask whether the complained-of conduct entailed a motive that Title VII prohibits." *Id*. (quoting *Lord*, 839 F.3d at 563) (cleaned up). "Title VII protects people of all races, including white people, from race discrimination." *Runkel v. City of Springfield*, 51 F.4th 736, 742 (7th Cir. 2022) (citation omitted). Nonetheless, "[t]he complaint must involve discrimination that is prohibited by Title VII, and if a plaintiff opposed conduct that was not proscribed by Title VII, no matter how frequent or severe, then his sincere belief that he opposed an unlawful practice cannot be reasonable." *Logan*, 4 F.4th at 539 (quoting *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 707 (7th Cir. 2000), overruled on other grounds by *Hively v. Ivy Tech Cmty. Coll. of Indiana*, 853 F.3d 339 (7th Cir. 2017)) (cleaned up).

There is no evidence that the Training, or Defendant's requirement to complete the Training, constituted an unlawful employment practice proscribed by Title VII. The only evidence before the Court is that the Training video was vetted and approved by DEI and the Law Department in an attempt to promote an inclusive environment, and that all U.S. employees were required to watch it. Again, Plaintiff admits that he lacks knowledge of the content of the Training. Merely "being required to attend across-the-board diversity training is not a discriminatory practice under Title VII." *Norgren v. Minn. Dep't of Human Servs.*, No. CV 22-

16

489 ADM/TNL, 2023 WL 35903, at *7 (D. Minn. Jan. 4, 2023), *appeal docketed*, No. 23-1208

(8th Cir. Feb. 3, 2023); *see also Brennan v. City of Phila.*, 856 F. App'x 385, 387 (3d Cir. 2021);

*Daza v. State*, 331 F. Supp. 3d 810, 844 (S.D. Ind. 2018) ("Mr. Daza has not pointed to any

evidence that the Core4 Principles were racially discriminatory in any way, nor that requiring

him to comply – along with his fellow INDOT colleagues – with the Core4 Principles was

motivated by racial animus. While Mr. Daza may have disagreed with the Core4 Principles, this

disagreement is not evidence that he faced racial discrimination by being required to abide by

those principles."), *aff'd*, 941 F.3d 303 (7th Cir. 2019); *Bourgeois v. U.S. Coast Guard*, 151 F.

Supp. 3d 726, 739 (W.D. La. 2015) (requiring all employees to watch a cultural diversity training

video does not constitute an "adverse employment action").

In short, Plaintiff puts forth no evidence that the Training, or Defendant's requirement

that all U.S. employees take the Training, was racially discriminatory or motivated by racial

animus, and so it does not fall into any category of conduct prohibited by Title VII. Plaintiff's

belief that the Training was racially discriminatory, however sincere, was not objectively

reasonable and his refusal to take the Training cannot be considered protected activity under

Title VII.[2]

### B. Causation

Having determined that Plaintiff's only protected activity were his complaint emails—as

opposed to his refusal to complete the Training—the Court turns next to whether Plaintiff

presents sufficient evidence for a factfinder to conclude that Defendant terminated him for

---

[2] While the Court accepts Defendant's concession that Plaintiff's complaint emails, including his complaint about the Training, constitutes protected activity, it notes that an employee's complaint about something that is not proscribed by Title VII would not constitute protected activity for the same reasons explained above.

engaging in that protected activity. "A plaintiff demonstrates a causal connection by showing

that the defendant 'would not have taken the adverse action but for [his] protected activity.'"

*Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (quoting *Greengrass v. Int'l*

*Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015)) (internal punctuation omitted). Plaintiff

does not rely on direct evidence of unlawful animus, pointing instead to purportedly

"circumstantial evidence from which a jury may infer intentional discrimination." *Id*. (citation

omitted). "If a plaintiff can assemble from various scraps of circumstantial evidence enough to

allow the trier of fact to conclude that it is more likely than not that discrimination lay behind the

adverse action, then summary judgment for the defendant is not appropriate." *Id*. (citation

omitted) (cleaned up).

Plaintiff argues that the timing of his termination—one month after his first complaint

email and fifteen days after his second complaint email—together with Defendant's purported

departure from established policies in responding to Plaintiff's complaints supports an inference

of discriminatory intent. "An employer's unusual deviation from standard procedures can serve

as circumstantial evidence of discrimination." *Id*. at 664 (citing *Coleman v. Donahoe*, 667 F.3d

835, 858 (7th Cir. 2012)). So too can suspicious timing, although that alone is not enough. *Stone*

*v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). "[M]ere temporal

proximity between the filing of the charge of discrimination and the action alleged to have been

taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue."

*Id*. (listing cases).

Here, Plaintiff points to no deviation by Defendant from any established policy that led to

his termination. Defendant's Code prohibits discrimination and encourages employees to report

any unlawful or inappropriate discrimination or harassment to Defendant. It also prohibits

retaliation for making a good faith complaint of discrimination. Plaintiff points to no policy

requiring a specific type of investigation. He points to no evidence that the review undertaken of

Plaintiff's emails by HR and the legal department, and the multiple conversations Plaintiff had

with his superiors, were insufficient under any of Defendant's policies. Plaintiff points to no

internal policy requiring Defendant to report the results of its investigation to Plaintiff in any

particular manner. Plaintiff does not even present evidence or argument of who made the

decision to terminate Plaintiff's employment; the only evidence before the Court is that the

decision was not made by either Mr. Cortez or Ms. Becker. *See Xiong v. Bd. of Regents of Univ.

of Wis. Sys.*, 62 F.4th 350, 356 (7th Cir. 2023) ("[F]uture litigation on the retaliation claim should

focus on what motivated Fletcher, *as the ultimate decision maker for the adverse action*, to make

the contingent decision to terminate Xiong on March 7." (emphasis added)); *Hiatt v. Rockwell

Int'l Corp.*, 26 F.3d 761, 769 (7th Cir. 1994) ("Hiatt has therefore failed to show *that those in

charge of his actual discharge* possessed an impermissible ulterior motive." (emphasis added)).

Plaintiff points to no evidence that it was his complaint of discrimination that motivated

the termination decision. Rather, the evidence shows that Defendant followed its company

policies when it required the UBA Training for all U.S. employees to promote diversity and

inclusion and terminated Plaintiff's employment for failing to complete it. *See Overly v.

KeyBank Nat. Ass'n*, 662 F.3d 856, 863 (7th Cir. 2011). "This Court does not sit as a super-

personnel department that reexamines an entity's business decisions," *Dale v. Chi. Tribune Co.*,

797 F.2d 458, 464 (7th Cir. 1986) (citations omitted), and there is no evidence before the Court

that would permit it to second-guess Defendant's mandatory training requirements where there is

no evidence in the record that the Training was racist or discriminatory. *Supra*. Plaintiff is left

APPENDIX 19

only with only his claim of suspicious timing, which even he concedes is insufficient on its own to create a triable issue.

At the summary judgment stage, a party cannot rely on allegations; he must put forth evidence. Fed. R. Civ. P. 56(c)(1)(A). "As the 'put up or shut up' moment in a lawsuit,' summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). Plaintiff's arguments regarding witness credibility are unsupported by any evidence whatsoever. Plaintiff fails to put forth sufficient evidence that there is a triable fact as to whether any protected activity caused his termination.

Finally, Plaintiff's reliance upon *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 569 (7th Cir. 2015) for the proposition that "[e]mployers cannot retaliate against employees who complain about violations of Title VII under the ruse that the employee was being 'disloyal' or 'insubordinate' by opposing the unlawful activity" is unavailing. The court made that statement in dicta in reference to a superior's comment that her staff should not go "running off to HR," and another's comment that people who "went to HR no longer work here," which comments the court found did not show evidence of retaliation. *Id*. In any event, here there is no evidence that any decisionmaker viewed Plaintiff's complaints to HR as an act of "disloyalty" or insubordination.

There is no genuine dispute of material fact in this case because plaintiff has not come forward with sufficient evidence to permit a factfinder to conclude that Plaintiff would not have been terminated but for his discrimination complaints. Accordingly, Defendant's motion for summary judgment is granted.

**IV.    CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment [41] is granted. Civil

case terminated.


**SO ORDERED.**                                        **ENTERED: August 21, 2023**

                                        _____

                                        **HON. JORGE ALONSO**
                                        **United States District Judge**

ILND 450 (Rev. 04/29/2016) Judgment in a Civil Action

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Charles Vavra

Plaintiff(s),

v.

Honeywell Intelligrated, Inc. et al,

Defendant(s).

Case No. 21 C 6847

Judge Jorge L. Alonso

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐ in favor of plaintiff(s)
and against defendant(s)
in the amount of $

which ☐ includes      pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☑ in favor of defendant(s)  Honeywell Intelligrated Inc., Honeywell International Inc.
and against plaintiff(s) Charles Vavra

Defendant(s) shall recover costs from plaintiff(s).

---

☐ other:

---

This action was *(check one)*:

☐ tried by a jury with Judge                          presiding, and the jury has rendered a verdict.
☐ tried by Judge                      without a jury and the above decision was reached.
☑ decided by Judge  Jorge L. Alonso                  on a motion for summary judgment.

Date: 8/21/2023                Thomas G. Bruton, Clerk of Court

Lesley Fairley                    , Deputy Clerk    APPENDIX 22