No. 23-2823

United States Court of Appeals
For The Seventh Circuit

CHARLES VAVRA,                                )
                                             )
            Plaintiff-Appellant,              )
                                             )
      v.                                      )
                                             )
HONEYWELL INTERNATIONAL, INC.,                )
                                             )
            Defendant-Appellee.               )

**Appeal From The United States District Court**
**For the Northern District of Illinois,**
**Case No. 21-cv-06847**
**The Honorable Jorge L. Alonso**

_____

**BRIEF OF DEFENDANT-APPELLEE**
**HONEYWELL INTERNATIONAL INC.**

_____

OGLETREE, DEAKINS, NASH,
   SMOAK & STEWART, P.C.
Jennifer L. Colvin (#6274731)
Sam Sedaei (#6317657)
Attorneys for Defendant-Appellee
   HONEYWELL INTERNATIONAL INC.

155 North Wacker Drive, Suite 4300
Chicago, Illinois 60603-1891
Phone: (312) 558-1220
Fax: (312) 807-3619
jennifer.colvin@ogletreedeakins.com
sam.sedaei@ogletreedeakins.com

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No.: 23-2823

Short Caption: ***Vavra v. Honeywell***

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

**Honeywell International Inc, incorrectly identified as "Honeywell International, Inc." by Plaintiff-Appellant.**

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

**Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**

(3)    If the party or amicus is a corporation:

i)      Identify all its parent corporations, if any; and

**Honeywell International Inc. states that it has no parent corporation, and no publicly held corporation owns 10% or more of its stock.**

ii)     list any publicly held company that owns 10% or more of the party's or amicus' stock:

---

Attorney's Signature:        /s/ Jennifer L. Colvin        Date: 01/30/2024

Attorney's Printed Name:        **Jennifer L. Colvin**

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes**

Address:        **Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**
                155 North Wacker Drive, Suite 4300
                Chicago, Illinois 60606

Phone Number:        **312-558-1234**        Fax Number:        **312-807-3619**
E-Mail Address:        **jennifer.colvin@ogletreedeakins.com**

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No.: 23-2823

Short Caption: ***Vavra v. Honeywell***

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   **Honeywell International Inc.**

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   **Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**

(3)   If the party or amicus is a corporation:

   i)      Identify all its parent corporations, if any; and

      **Honeywell International Inc. states that it has no parent corporation, and no publicly held corporation owns 10% or more of its stock.**

   ii)     list any publicly held company that owns 10% or more of the party's or amicus' stock:

---

Attorney's Signature:          /s/ Sam Sedaei          Date: 01/30/2024

Attorney's Printed Name:      **Sam Sedaei**

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **No**

Address:   **Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**
         155 North Wacker Drive, Suite 4300
         Chicago, Illinois 60606

Phone Number:   **312-558-3024**          Fax Number:   **312-807-3619**

E-Mail Address:   **sam.sedaei@ogletreedeakins.com**

# TABLE OF CONTENTS

STATEMENT CONCERNING ORAL ARGUMENT ........................................ 1

JURISDICTIONAL STATEMENT ................................................................ 1

Appellant's jurisdictional statement is complete and correct. ...................... 1

STATEMENT OF THE ISSUES ................................................................... 1

STATEMENT OF THE CASE ...................................................................... 1

I.    **Statement of Facts** ...................................................................... 1

    *A.  Honeywell's Policies* ............................................................ *1*
    *B.  Vavra's Employment with Honeywell* ................................ *3*
        i.  Honeywell announces mandatory Unconscious Bias Awareness training ........................................................... 3
        ii.  Vavra fails to undergo mandatory Unconscious Bias Awareness training despite receiving numerous e-mail reminders and personal appeals by several individuals from Honeywell's leadership ................... 7
        iii. Vavra's employment is terminated after he refuses requests over multiple months to undergo mandatory Unconscious Bias Awareness training ......................................................... 20

PROCEDURAL HISTORY .......................................................................... 22

The Procedural History set forth in Appellant's Brief is accurate. ............... 22

SUMMARY OF THE ARGUMENT ............................................................... 22

STANDARD OF REVIEW .......................................................................... 24

ARGUMENT ........................................................................................... 24

I.    **The District Court Properly Found that Vavra's Failure to Undergo Training Was Not "Protected Activity"** .............................. 24

II.   **The District Court Properly Found that No Reasonable Jury Could Infer Causation Between Vavra's E-mails and His Termination** ........... 34

III.  **There Are No Disputes of Material Fact, and No Issues of Credibility on Which a Jury Should Weigh In** ........................................................................... 42

**CONCLUSION** .................................................................................................................. 46

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                          **Page(s)**

*Baines v. Walgreen Co.*,
   863 F.3d 656 (7th Cir. 2017)…………………………………………………………     25

*Beard v. Whitley County REMC*,
   840 F.2d 405 (7th Cir.1988)…………………………………………………………     43

*Bourgeois v. United States Coast Guard*,
   151 F. Supp. 3d 726 (W.D. La. 2015) ……………………….........................     29, 30,
                                                                                                                                                31

*Casna v. City of Loves Park*,
   574 F.3d 420 (7th Cir. 2009)…………………………………………………………     34

*Castro v. DeVry Univ., Inc.*,
   786 F.3d 559 (7th Cir. 2015)…………………………………………………………     44-45

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)……………………………………………………………………     24

*Cleveland v. Policy Mgmt. Sys. Corp.*,
   526 U.S. 795 (1999)……………………………………………………………………     24

*Corrugated Paper Prod., Inc. v. Longview Fibre Co.*,
   868 F.2d 908 (7th Cir. 1989)……………………………………………….............     43

*Culver v. Gorman & Co.*,
   416 F.3d 540 (7th Cir. 2005)…………………………………………………………     34

*Curl v. International Business Mach. Corp.*,
   517 F.2d 212 (5th Cir.1975)…………………………………………………………     44

*Daza v. State of Indiana*,
   331 F.Supp. 3d 810 (S.D. Ind. 2018)……………………………………………     28, 30,
                                                                                                                                               31

*Daza v. State of Indiana*,
   941 F.3d 303 (7th Cir. 2019) …………………………………………………………     34

*Devine v. Pittsburgh Bd. of Pub. Educ.*,
   No. 2:13-CV-220, 2015 WL 3646453 (W.D. Pa. June 10, 2015)……………….     32

*Dugan v. Smerwick Sewerage Co.*,
   142 F.3d 398 (7th Cir. 1998)………………………………………………..........     44

*Hartman v. Pena*,
   914 F. Supp. 225 (N.D. Ill. 1995)……………………………………….…..........     31

**Cases**                                                                 **Page(s)**

*Holland v. Jefferson Nat. Life Ins. Co.,*
    883 F.2d 1307 (7th Cir. 1989)……………………………………………………… 37

*Khungar v. Access Cmty. Health Network,*
    985 F.3d 565 (7th Cir. 2021)……………………………………………………… 24

*Kidwell v. Eisenhauer,*
    679 F.3d 957 (7th Cir. 2012)……………………………………………………… 34, 37

*Logan v. City of Chicago,*
    4 F.4th 529 (7th Cir. 2021)……………………………………………………… 27, 33

*Magyar v. Saint Joseph Reg'l Med. Ctr.,*
    544 F.3d 766 (7th Cir. 2008)……………………………………………………… 36

*McClendon v. Indiana Sugars, Inc.,*
    108 F.3d 789 (7th Cir. 1997)……………………………………………………… 37

*Morgan v. SVT, LLC,*
    724 F.3d 990 (7th Cir. 2013)……………………………………………………… 36

*Norgren v. Minnesota Dep't of Hum. Servs.,*
    No. CV 22-489 ADM/TNL, 2023 WL 35903 (D. Minn. Jan. 4, 2023)………… 29-31

*Perez v. Staples Contract & Commercial LLC,*
    31 F.4th 560 (7th Cir. 2022)……………………………………………………… 24

*Scheidler v. Indiana,*
    914 F.3d 535 (7th Cir. 2019)……………………………………………………… 25. 27

*Silk v. Bd. of Trustees, Moraine Valley Cmty. Coll.,*
    Dist. No. 524, 795 F.3d 698 (7th Cir. 2015)………………………………… 37

*Springer v. Durflinger,*
    518 F.3d 479 (7th Cir. 2008)……………………………………………………… 44

## **Statutes**                                                          **Page(s)**

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e……….….................. *passim*

## **Other Authorities**

Fed. R. App. P. 34(a)………………………………………………..…………………1

v

## STATEMENT CONCERNING ORAL ARGUMENT

Oral argument is not appropriate under Fed. R. App. P. 34(a) because the issues presented are straightforward and adequately presented in the briefs and record.

## JURISDICTIONAL STATEMENT

Appellant's jurisdictional statement is complete and correct.

## STATEMENT OF THE ISSUES

1.    Whether the District Court properly granted summary judgment on Appellant Charles Vavra's ("Appellant" or "Vavra") retaliation claim where Vavra failed to show that his refusal to undergo mandatory Unconscious Bias Awareness training was "protected activity," failed to show causation between his complaints about the aforementioned training and his termination, and failed to identify any genuine dispute over material facts or credibility issues.

## STATEMENT OF THE CASE

Vavra's Statement of the Case is not complete or correct.

## I.    Statement of Facts

### A.    Honeywell's Policies

Honeywell maintains a number of policies in its Code of Business Conduct ("Code") that applied to all employees at all relevant times. (R. 43 ¶4).[1] Vavra

---

[1] The District Court's opinion is cited to in the Plaintiff-Appellant's short appendix as "Appx. <pg. no.>" as well as to the docket entry in the record as "R. ___ <pg. no.>." Docket entries in the record are cited by document number as "R. <no.>". Exhibits to Honeywell's Rule 56.1 Statement of Undisputed Facts are cited as "Def. Ex. <no.>".

acknowledges receiving and being aware of Honeywell's Code throughout his employment. *Id.*

Honeywell specifically prohibits discrimination and its Code states:

> **Respecting Each Other and Promoting a Positive Workplace**
> Honeywell respects and values the diversity reflected in our various backgrounds, experiences, and ideas. Together, we provide an inclusive work environment that fosters respect for all coworkers, clients, and business partners. Our workplace is one that reflects the diversity of the communities in which we operate and we are committed to providing employees with a workplace that is free from unlawful discrimination, harassment, or personal behavior that is not conducive to a productive work climate. This pledge applies to all phases of the employment relationship, including hiring, promotion, demotion, transfer, discipline, layoff or termination, compensation, use of facilities, and selection for training or related programs.

(R. 43 ¶5).

Honeywell also prohibits retaliation and its Code states:

> **Honeywell Will Not Tolerate Retaliation**
> It is important that you feel comfortable raising your questions and concerns. Honeywell will not tolerate retaliation against you for making a good faith report of actual or potential misconduct. Making a report in "good faith" means your report is honest, sincere, and complete to the best of your knowledge. If you feel an act of retaliation has occurred, you should report your concerns via one of the methods outlined in "Ask for Advice and Voicing Concerns."

(R. 43 ¶6)

Honeywell offers employees multiple methods by which they can report concerns of perceived harassment, discrimination, and/or retaliation, including an

independent third-party 24-hour Helpline. (R. 43 ¶7). During his employment, Vavra was aware that Honeywell had non-discrimination and retaliation policies, as well as methods for reporting concerns. (R. 43 ¶8)

B.     Vavra's Employment with Honeywell

In or around 2016, Honeywell acquired Intelligrated, integrated it into Honeywell's Safety and Productivity Solutions ("SPS") business unit, and it became known as Honeywell Intelligrated. (R. 43 ¶9). Vavra began working at Intelligrated in 2008. *Id.* Vavra became a Honeywell employee when it acquired Intelligrated and he was credited with his 2008 service date. *Id.* Vavra knew his employment with Honeywell was at-will. *Id.*

Vavra's first position with Intelligrated was Project Manager, but he held the position of Estimating Manager at the time of the acquisition. (R. 43 ¶10). In or about February 2021, Vavra received the position of Principal Application Engineer and he held that position for the remainder of his employment. *Id.* In that position, he directly reported to Jeffrey Cortez, Manager of Concepting and Estimating. *Id.* Cortez reported to Brian Swinkola, and Swinkola reported to Justin Lieb. *Id.*

i.     Honeywell announces mandatory Unconscious Bias Awareness training

On September 24, 2020, John Waldron, SPS's President and CEO at the time, sent an e-mail to all SPS employees, with the subject line "Continue to Fight for Social Justice." (R. 43 ¶12). The entirety of the e-mail stated:

Dear Friends and Colleagues,

Yesterday's decision by the grand jury in Louisville, Kentucky not to indict the officers who killed Breonna

3

Taylor is difficult for me to understand. I'm sure I don't have all the facts, and I'm struggling to process the many thoughts and emotions I have around this tragic situation. I can only imagine how our Black colleagues are feeling ... again. Each time these situations occur, they highlight how far we must go to create an equal and just society where all people have the same opportunities to succeed.

Racial bias is real. Don't kid yourself. Each of us has unconscious bias within us. When these biases compound, they can evolve into institutional biases. Breaking out of this cycle is critically important for moving society forward. Breaking this cycle requires courage — the courage to discuss, the courage to admit our bias and to encourage and promote our differences, the courage to change.

Words alone aren't sufficient. We must take tangible actions to make a difference. We have, and we will continue to do so. In SPS, we are committed to doubling our efforts on the agenda we have set forth previously which includes engaging our Employee Resource Groups (ERG) with another round of listening sessions, upping our game when hiring ensuring 100% of the time that the interview panel and candidates are diverse, and you can expect to hear of other actions we will be taking.

Shortly after George Floyd's death, one of our Black colleagues reminded me that it was white people in America that freed the slaves and ultimately supported the civil rights movement and legislation of the 1960s. That time is upon us again — we, me included, must insist upon racial equality. We must demand it from ourselves. We must welcome dialogue about it. We must have zero tolerance for its absence.

My hands and heart are open to each of our Black, Hispanic, Asian, and LGBTQ colleagues. I stand with you.

John

*Id*. At the time Vavra received this e-mail, he was still an Estimating Manager, and

reported to Todd Bryant. (R. 43 ¶13). Vavra believed the e-mail contained racist and

4

discriminatory statements, but he did not voice those concerns to Bryant or anyone in Human Resources at that time. *Id*.

Vavra alleges that in November 2020, Honeywell's Diversity, Equity and Inclusion office announced an Unconscious Bias Awareness training ("UBA training" or "the training") initiative whereby employees were required to complete on-line training by February 25, 2021. (R. 43 ¶14). Vavra's First Amended Complaint alleges that the training was "Implicit Bias Training" and required employees to undergo training on the theory of implicit bias. *Id*.

On February 24, 2021, Louise Quilter-Wood, Honeywell's Vice President HR and Communications, SPS, sent an e-mail to certain Honeywell employees, including Vavra, with the Subject "TAKE ACTION TODAY: Unconscious Bias Awareness Training is Due Now." (R. 43 ¶15). The e-mail informed the recipient: "You are receiving this message because you have not completed the Unconscious Bias Awareness training which is due Feb. 25, 2021. Please click the link at the bottom of this email and complete the training within the next 24 hours." *Id*. Beneath the directive to complete the training, the e-mail also contained the content of the original e-mail that announced the training:

> As part of our commitment to Inclusion and Diversity, Honeywell has launched Unconscious Bias Awareness training, which is required for all employees.*
>
> While it's human nature to have biases, we must strive to overcome them to create an environment that values everyone's perspectives — a workplace based on trust, respect, and open communication. This training aims to equip you with the insights and tools needed to help spot

> and challenge the ways biases prevent us from creating an inclusive environment.
>
> When we work to eliminate our implicit biases, we not only treat each other better, but we become a better company. Combating unconscious bias allows us to build a culture that supports better customer service, stronger business results, and a more engaged workforce. If you want to learn more about unconscious bias, watch this video on Removing Bias from Our Everyday Decision Making.
>
> Please complete Unconscious Bias Awareness training by Feb. 25, 2021.

*Id*. Vavra believes that he received the original announcement of the training in November 2020. *Id*. Vavra is aware that the e-mail contained a link he could click that would open the UBA training video, but he never clicked on that link during his employment at Honeywell. (R. 43 ¶16).

At all relevant times, Katie Becker was the Human Resources Director supporting the Intelligrated business. (R. 43 ¶17). Becker's role in the UBA training was to help ensure that employees completed the training, which was mandatory. *Id*. Becker testified that the UBA training applied to all Honeywell employees within the United States. *Id*. The consequence of not taking the UBA training was termination. (R. 43 ¶18). An employee could not refuse to undergo, and the employee would not be relieved from completing, a mandatory training on any topic simply by saying he or she thought that the specific training was racist or discriminatory. *Id*.

ii.     Vavra fails to undergo mandatory Unconscious Bias Awareness training despite receiving numerous e-mail reminders and personal appeals by several individuals from Honeywell's leadership

When Vavra received notice of the UBA training in November 2020, he did not raise any concerns about the training to his supervisor or Human Resources. (R. 43 ¶19).

Vavra admits that he was late on taking trainings during his employment and eventually would complete them, but he "had no plans" to take the UBA training. (R. 43 ¶20). Whenever he was late for a training, Vavra would receive some sort of reminder about that training. *Id*. After failing to take the UBA training in response to the original announcement, Vavra received several reminders from Honeywell's Inclusion and Diversity team about it. (R. 43 ¶21). When only five days remained to the February 25 UBA training completion deadline, Vavra began to receive daily reminders about the training. *Id*. Vavra subsequently missed the deadline for taking the UBA training, and at that point, he continued to receive daily e-mail notifications indicating how many days he was past due on his training requirement. *Id*. On March 18, 2021, Vavra was 17 days past due in completing the UBA training and he received both a daily e-mail notification and a personalized email instructing him to "Please take the training asap." *Id*.

In addition to the automatic reminders, several individuals from Honeywell reached out to Vavra and asked him to complete the training. (R. 43 ¶22). On March 2, 2021, at 7:51 a.m., Cortez forwarded Vavra an email he had received the prior evening from Honeywell's Inclusion and Diversity in which Cortez was asked to

ensure that his direct reports who had not completed the UBA training complete it. *Id*. In forwarding the email, Cortez wrote to Vavra, "Chuck — know you are not a fan of this training module, however you are currently the only one who hasn't completed this training so would ask that you do this." *Id*.

Vavra believes Cortez commented about him not being a fan of the training because sometime prior to Cortez sending the email, Vavra had a conversation with Cortez during which Vavra expressed issues he had with the training. (R. 43 ¶23). However, neither Vavra nor Cortez recall when the conversation occurred or what was said during the conversation. *Id*. Cortez does not recall Vavra ever telling him that he thought the UBA training was racist. *Id*. Cortez's understanding was that Vavra felt the company was "pushing in political correctness issues" and that Vavra did not think the company had a right to do that. *Id*. At 10:11 a.m. on the same day, Cortez forwarded an e-mail chain to Vavra and wrote, "Chuck — as I thought would happen, getting additional pressure to get this training completed. Please get completed today and let me know when done." (R. 43 ¶24). Cortez was not threatened with any potential discipline for failing to get the people on his team to complete the training. *Id*.

Several e-mails were included in the chain below Cortez's e-mail to Vavra. The first e-mail was from Jennifer Carpenter, Vice President, Human Resources, to John Dillon, and provided a list of individuals in Dillon's organization who had yet to take the training, and requested Dillon to ask leaders under his supervision to ensure that all individuals completed the training. (R. 43 ¶25). The second e-mail was from Dillon

to his leaders, including Justin Leib, Director Applications / System Sales Engineering, forwarding Carpenter's email and asking them to address the training with their teams ASAP. *Id*. The third e-mail was from Justin Leib to several individuals, including Cortez and Swinkola, informing them that they had individuals on their teams who had not completed the training, stating, "I want it completed today, it should take less than 30 minutes." *Id*. Cortez explained at his deposition that whenever trainings are announced, "they get escalated pretty fast. They were very good at follow ups." (R. 43 ¶26).

On March 2, 2021 at 10:24 a.m., Vavra received an e-mail from Swinkola, which also forwarded the email chain Vavra received from Cortez at 10:11 a.m., and asked him to "please complete the Unconscious Bias training." (R. 43 ¶27). Vavra never had a conversation with Swinkola about the training, before or after the aforementioned e-mail. *Id*.

On March 2, 2021, at 12:16 p.m., Becker sent an e-mail to an undisclosed list of individual(s), reminding them that the training was due on February 28, 2021, asked recipient(s) to complete the training asap, and encouraged them to let her know if anyone had any issues in completing the training. (R. 43 ¶28). Vavra received this e-mail, and replied to it that afternoon, stating "Yes, I do have issues completing this. I will be sending out an email shortly explaining why." *Id*.

On March 5, 2021, Becker e-mailed Vavra, informing him that the UBA training was required for all Honeywell employees, and asked him what barriers he was having in completing the training. (R. 43 ¶29) On March 8, 2021, Vavra sent an

e-mail to Becker, carbon-copying Cortez and Swinkola (spanning 7 pages when printed), setting out his objections to Waldron's e-mail. *Id*. Among other things, Vavra made the following statements:

> …
>
> The reason I'm not taking [the UBA training] is because it's absolutely ridiculous and it doesn't work. How do I know that? Because we have our own CEO to thank for proving to to [sic] all of us that it doesn't work. To be honest, if John Waldron's 9/24 email below hadn't preceded the training mandate a couple months earlier I probably would have just taken it… I'm going to explain in hopefully more than enough detail why I, and I'm sure many others found his email so offensive.
>
> …
>
> After reading the first sentence in his email I asked myself, why on earth would John Waldron think any of his colleagues are even interested in hearing about his thoughts and feelings about the Breonna Taylor case? What does that have to do with work? Why would he even bring that into the workplace? Then I got to the second sentence where he said, and I quote, "I'm sure I don't have all the facts, and I'm struggling to process all of the thoughts and emotions I have around this tragic situation". At that point I thought to myself, if he doesn't have all the facts, why would he even continue on? Anything after that sentence is meaningless and invalidated, and I'm not sure about any of my other colleagues, but I'm not a shrink to help him sort out his thoughts and emotions about this tragic incident that affected him to the point he needed to share his views with all of his colleagues. THEN he's says, "I can only imagine how our black colleagues are feeling....again". Why would he say that? Why is he only concerned with our BLACK colleagues feelings? I suppose it's possible that a couple of our black colleagues were somehow related to Breonna Taylor...but all of them? If they didn't know her personally why would they feel anything other than maybe some compassion for Breonna Taylor's grieving friends and family? As the CEO of a

division of a global company, I'm sure there is no way he would ever suggest that all of his black colleagues should somehow feel like victims in the Breonna Taylor case just because she was black. I'm sure he would never suggest that his colleagues of other races should have no feelings about the Breonna Taylor incident because they're NOT black, right? Because that would be kind of....oh, I don't know...racist and discriminatory?

...

His next incongruous thought went on to talk about racial bias. Ok, now we're onto racial bias. Sure, why not? When you're on a roll, spitting out random thoughts that have nothing to do with each other, or anything work related, who stop now, right? What does racial bias have to do with a couple police officers accidentally killing Breonna Taylor after they were shot at first? Is he implying that Breonna Taylor's death was somehow racially motivated? Because it sure sounds like it. I would expect that from the liberal media because they love to find just the right story, sensationalize it 24/7 for weeks or months on end it to continue their "systemic racism" narrative, create riots, destroy businesses (even businesses of black owners) and destabilize cities. But our CEO? I wouldn't expect that from him.

Then he goes on to say "breaking out of this cycle is critically important to moving society forward. Breaking this cycle reqires courage". What cycle is that? The cycle of people like John Waldron and the mainstream media exploiting the deaths of black people to incite racial tensions? Is that what he means? If so, then I wholeheartedly agree with him. But something tells me that John Waldron knew exactly what he was doing by bringing up incendiary topics like Breonna Taylor and George Floyd deaths. So why would he bring this into our workplace?

...

With regards to courage I found the courage to admit to myself that the CEO of SPS was a race-baiter. It appeared he was gaslighting his non-white colleagues into believing

he is some sort of angelic empath that has taken it upon himself to be the spokesperson and apologist for all of his white colleague's and their evil ways by implying that we all are somehow tied to the killings of Breonna Taylor and George Floyd.

...

Everything has only gotten better since the 1960s until the globalist's and their socialist mouthpieces recently needed to INVENT a new "systemic racism" problem to push their agenda....again. Then there is their media.

...

Today and for the past decade or so the only time I ever witness "systemic racism" or "racial bias" is when I turn on my TV....or read emails like Waldron's. As a matter of fact, if the mainstream media would just shut up and John Waldron and others like him would quit sending out divisive emails, race relations would probably be better than ever. But we all know that things are going to get far worse and Waldron's email was just another brick in that road to hell.

...

My initial though, after reading where he says "Racial bias is real, Don't kid yourself. Each of us has racial bias within us" was how dare he even suggest something like that. Says who, him? CNN? Xi Jinping? Klaus Schwab? 99% of some group of nameless psychologists that agree everyone has unconscious bias? Who? But after witnessing all of the lunacy taking place these days, nothing even surprises me anymore. Perhaps Mr. Waldron should take the red/yellow/green light training because to me, reading that email was bright red light. He didn't just cross a line, he did a cartwheel over it.

...

Their so-called "systemic racism" is just another manufactured crisis to keep people at odds with each other

and "unconscious bias" training is the decades old joke of a solution to a problem that doesn't even exist to anywhere near the extent they make it out to.

…

Then they talk about it 24/7, non-stop and sensationalize stories like the George Floyd and Breonna Taylor incidents....and talk about THEM for months on end until the more easily manipulated people who aren't able to see through the bullshit actually start to believe there really is a problem. The media companies and the people that write their scripts know it.

…

You may have heard that Mr. Potato Head has recently gone gender neutral, the Coca-Cola polar bears are being told to stop being so white and Dr. Seuss books are now somehow racist and being pulled from Ebay and other distribution outlets. So what's next? If I like my coffee with cream, does that somehow make me a racist now? How much more insane can this get? This is exactly why emails like Waldron's are so dangerous because they just add fuel to the fire. He's making his non-white colleagues all victims and turning his white colleagues, that had absolutely nothing to do with those two incidents into villains.

…

So let me make this perfectly clear, John Waldron nor anybody else gets to tell me I have unconscious bias.

…

If racial bias exists within some people, don't kid yourself. There is nothing unconscious about it. Just ask John Waldron. He made a "conscious" decision to race-bait all of his colleagues by suggesting the Breonna Taylor case was racially motivated. Some of his colleagues will actually buy that. People aren't inherently racist. It is learned. It is pushed into and absorbed in the heads of gullible victims that have had their trust betrayed by people in positions of power like greedy, self-serving politicians, the media and

13

even CEOs of global corporations that are all working in concert towards a common "political" goal. I'm here to work. I'm not here for an indoctrination into John Waldron's mindset or his ideologies that he feels empowered to shove down our thoughts just because he's in a leadership position in this organization.

...

If someone has complained about any racist, misogynistic or homophobic behavior I'm associated with, only then would I consider taking the training. Until then, I have no intention of taking it.

...

The most disturbing…..and somewhat laughable observation I made in Mr. Waldron's email was the exclusion of an entire race of his colleagues that his heart went out to. And I quote, "My hands and heart are open to each of our Black, Hispanic, Asian, and LGBTQ colleagues". … So why did John Waldron give a nod to the Hispanics and Asians, but not us white people? To hell with all of our feelings, right? … It may surprise Mr. Waldron that I, being white and all, had feelings about the Breonna Taylor case as well.  It was tragic what happened to her. There is no doubt about that. What was even more tragic is how a certain political party and their media…and John Waldron himself shamelessly exploited their deaths to push their "systemic racism" lie. It's a textbook example of race-baiting. John Waldron would never say hist [sic] heart goes out to ALL of his colleagues for the same reason BLM would never say ALL lives matter. To them, if you've been paying attention, saying "all lives matter" is a cardinal sin and somehow racist. Wouldn't it make more sense to just say nothing at all and keep your opinions to yourself to prevent racial tensions in the workplace?

...

I remember a year or two ago taking "active shooter" training here at Honeywell. I thought it bizarre. I thought to myself, why would they even have this training? Now it's all beginning to make sense to me. Maybe it's because they

knew someone might stir the political pot enough to make something like that actually happen. It's no secret that the media started riots with their lies about the Breonna Taylor and George Floyd incidents. Why would John Waldron even think it would be ok to suggest that he killing was somehow racially motivated here at work?

...

John Waldron's excluding and alienating an entire race of his colleagues was a passive aggressive way of making it clear to all of our non-white colleagues who the bad people are....all of us whit folks of course.

...

It seems a little counterintuitive to EXCLUDE an entire race of his colleagues "who his heart goes out to", especially when he's planning on following up with an "unconscious bias" training mandate…. That is being headed up by the "INCLUSION" and diversity group. That's where the irony and hypocrisy come in. It's laughable. You can't make shit up. But you know, maybe he's right. Maybe SOME of us DO have unconscious bias. If John Waldron does, I think it would be best for him to just deal with it himself on a personal level rather than project his racial biases or his "white guilt" onto his employees.  To say that "each of us has unconscious bias within us" is reckless and irresponsible. That's a pretty broad brush stroke.

...

I couldn't care less how John Waldron feels about the Breonna Taylor or George Floyd cases or any other social or political issues he may feel compelled to share with us in the future....that have absolutely NOTHING to do with work.

...

My heart goes out to ALL of my colleagues. It goes out to my white colleagues, that had nothing to do with the Breonna Taylor incident, for being demonized by John Waldron's email through exclusion, and it goes out to the

> rest of my non-white colleagues, that had nothing to do with the Breonna Taylor incident for being made victims by John Waldron when may of them probably didn't want to be. I think he'd be surprised to know how may people of all races feel these so-called "social justice warriors" cause more damage to society than actual racists.
>
> …
>
> To reiterate, I AM NOT taking this training because it's a joke, and I'll use John Waldron's email as proof of it. I refuse to take part in this ridiculous charade. I feel John Waldron owes ALL of his colleagues an apology for even perpetuating this nonsense. Do whatever it is you feel you have to do to deal with my non-compliance, but I can tell you this...I am not a sellout to myself, my integrity, my convictions or to the tens of millions of freedom-loving, Constitution-loving Americans of ALL races and genders in this country that feel the same way I do. If I am expected to agree with John Waldron's opinions on social and political issues, I feel I am being forced into having to re-evaluate my working relationship with Honeywell.   I shouldn't be made to feel that way.   If that's not the expectation, I'll get back to work and wait for my apology to arrive.   … He should keep his social and political opinions to himself.

*Id*. According to Vavra, this e-mail set out all the reasons for his objection to the training and he left nothing out. (R. 43 ¶30). Prior to sending this email, Vavra had not expressed any objections to taking the training to the three recipients of his March 8, 2021 e-mail. *Id*. Becker replied to Vavra's March 8, 2021 e-mail, stating "I wanted to acknowledge that I have received your response on this, will review and get back with you." *Id*. Becker communicated Vavra's concerns to other individuals within Human Resources. *Id*. Cortez did not have a conversation with anyone about Vavra's e-mail. After Vavra sent his March 8 e-mail, he continued to receive automated daily reminders about the training. (R. 43 ¶31).

16

On March 19, 2021, Chris Maines, Vice President of Engineering had a Microsoft Teams meeting with Vavra. (R. 43 ¶32). According to Vavra, during the call, Maines told Vavra that the training was "just another check box of things to do", and he should not read too much into it. *Id*. Maines tried to convince Vavra to take the training. *Id*. Vavra told Maines he would think about it over the weekend and get back to him the following week. *Id*. Maines told Vavra that not taking the training would be considered insubordination. *Id*. Vavra does not recall whether he told Maines that he felt the training was racist or discriminatory. *Id*.

Cortez recalls seeing Vavra's March 8 e-mail, but did not read it closely beyond the first page. (R. 43 ¶33). He does not remember reading the portion of the e-mail that referenced "race-baiting" or "discrimination." *Id*. After Cortez underwent the training, he explained to Vavra that Cortez did not see anything racist about it. *Id*. Cortez even mentioned an example from the video to Vavra where a white male was being subjected to bias, as the holder of the bias had assumed a woman would be more capable of doing a specific task. *Id*. Cortez does not remember Vavra complaining that the training was "racist" and he believes that Vavra's issue was on political correctness. *Id*.

Vavra claims that after this meeting with Maines, he found an Implicit Association Test (IAT) on a Harvard.edu website, and he took the test four times with inconsistent results about whether he had any implicit biases, and against what groups. (R. 43 ¶34). Vavra does not know if Honeywell's training would have had employees take an IAT. *Id*. He believes "unconscious bias" and "implicit bias" are

"similar," that "unconscious bias" is a made-up term, and people's biases are more conscious than unconscious. *Id*. Vavra did not know what the content of Honeywell's training was, but had his "thoughts" on it based on Waldron's e-mail, and thought "it was going to try to make [him] feel guilty for the color of [his] skin, that it was going to make people of color feel like victims for the color of their skin." *Id*.

Cortez underwent the training, and considered it to be a relatively simple training. (R. 43 ¶35). The training was between 20-30 minutes long. It contained short, pre-recorded videos about various scenarios, with a quiz at the end. *Id*. Trainees were not asked to sign a document stating that they agreed with the contents of the training. *Id*. Cortez did not find the training offensive or racist, and found it pretty balanced, fairly diverse, and innocuous. *Id*. No individual other than Vavra refused to undergo the training. (R. 43 ¶36).

On March 23, 2021, Maines e-mailed Vavra and asked him if Vavra had changed his mind about the training. (R. 43 ¶37). Vavra replied that he was going to get back to Maines soon. *Id*. On March 24, 2021, Vavra forwarded to Becker another e-mail he had sent to Maines on March 23, 2021, along with a note stating "I just I [sic] should copy you on the email I sent to Chris Maines after our Teams meeting on Friday." (R. 43 ¶38). In that e-mail to Maines (spanning 5 pages when printed), Vavra stated that he "had a little more to say about the matter to hopefully provide more detail as to why I am not going to take the training." *Id*. He also stated, "Whatever the consequences are of that decision, I will accept." *Id*. Vavra then provided links to media coverage of a mass shooting at an Atlanta spa, where the victims were Asian,

that he represented were examples of "how the media and politicians sensationalize and twist the facts of certain stories to push their agendas which ultimately lead to things like 'Unconscious Bias' training." *Id*. Vavra stated, "I refuse to take training that was developed as a result of, or perhaps in concert with nothing but lies and manipulation by the media and corrupt public servants that insist on perpetuating division." *Id*. Vavra further stated, "I found John Waldron's 9/24 [e-mail] incredibly offensive, discriminatory and racist and I don't want to be 'trained' to be someone like that. His email was meant to be offensive as far as I'm concerned." *Id*. At the end of his e-mail to Maines, Vavra stated "I am still expecting an apology from John Waldron. I would prefer this to be the end of any further requests for me to take the training." *Id*. According to Vavra, he tried to be "as thorough as possible" in his March 8 and 23, 2021 e-mails regarding why he thought Waldron's e-mail was "discriminatory and racist." (R. 43 ¶39).

On March 30, 2021, Vavra e-mailed Becker, and shared the link to a YouTube video in which, he claimed, an individual "very eloquently explains why I have taken such a strong stance on not taking the unconscious bias training." (R. 43 ¶40). Vavra also stated:

> It has been three weeks since I sent my explanation on why I am refusing to take the training and I have not heard anything back since 3/8, other than daily requests to take the training up until last Tuesday, 3/23 after my conversation with Chris Maines. Can you please give me an update as to where things stand? Can we schedule some time to discuss? Please let me know.

*Id*. Becker replied to Vavra's e-mail on April 1, 2021, stating that she would schedule a time the following week to discuss the situation. *Id*.

   iii. Vavra's employment is terminated after he refuses requests over multiple months to undergo mandatory Unconscious Bias Awareness training

Cortez subsequently scheduled a Teams call with Vavra for April 7, 2021. (R. 43 ¶41). Cortez recalls speaking with Vavra before the meeting, and asking "Chuck, are you sure you won't take the training?" (R. 43 ¶42). Vavra responded that he would not take the training. *Id*. During the meeting, Cortez told Vavra that he had to take the training or be terminated. *Id*. At that point, Vavra told Cortez that he needed to speak with his wife, who was in another room. *Id*. After speaking with his wife, Vavra confirmed to Cortez that he would not take the training. *Id*. Vavra was then terminated for refusing to undergo the training. Thereafter, Becker walked Vavra through the final steps of ending Vavra's employment. *Id*.

Vavra's termination was considered a "voluntary separation," and one where Vavra was choosing to quit. (R. 43 ¶43). Becker informed Vavra that the reason for his termination was his failure to complete the training. *Id*. Cortez believes that Vavra's refusal to undergo the UBA training could be viewed as insubordination. (R. 43 ¶44).

Sometime after the April 7, 2023 meeting on the same day, Vavra e-mailed Becker, stating:

> I just wanted to let you know that I think I've got all my personal stuff off of the laptop. Richard and Chris were a big help. I'm sorry that things couldn't have worked out differently. I was hoping that a discrimination claim wouldn't have ended with getting terminated, but it's a

> different country we're living in these days. I wish you all
> the best and thanks for everything.

(R. 43 ¶45). Becker responded to Vavra's e-mail on the same day, thanking him for
his e-mail, attached a copy of an IP agreement, and invited "any additional questions
on the exit items this morning." *Id.*

On April 7, 2021, one of Vavra's coworkers, Susan Parmenter, e-mailed him to
express "sad[ness]" about Vavra's departure. (R. 43 ¶46). On April 9, 2021, Vavra
replied to Parmenter's e-mail. In the e-mail, he stated:

> Thank you so much for the kind words. That means a lot. I
> was hoping things would have worked out differently but
> I'm not surprised how they did. My leaving wasn't
> voluntary. I was fired for not complying with their
> "Unconscious Bias" training mandate. I know to some that
> it was just another checkbox of things to do but to me it was
> so much more to me. I feel very strongly about this
> corporate "wokeism" crap. I sent HR a very detailed email
> as to why I wasn't taking the training, pointing out the
> hypocrisy and discrimination in John Waldron's 9/24
> email. Wednesday morning Jeff Cortez scheduled a Teams
> meeting with me and tried one last time to get me to take
> the training and I stood my ground. Jeff is a good guy. I felt
> bad for putting him in this position. But at the end of the
> day, you can see where our country is headed if me taking
> this training was their highest priority and took
> precedence over everything else.

*Id.*

On April 8, 2022, Vavra sent Becker another e-mail, asking "Are you going to
send something stating the exact reason why I was fired, or will that come from Jeff
Cortez?" (R. 43 ¶47). On April 11, 2022, Becker replied to Vavra's e-mail, stating
"There is not additional information sent regarding your termination. You will

however receive all of the benefits information in the mail within the next 7 - 10 days." *Id*.

In cases of involuntary terminations, Honeywell did not typically send out written notices of any kind to state the reasons for the terminations. (R. 43 ¶48). Vavra did not have any further communications of any kind with Becker, Cortez, Maines, or anyone else within Honeywell's management. *Id*.

Vavra has never seen Honeywell's UBA training video, and does not know the length of the training. (R. 43 ¶49). He understood from the e-mail reminders about the training that it was required for all employees. *Id*. He is not aware of any other employee who failed to take the training. *Id*. Cortez has never been told that Vavra's March 8, 2021 e-mail was the reason Vavra was terminated. (R. 43 ¶50). Vavra was terminated for refusing to undergo the training. *Id*. Vavra was told during the meeting on April 7, 2021 that the reason for his termination was his refusal to undergo the training. *Id*. Becker has also testified that Vavra was terminated for failing to undergo the mandatory UBA training. *Id*.

### PROCEDURAL HISTORY

The Procedural History set forth in Appellant's Brief is accurate.

### SUMMARY OF THE ARGUMENT

Following a careful review of the evidence under governing law and a holistic approach, and after drawing every reasonable inference in favor of Vavra, the District Court properly entered summary judgment in Honeywell's favor. The record shows that the District Court did not err in finding that Vavra's refusal to undergo UBA training was not protected activity, and Vavra had not presented sufficient evidence

for a reasonable jury to infer causation between his e-mail complaints and his termination. The record also supports the District Court's determination that there are no issues of credibility that require a jury to weigh in.

On appeal, Vavra reiterates his argument that his refusal to undergo training was protected activity. The District Court properly found that even assuming that Vavra sincerely and in good faith believed that the UBA training was discriminatory, his belief was not objectively reasonable under the circumstances, and as such, his refusal to undergo the training was not protected activity.

Vavra also argues that he has produced sufficient evidence of causation between his complaint e-mails and his termination that precluded summary judgment being awarded to Honeywell. First, he erroneously claims the District Court erred by never considering the context of this case with respect to the timing of his termination in relation to each of his complaints. Vavra entirely ignores the events of the nearly four months leading up to his initial protected activity, during which he repeatedly and knowingly refused to undergo Honeywell's mandatory UBA training. Vavra's initial complaint acknowledged he knew there would be consequences to his non-compliance. The District Court properly found that timing alone did not create a triable issue. The District Court also correctly observed that Vavra's allegation that Honeywell departed from its own policies when addressing his complaints was without merit. Vavra fails to point to any specific ways in which Honeywell allegedly deviated from its own policies, and fails to point to any part of Honeywell's policies that required a specific kind of an investigation in response to

every complaint, or a response and update to every complainant. Finally, Vavra fails to identify any genuine credibility issues that must be resolved by a jury.

## STANDARD OF REVIEW

The Court of Appeals reviews the District Court's grant of summary judgment *de novo*, construing facts in the light most favorable to Vavra and drawing all reasonable inferences in his favor. *Perez v. Staples Contract & Commercial LLC*, 31 F.4th 560, 571 (7th Cir. 2022); *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572 (7th Cir. 2021). Summary judgment for a defendant is appropriate when the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to his case, and on which he will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-806 (1999). The Court of Appeals may affirm the grant of summary judgment on any basis that is apparent from its review of the record. *Perez*, 31 F.4th at 570-571.

## ARGUMENT

## I.   The District Court Properly Found that Vavra's Failure to Undergo Training Was Not "Protected Activity"

Vavra insists that his *actual refusal* to undergo UBA training should be considered "protected activity," even if the Court finds that the UBA training was lawful, because he claims to have had a "sincere and reasonable belief that he was opposing an unlawful practice" in refusing to undergo the training, and that his complaints were objectively reasonable. Appellant Br. 31-33. The argument is without merit on both counts.

To survive summary judgment on his retaliation claim, Vavra was required to offer evidence of: "(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (internal citations omitted). Regarding the first element, in order for an activity to be considered a statutory protected activity, "[t]he plaintiff must not only have a subjective (sincere, good faith) belief that he opposed an unlawful practice; his belief must also be objectively reasonable, which means that the complaint must involve discrimination that is prohibited by Title VII." *Scheidler v. Indiana*, 914 F.3d 535, 542 (7th Cir. 2019).

> A.   *There was sufficient evidence in the record for the District Court to find Vavra's belief insincere.*

While the District Court observed "[a]s an initial matter" that it was not clear whether Vavra sincerely believed that the UBA training was a racially discriminatory employment practice, it did not rely on that observation in concluding that Vavra's complaint did not amount to protected activity. The Court dedicated only a few sentences to discussing Vavra's proclaimed sincerity, but then "assumes" for the sake of argument that Vavra was sincere. (Appx. 15-16; R. 53 at 15-16.). The District Court concluded the section of the memorandum opinion and order addressing protected activity by stating that Vavra's belief, "however sincere," was not considered protected activity because it was not objectively reasonable. Nevertheless, to the extent that Vavra suggests that the District Court's questioning of Vavra's sincerity was unreasonable, his argument misses the mark.

As the District Court has noted, there are a number of facts that suggest Vavra did not sincerely believe the UBA training was racist. He has readily admitted that he never took the UBA training, and has no knowledge of its contents. Cortez, however, had told Vavra at least one fact about the training: it contained an example of a white man being the victim of unconscious bias. Vavra made several comments in his communications with Honeywell that raise the inference that his beliefs were based on his general views of unconscious bias, on *other* diversity trainings he may have known or heard about, and based on his beliefs about those other trainings, he claimed that Honeywell's UBA training would be unproductive and ineffective. Vavra's complete lack of knowledge regarding the UBA training when he first raised his concerns —and his steadfast refusal to undergo the training even after learning that a white man was used as a victim of unconscious bias—did make it reasonable for the District Court to question his sincerity.

Vavra argues that his refusal to take the training was in good faith because he felt the training's "goal was to vilify an entire race of people [white people]" – which is an unlawful practice under Title VII. This argument is ludicrous, and Vavra could have had no such belief. The training went out to all employees, irrespective of their race. The e-mail rolling out the training also specifically stated the intent of the training was "to overcome [biases] to create an environment that values everyone's perspectives." (R. 43, ¶15). This stated intent is the exact opposite of vilifying an entire race of people.

Vavra also argues that because he stated that his e-mails should be considered "an 'official' discrimination claim," that is sufficient to prove his sincerity. This is illogical. An employee's decision to call a policy or job requirement "discriminatory" is not proof that he believes that policy or job requirement to actually be discriminatory. While the District Court did not base its decision that Vavra's refusal to undergo training was not protected activity on Vavra's sincerity or lack thereof, it was entirely appropriate for the District Court to make its observations based on the undisputed facts in the record.

> **B.** *The District Court correctly found that Vavra's refusal to undergo training was not objectively reasonable.*

A speech or activity can only be protected if it is based on a belief that is both sincerely held and in good faith, and also objectively reasonable. *Scheidler*, 914 F.3d at 542. The *Scheidler* Court also explained that in order for a belief to be objectively reasonable, "the complaint must involve discrimination that is prohibited by Title VII." *Id.* (internal citations omitted). As an example, this Court in *Logan v. City of Chicago*, 4 F.4th 529 (7th Cir. 2021)—a case on which the District Court relied—held that while the plaintiff might have had a sincere, good faith belief that he was opposing an unlawful practice by telling his supervisor not to flirt with plaintiff's girlfriend, his belief was not reasonable because plaintiff's supervisor and girlfriend did not have the same employer. *Id.* at 538.

Vavra admits the objectivity requirement, but advocates an expansive interpretation, arguing that his belief was objectively reasonable because it involved a "type of activity" that, under some other circumstances, *could be* discriminatory.

Appellant Br. 34. Vavra defines the "type of activity" involved here as "diversity trainings." *Id*. Case law does not support such an interpretation.

The objectively reasonableness requirement of Title VII allows for an employee's activity to have the potential to be protected, even though it is in opposition to an employment action, decision or policy that is, in fact, not discriminatory. However, Appellant does not point to any cases in support of the notion that so long as the *type* of activity he complained of *could be* discriminatory in an entirely different context, that is enough to make his refusal to undergo the UBA training objectively reasonable. To the contrary, case law supports the idea that objective reasonableness is a fact-based analysis.

In its Motion for Summary Judgment, Honeywell cited to several cases where various types of employer-mandated trainings were found to not be discriminatory. (R. 42, at 8-10.) The District Court referenced these cases in its analysis (Appx. 16-17; R. 53 at 16-17), and Vavra is dismissive of those cases. Appellate Br. 35. However, it is instructive to take a closer look at those cases because they guide the analysis on whether Vavra's opposition to the UBA training could be considered objectively reasonable.

In *Daza v. State of Indiana*, 331 F. Supp. 3d 810 (S.D. Ind. 2018), the plaintiff argued that it was racially discriminatory for his employer to expect him to act according to its Core4 Principles in his interactions with white employees when he did not believe he was treated according to those principles. The court found "this argument …a non-starter" because the plaintiff had not pointed to any evidence that

the Core4 Principles were discriminatory in any way, nor that requiring him – along with this fellow colleagues — to comply with the principles was motivated by racial animus. *Id.* at 844.

In *Norgren v. Minnesota Dep't of Hum. Servs.*, No. CV 22-489 ADM/TNL, 2023 WL 35903 (D. Minn. Jan. 4, 2023), plaintiff's employer required him and his colleagues to complete computer-based workplace training units on anti-racism and gender identity. Norgren opposed the training because he equated it to Critical Race Theory ("CRT"), which he viewed as violating "the traditional view of equality under Title VII." *Id.* at *4. He also opposed the gender identity training because he viewed nonbinary genders to be "contrary to his sincerely held religious belief." *Id.* He resigned from his position and filed a lawsuit, claiming that he was constructively discharged due to "threat of being terminated for his religious beliefs, as well as the mandated training and refusal for exemption." *Id.* The District Court for the District of Minnesota granted DHS's Motion to Dismiss, holding that "[r]equiring all employees to undergo diversity training does not amount to abusive working conditions, and does not plausibly show that DHS imposed across-the-board training with the intention of forcing Norgren to quit." *Id.* at *4.

In *Bourgeois v. United States Coast Guard*, 151 F. Supp. 3d 726, 739-740 (W.D. La. 2015), plaintiff argued that he was retaliated against by being forced to attend a "training class" after he filed an EEO complaint, even though all employees were required to attend "cultural diversity training," and plaintiff was only required to watch a video of the training during his scheduled work hours. *Id.* The court granted

the defendants' motion for summary judgment as it pertained to plaintiff's retaliation claim, acknowledging that "[n]ot only was the plaintiff not singled out to watch the video, but it appears the video was the plaintiff's employer's attempt to rectify potential harassment that was occurring in the workplace environment." *Id*. at \*740. Therefore, the plaintiff had not satisfied his burden of showing that watching the cultural diversity video was an "adverse employment action" that properly supported his retaliation claim. *Id*.

Here, Vavra attempts to make distinctions between those cases and his, but those factual distinctions do not impact the applicability of those analyses to this case. Vavra claims that in *Norgren*, the court did not engage in analysis of whether a diversity training *could* violate Title VII. Appellate Br. 35. The Court was not required to engage in an extended discussion, and lack of a detailed discussion only underscores that the Court's finding that "[r]equiring all employees to undergo diversity training does not amount to abusive working conditions" was applicable to other such diversity trainings. Vavra dismisses *Daza* by noting a procedural fact about that case. Vavra does not explain why that procedural distinction impacts *Daza*'s substantive holding that the plaintiff's claim failed because the plaintiff had not pointed to any evidence that his employer's Core4 Principles were discriminatory in any way. Vavra is entirely silent on *Bourgeois*.

Vavra's own two cited cases do not support his argument that diversity programs in general could be discriminatory. The issue before the court in those cases was not whether a refusal to participate in a diversity training was protected activity.

Indeed, *Hartman v. Pena*, 914 F. Supp. 225, 227 (N.D. Ill. 1995), was decided nearly 30 years ago and even then, the District Court noted that cultural diversity training in the workplace was "not uncommon due to the rash of discrimination lawsuits… ." *Id*.

The issue in *Hartman* also was not whether diversity training in general could be discriminatory – rather the question was whether the training the plaintiff actually took was discriminatory. *Id*. The plaintiff in *Hartman* participated in a "cultural diversity workshop" that focused on a "role-reversal" exercise whereby only male employees were subjected to verbal and physical harassment. The plaintiff specifically alleged he was subjected to a hostile work environment because his genitalia was touched by female employees during the exercise while other male employees laughed and derided him.[2] The district court found "it is difficult to accept the argument that an exercise created to be sexually harassing was not." *Id*., at 230.

The facts in *Hartman* are vastly different than at issue here, and the holding is not applicable. Unlike the trainings involved in *Norgren*, *Daza*, *Bourgeois*, and this case, employees in *Hartman* were subjected to training purposely designed to be discriminatory and which was, in fact, discriminatory in that employees were required to undergo essentially different trainings, and play different roles, solely based on their gender. The District Court in this case properly found there was no evidence that Honeywell's training, or its requirement that all employees complete

---

[2] Summary judgment was granted in the employer's favor on the plaintiff's allegation that he was subjected to retaliation for filing a charge of discrimination with the EEOC. *Id*., at 231.

the training, constituted an unlawful employment practice proscribed by Title VII.
(Appx. 16; R. 53 at 16.)

Similarly, *Devine v. Pittsburgh Bd. of Pub. Educ.*, No. 2:13-CV-220, 2015 WL
3646453 (W.D. Pa. June 10, 2015) does not support Vavra's position, as it did not
involve a diversity training, or training of any kind at all. Moreover, the district court
granted summary judgment on the retaliation claim, finding there was no evidence
of the plaintiff having engaged in any protected activity. The district court rejected
the plaintiff's contention that e-mails she had sent seeking additional support
services for students who she thought may be emotionally disturbed constituted
"opposition" to discriminatory practices. *Id.*, at *9. Furthermore, contrary to Vavra's
representation, the race claim did not survive summary judgment because the
principal applied a different performance standard to teachers with perceived "white
privilege." Actually, the district court held that the plaintiff's "theory of anti-white
bias" was undercut by the facts. *Id.*, at *8. Instead, summary judgment was denied
because there were factual disputes as to whether alleged comparators were actually
similarly situated and whether they were treated disparately, as well as questions
about the evidence put forward as to the reasons given for the principal's decision.

Vavra fails to cite to any case law for the proposition that an employee can be
deemed objectively reasonable in refusing to participate in a diversity training simply
because some other hypothetical "diversity training"—a phrase he does not define—
*could* violate Title VII. Such an interpretation, if taken to its logical conclusion, would
also lead to very absurd results. Hypothetically, *any* employer-mandated practice

*could* be discriminatory, depending on the facts. Vavra believes this fact is enough for him to not only complain about not just a diversity training—but *any* policy or practice by his employer—by calling it discriminatory. He believes such a complaint should automatically be considered "objectively reasonable"—despite his complete lack of knowledge regarding the specific training, policy or practice at issue—simply because some other form of that training, policy or practice in a hypothetical context *could* be discriminatory. Vavra is asking this Court to authorize something even more drastic; he wants to be able to piggyback on the presumed objective reasonableness of his complaint about an employer's practice, and unilaterally veto that requirement and refuse to satisfy it, and have the actual refusal be considered objectively reasonable as well. There is no basis for such an expansive view of protected activity.

As this court's analysis in *Logan* shows, objective reasonableness of an employee is not based on hypotheticals, but based on an analysis of the facts of each case. In *this* case, even if Vavra sincerely believed that Honeywell's UBA training was ineffective, counterproductive, or racist (based on his presumptions or misconceptions about what he thought the training entailed), he could not have been objectively reasonable because he knew nothing about the training before deciding to refuse it. Moreover, when he expressed why he would not take the training, multiple representatives from Honeywell spoke with him about the training – including Cortez who shared with Vavra that he did not see anything racist about it and that the training included a scenario where a white male was being subjected to bias.

Therefore, Vavra's refusal to undergo the UBA training was not objectively reasonable, and not protected activity.

## II.     The District Court Properly Found that No Reasonable Jury Could Infer Causation Between Vavra's E-mails and His Termination

Vavra argues that his termination was due to his two e-mails complaining about the UBA training. He cites two facts as his evidence: the timing of his termination, and what he perceives to have been an inadequate investigation into his complaints. The District Court properly held that neither one creates a disputed issue of fact for the jury.

### A.     The timing of Vavra's termination is insufficient in helping Vavra establish a prima facie case.

Seventh Circuit case law establishes, "[s]uspicious timing is rarely enough to create a trible issue." *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009). Therefore, "[f]or an inference of causation to be drawn solely on the basis of a suspicious-timing argument, we typically allow no more than a few days to elapse between the protected activity and the adverse action." *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012). "When suspicious timing alone is insufficient to carry the plaintiff's burden, a plaintiff may 'survive summary judgment if there is other evidence that supports the inference of a causal link.'" *Daza v. Indiana*, 941 F.3d 303, 309 (7th Cir. 2019) (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005)).

Vavra erroneously claims that the District Court "never considered the context" in this case in determining whether the timing of his termination gave rise to an inference of causation, and he suggests that the District Court believed that

timing never supports an inference of causation. Appellate Br. 22. Contrary to Vavra's suggestion, the District Court properly acknowledged that timing alone could raise an inference of causation. (Appx. 22; R. 53 at 22.) However, it held that Vavra had presented "no evidence that it was his complaint of discrimination that motivated the termination decision." *Id.* at 19. A review of undisputed facts quickly reveals that the District Court's conclusion was the only reasonable one to draw in this case.

As Vavra did at the summary judgment stage, he intently focuses on the time-period between his March 8, 2021 and March 24, 2021 emails and his termination on April 7, 2021, and he entirely ignores the events that occurred prior to March 8, 2021. Vavra put himself on the course of termination as early as November 2020, when he received Honeywell's announcement of UBA training. At that point, Vavra became aware that the training was required for all U.S. employees and was to be completed by February 25, 2021. (R.43 ¶¶14-15). As the deadline approached, all employees who had yet to take the training received many automated reminders about the deadline. (R. 43 ¶21). When only five days remained, Vavra received daily reminders about the training. *Id.* He decided to intentionally ignore the deadline and continue to not take the training. The reminders also left no reasonable doubt in Vavra's mind about the importance of this training to Honeywell. Several individuals with various levels of authority also directly and indirectly reached out to Vavra to direct him to take the training. He admitted that several of these individuals—including Katie Becker, Jeff Cortez and Brian Swinkola—approached and reminded him about the required training *before* March 8, 2021. By the time Vavra sent his March 8, 2021 e-mail, he

had already missed his deadline for Honeywell's mandatory training by more than two weeks.

What Vavra asked the District Court—and now this Court—to do is believe that it was only after he made *complaints* about the UBA training that Honeywell decided to terminate him. The District Court saw through that attempt, and this Court should as well. In fact, Vavra *knew* the training was mandatory and there would be consequences to his months-long noncompliance. Indeed, in his initial March 8 e-mail he stated, "Do whatever it is you feel you have to do to deal with my non-compliance…." (R. 43 ¶30). He similarly stated in his March 24 e-mail, "Whatever the consequences are of that decision [not to take the training], I will accept." (R. 43 ¶38). *See Morgan v. SVT, LLC*, 724 F.3d 990, 998 (7th Cir. 2013) ("Where, as here, there are reasonable, non-suspicious explanations for the timing of [plaintiff's] termination … we will not deny summary judgment solely on the strength of [suspicious timing].")

Vavra erroneously relies on *Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 770 (7th Cir. 2008), a case with starkly different facts. That case involved a plaintiff who complained to the company's General Counsel about sexual harassment by a co-worker, only to be questioned by her supervisor regarding her contact with General Counsel and, two days later, the supervisor began the process of eliminating plaintiff's job and designating her as ineligible for rehire. In addition, Magyar's supervisor made statements about plaintiff's complaint to the General Counsel that a reasonable jury could find "defensive and accusatory." Therefore, that case involved

much more than suspicious timing that could raise the inference of causation. Here, Vavra was not subjected to any targeted conduct. The training was required of, and applied to, all U.S. employees. In addition, Vavra's job was not eliminated, and he was not powerless in preventing his termination. He was rather repeatedly told for five months that he needed to undergo mandatory training like all other U.S. employees, and was later informed what the consequences of refusal would be.

Vavra's reliance on other cases that discuss timing is equally unavailing. *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789 (7th Cir. 1997) involved an employee who was terminated just two days after his employer was served with a complaint in a discrimination case. *Id*. at 796. In *Holland v. Jefferson Nat. Life Ins. Co.*, 883 F.2d 1307, 1309-1310 (7th Cir. 1989),  plaintiff claimed that her employer advised her that it would not be able to keep her job open during maternity leave one week after she complained about a sexual comment made on a piece of paper, and suggested that she was going to complain to the EEOC about it. Neither case involved an employee who for months refused to comply with an employer's required training. Furthermore, as Vavra readily admits, several cases have held that a few weeks of time between a protected activity and an adverse action are insufficient from which to infer causation. *See Silk v. Bd. of Trustees, Moraine Valley Cmty. Coll.*, Dist. No. 524, 795 F.3d 698 (7th Cir. 2015) and *Kidwell,* 679 F.3d at 966-967. By his own admission, Vavra's March 8, 2021 e-mail constitutes his first protected activity, and he was not terminated until April 7, 2023. Therefore, according to his own analysis,

the length of time between these two events does not support an inference of causation.

Vavra wants the Court to believe that his March 8 email marked a change in how Honeywell responded to his noncompliance with the training. He claims that if Honeywell's "sole interest was in having Vavra complete the training, it seems likely that it would have told him a termination was coming if he continued to refuse." Appellant Br. 25. Yet, that is exactly what happened. Vavra shockingly contends that Honeywell stopped trying to gain his compliance, which evidences they were punishing him for making a discrimination complaint. *Id.* Honeywell never stopped trying to gain Vavra's compliance.

It was not until the March 8 email that it was clear that Vavra was refusing to take the training. Until then, he had simply ignored repeated reminders to take it. A busy employee may have put off the training and ignored reminders until confronted with the noncompliance. When it became clear that Vavra was refusing the training, not only did Honeywell attempt to gain compliance by sending him daily automated reminders about the training, Maines also met with Vavra in an attempt to gain his compliance and to inform him that continued refusal would be considered insubordination. Vavra clearly understood insubordination could be grounds for termination. Thereafter, Vavra continued to receive automated reminders, and Maines followed up with Vavra to see if he had changed his mind. Similarly, Cortez attempted to gain Vavra's compliance before the April 7 meeting by asking him if he was sure he would not take the training. During the meeting, Vavra was given a final

chance to agree to take the training when he was told he would be terminated if he did not. Vavra took the time to consult his wife and then responded he would not take the training. The facts evidence that Honeywell consistently tried to obtain Vavra's compliance with mandatory training. These attempts spanned months, and it was only when it became definitive that Vavra would not comply that he was terminated. His termination had no connection to his complaints.

Based on the forgoing analysis, no reasonable jury could look at the facts in this case and believe that Vavra's termination was something more than a natural consequence of his months of refusal to undergo the UBA training, and the District Court's determination of this issue was sound.

> ### B.   *Honeywell took appropriate action in response to Vavra's complaint.*

Vavra renews a failed argument from his response to Honeywell's Motion for Summary Judgment. Vavra claims that Honeywell departed from its policy governing its response to discrimination complaints. Appellant Br. 26. He argues that Honeywell's policies required it to "investigate" his complaints about the UBA training and claims that it did not do that. This is a last-ditch effort to revive an argument that was dead on arrival.

Honeywell's Code prohibits discrimination, and encourages employees to report any unlawful or inappropriate discrimination or harassment to Honeywell. (R. 43 ¶¶5,7). It also specifically prohibits retaliation for making a good faith complaint of discrimination. (R. 43 ¶6). Honeywell's policies do not require it to conduct a specific type of investigation.

Vavra erroneously suggests that his complaint was not investigated, and no one at Honeywell spoke with him about his complaint. However, Katie Becker testified that the manner of investigation of every complaint is different, and that she communicated Vavra's concerns within Human Resources and it was reviewed by Honeywell's Legal Department before proceeding with his termination. Def. Ex. G, 19:19-20:6, 43:8-44:11. Vavra's complaint e-mails set forth his thoughts on the UBA training and why he would not take it. His objections were not raising specific conduct taken against him by any individual. He was rather complaining about a training program that not only Honeywell already knew about, but it was vetted and approved by Honeywell's Diversity, Equity and Inclusion Department, as well as the Law Department. Vavra's complaints disclosed no facts about the training or its contents to which Honeywell was unaware. The only unknown information Vavra shared was his feelings about the training.

Vavra acknowledges that Honeywell's policy for discrimination complaints is broad. Appellant Br. 26. As the District Court correctly observed,

> Plaintiff points to no deviation by Defendant from any established policy that led to his termination. Defendant's Code prohibits discrimination and encourages employees to report any unlawful or inappropriate discrimination or harassment to Defendant. It also prohibits retaliation for making a good faith complaint of discrimination. Plaintiff points to no policy requiring a specific type of investigation. He points to no evidence that the review undertaken of Plaintiff's emails by HR and the legal department, and the multiple conversations Plaintiff had with his superiors, were insufficient under any of Defendant's policies. Plaintiff points to no internal policy requiring Defendant to report the results of its investigation to Plaintiff in any particular manner. Plaintiff does not even present evidence

or argument of who made the decision to terminate Plaintiff's employment; the only evidence before the Court is that the decision was not made by either Mr. Cortez or Ms. Becker.

(Appx. 19; R. 53 at 19.) (internal citations omitted).

Vavra contends that his complaints about the training were not taken seriously because Coretz only "glanced through" his email. Appellant Br. 27. Yet, there is no evidence that Cortez, as Vavra's supervisor, had any responsibility for investigating complaints. Cortez was just one recipient of the March 8 email, Becker being another. As noted, Becker communicated Vavra's concerns within Human Resources and Vavra's concerns were reviewed by the Legal Department.

Vavra argues the District Court erred by concluding that he had multiple conversations with his supervisors. In Vavra's view, those conversations were not sufficiently investigatory because they were not concerned with the merits of Vavra's complaints. Yet it is undisputed that Cortez and Vavra discussed the training, Vavra's beliefs that the company was "pushing in political correctness issues" through the training, and Cortez's belief — after having taking the training — that the training was not racist. (R. 43 ¶¶23, 33). Vavra seems to believe that Human Resources should have interviewed him about his emails. However, his emails were expansive on his views, and Vavra testified he was "as thorough as possible" in his e-mails regarding why he thought Waldron's e-mail was "discriminatory and racist." (R. 43 ¶39). A further investigatory interview with him was unneeded.

Vavra contends the most basic and minimal procedure for responding to a discrimination complaint is issuing a response. Appellant Br. 28. Vavra does not

dispute that Becker acknowledged his March 8 complaint and responded that she would review and get back to him – which she did. Vavra maintains that no remedial response was ever issued to him about his complaints. *Id.* First, Vavra cites to no case law supporting that an individual is required to receive information regarding the outcome of an employer's investigation. Second, Vavra cites no Honeywell policy requiring that an employee receive information regarding the outcome of an investigation. Third, there was no remedial response to issue. There was nothing to remedy – as Honeywell had vetted the training and did not find it to have unlawful content.

Vavra also contends his complaints were not taken seriously because he continued to receive daily email reminders to take the training. Appellant Br. 27-28. This contradicts his prior argument that his termination came on the heels of his complaints, and Honeywell was punishing him for complaining, as evidenced by it no longer trying to gain his compliance with the training. Appellant Br. 25. He does not get it both ways.

For the forgoing reasons, Vavra's complaints about a lack of investigation are without merit.

## III. There Are No Disputes of Material Fact, and No Issues of Credibility on Which a Jury Should Weigh In

Vavra argues that because, in his eyes, there is a "dispute" over Honeywell's "intent" and motivation for terminating his employment, that is sufficient to permit the issue to go to a jury. His argument is that because he claims that his termination was in retaliation for engaging in a protected activity, and Honeywell's proffered

reason for Vavra's termination is Vavra's refusal to undergo a mandatory training, the issue has to be decided by a jury. Appellant Br. 29. Vavra's position cannot be the law, because an unqualified application of it to retaliation cases would likely lead to virtually all retaliation claims going to the jury, as they all invariably involve a plaintiff who alleges retaliation for engaging in protected activities, and a defendant who cites to alternative bases for terminating an employee. But as discussed *infra*, the applicable law is more nuanced, and in this case, the District Court correctly relied on the law to dismiss Vavra's claim.

As the Seventh Circuit has established, in cases where the defendant's motive or state of mind is an essential element of a plaintiff's case, a court must be circumspect in granting summary judgment based solely on the defendant's denial that the requisite mental state existed. *See Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988) ("When the issue is one of intent, we approach the application of [summary judgment] principles with special caution."). But there is no absolute rule against granting summary judgment in such cases, especially "where the plaintiff has had the opportunity to depose the defendant to test the defendant's veracity and the plaintiff has failed to 'shake' the defendant's version of the facts or to raise significant issues of credibility, summary judgment for the defendant may ordinarily be granted[,]…unless the plaintiff has adduced other 'significant probative evidence' from which a jury would be entitled to infer contrary conclusions about the mental state at issue." *Corrugated Paper Prod., Inc. v. Longview Fibre Co.*, 868 F.2d 908, 914 (7th Cir. 1989). "[T]he opposing party may not merely recite the incantation,

'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Id.* (citing *Curl v. International Business Mach. Corp.*, 517 F.2d 212, 214 (5th Cir. 1975)). "[W]hen challenges to witness' credibility are all that a plaintiff relies on, and he has shown no independent facts—no proof—to support his claims, summary judgment in favor of the defendant is proper." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (emphasis in original); *see also Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398, 406 (7th Cir. 1998) ("[T]he prospect of challenging a witness' credibility is not alone enough to avoid summary judgment.").

Vavra refers to *Castro v. DeVry Univ., Inc.*, 786 F.3d 559 (7th Cir. 2015) in support of the proposition that an employer cannot brand a protected activity as "insubordination." The facts and context of that case are entirely different than those at issue here, and the District Court properly found that Vavra's reliance on *Castro* was unavailing. (Appx. 20; R. 53 at 20). In *Castro*, the Seventh Circuit only reversed a retaliation claim brought by one of three plaintiffs in the case because the employee produced evidence that the defendant did not honestly believe in its proffered reason for terminating him, provided false information to the EEOC regarding the employee's supervisor's knowledge of the employee's protected activity, and specifically referred to the employee's protected activity in the same internal e-mail that recommended his termination. *Id.* at 563. Evidence in that case revealed that plaintiff's supervisor had even stated that staff should not go "running off to HR" and another supervisor told plaintiff and another employee that people who "went to HR no longer work here." *Id.* at 568-569. Unlike in *Castro*, that is not the case here, and

there is no evidence of pretext. Notably, even Vavra wrote to his former colleague: "I was fired for not complying with [Honeywell]'s 'Unconscious Bias' training mandate" (R. 43 ¶46), *not* for complaining about the training.

Vavra also attempts to manufacture credibility issues by noting that although his deadline for completing the training was in February, he was not terminated until April 2021. Appellant Br. 30. He once again erroneously asserts—as he did at the summary judgment stage—that he only received automated reminders until he sent his e-mail complaint. As discussed *supra*, that is not true, as at least three individuals personally reached out to Vavra before his March 8, 2021 e-mail. The occurrence of his termination in April 2021 instead of February 2021 (when the deadline for undergoing UBA training expired) is also not inconsistent when viewed in context. Over five months of Vavra's refusal to undergo the training, one can see a natural progression of activities designed to bring Vavra into compliance. Automated reminders increased in frequency, followed by personal outreach by Becker and Cortez, culminating in a final outreach by Maines and follow-up by Maines thereafter. These events do not reflect a sudden turn of events against Vavra, but rather a gradual and natural progression of Honeywell's escalating response to an employee who continued to be noncompliant with mandatory training. Notably, even on the day of Vavra's termination, Cortez gave him a choice: undergo the training or be terminated. Vavra understood the consequences of his decision, consulted with his wife, and communicated his final decision to continue his refusal. (R. 43 ¶42).

In November 2020, Vavra began a march towards his termination unless he changed course, becoming fully aware of the inevitable consequence of his refusal to undergo the UBA training along the way. Vavra's attempt to feign surprise by his termination does not create an issue of credibility for a jury. Therefore, the District Court's decision was well-grounded in undisputed facts and should be affirmed.

## CONCLUSION

For the foregoing reasons, Honeywell respectfully requests that this Court affirm the District Court's grant of summary judgment in favor of Defendant-Appellee Honeywell International Inc. on Vavra's retaliation claim.

<div style="margin-left: 45%;">

Respectfully submitted,

Defendant-Appellee HONEYWELL INTERNATIONAL INC.

By: /s/ Jennifer L. Colvin
    One of Its Attorneys
</div>

Jennifer L. Colvin
Sam Sedaei
**OGLETREE, DEAKINS, NASH,**
  **SMOAK & STEWART, P.C.**
155 North Wacker Drive, Suite 4300
Chicago, Illinois 60603-1891
Phone: (312) 558-1220
*jennifer.colvin@ogletreedeakins.com*
*sam.sedaei@ogletreedeakins.com*

**CERTIFICATE OF COMPLIANCE
WITH F.R.A.P. 32(a)(7) AND CIR. R. 32(c)**

1.      This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(A), FED. R. APP. P. 32(a)(7)(B), and Cir. R. 32(c), because this brief contains 12,823 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

2.      This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and Cir. R. 32, and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 12 point, Century Schoolbook font.


Date:  January 30, 2024                    /s/  Jennifer L. Colvin
                                                    Attorney for Defendant-Appellee
                                                    HONEYWELL INTERNATIONAL INC.

### CERTIFICATE OF SERVICE

The undersigned counsel for Defendant-Appellee Honeywell International Inc. certifies that on January 30, 2024, she electronically filed the foregoing *Brief of Defendant-Appellee Honeywell International Inc.* and electronic service of that filing will be made on all participants via the CM/ECF system of the Clerk of Court for the United States Court of Appeals for the Seventh Circuit.

 /s/ Jennifer L. Colvin
Attorney for Defendant-Appellee
Honeywell International Inc.