No. 23-2823

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

CHARLES VAVRA,
        Plaintiff-Appellant,

v.

HONEYWELL INTERNATIONAL, INC.,
        Defendant-Appellee.

_____

On Appeal from the United States District Court
for the Northern District of Illinois

_____

BRIEF OF THE EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION AS AMICUS CURIAE IN SUPPORT OF
NEITHER PARTY

_____

KARLA GILBRIDE
General Counsel

JENNIFER S. GOLDSTEIN
Associate General Counsel

DARA S. SMITH
Assistant General Counsel

TARA PATEL
Attorney

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Floor
Washington, D.C. 20507
202-921-2770
tara.patel@eeoc.gov

# TABLE OF CONTENTS

Table of Authorities .................................................................................... ii

Statement of Interest ....................................................................................1

Statement of the Issues ................................................................................1

Statement of the Case ..................................................................................2

    A.  Statement of the Facts ........................................................................2

    B.  District Court's Decision....................................................................8

Argument .....................................................................................................11

    I.   Anti-discrimination trainings, including unconscious bias trainings, are not *per se* discriminatory and may serve as vital measures to prevent or remediate workplace discrimination. ........................................................14

    II.  Opposition to an anti-discrimination training, such as an unconscious bias training, may constitute protected activity where the plaintiff provides a fact-specific basis for his belief that the training violated Title VII.…………………………………………………………………………...20

Conclusion....................................................................................................24

Certificate of Compliance .........................................................................25

Certificate of Service ..................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albemarle Paper Co. v. Moody*,
422 U.S. 405 (1975)................................................................................15

*Anderson v. Liberty Lobby*,
477 U.S. 242 (1986)..................................................................................2

*Burlington Indus., Inc. v. Ellerth*,
524 U.S. 742 (1998)................................................................................16

*Byers v. Dall. Morning News*,
209 F.3d 419 (5th Cir. 2000)..................................................................20

*De Piero v. Pa. State Univ.*
No. 23-cv-2281, 2024 WL 128209 (E.D. Pa. Jan. 11, 2024) ..............14, 19, 22

*EEOC v. Boh Bros. Constr. Co.*,
731 F.3d 444 (5th Cir. 2013) (en banc)..................................................16

*EEOC v. Gurnee Inn Corp.*,
No. 87 C 0888, 1988 WL 129329 (N.D. Ill. Nov. 28, 1988), *aff'd*,
914 F.2d 815 (7th Cir. 1990) ..................................................................17

*EEOC v. Mgmt. Hosp. of Racine, Inc.*,
666 F.3d 422 (7th Cir. 2012) ..................................................................16

*EEOC v. N. Star Hosp.*,
No. 12-cv-214, 2014 WL 282026 (W.D. Wis. Jan. 27, 2014),
*aff'd on other grounds*, 777 F.3d 898 (7th Cir. 2015) ......................17

*EEOC v. Wal-Mart Stores, Inc.*,
11 F. Supp. 2d 1313 (D.N.M. 1998), *aff'd*, 202 F.3d 281 (10th
Cir. 1999)................................................................................................17

*Erickson v. Wisc. Dep't. of Corrs.*,
469 F.3d 600 (7th Cir. 2006) ..................................................................15

*Faragher v. City of Boca Raton*,
  524 U.S. 775 (1998).................................................................15, 16

*Fine v. Ryan Int'l Airlines*,
  305 F.3d 746 (7th Cir. 2002).......................................................11

*Hartman v. Pena*,
  914 F. Supp. 225 (N.D. Ill. 1995).............................................21, 22

*Hunt v. Wal-Mart Stores, Inc.*,
  931 F.3d 624 (7th Cir. 2019).......................................................15

*Isbell v. Baxter Healthcare, Corp.*,
  273 F. Supp. 3d 965 (N.D. Ill. 2017)...........................................20

*Logan v. City of Chi.*,
  4 F.4th 529 (7th Cir. 2021)...........................................................9

*Lord v. High Voltage Software, Inc.*,
  839 F.3d 556 (7th Cir. 2016).....................................................8, 11

*Magyar v. Saint Joseph Reg'l Med. Ctr.*,
  544 F.3d 766 (7th Cir. 2008).......................................................12

*Norgren v. Minn. Dep't of Hum. Servs.*,
  No. 22-cv-00489, 2023 WL 35903 (D. Minn. Jan. 4, 2023),
  *appeal docketed*, No. 23-1208 (8th Cir. Feb. 3, 2023) ...............14, 23

*Shannon v. Cherry Creek Sch. Dist.*,
  No. 20-cv-3469, 2022 WL 4364151 (D. Colo. Sept. 21, 2022).......23

*Taylor v. Exxon Mobil Corp.*,
  No. 1:07-cv-03172, 2009 WL 458610 (N.D. Ill. Feb. 24, 2009) ....20

*Thomas v. Eastman Kodak Co.*,
  183 F.3d 38 (1st Cir. 1999) .........................................................19

*Young v. Colo. Dep't of Corr.*,
  No. 22-cv-00145, 2023 WL 1437894 (D. Colo. Feb. 1, 2023),
  *appeal docketed*, No. 23-1063 (10th Cir. March 7, 2023) ...........14, 23

## Statutes

42 U.S.C. §§ 2000e *et seq.* ................................................................*passim*

42 U.S.C. § 2000e–3(a) .......................................................................11

42 U.S.C. § 2000e-2(a)(1) ...................................................................11

## Rules & Regulations

Federal Rule of Appellate Procedure 29(a) ...........................................1

## Other Authorities

Alex Lindsey, et al., *The Impact of Method, Motivation, and*
    *Empathy on Diversity Training Effectiveness*, J. Bus. Psych.
    (Nov. 2014) ......................................................................................13

Chai R. Feldblum & Victoria A. Lipnic, EEOC, *Select Task Force*
    *on the Study of Harassment in the Workplace* (June 2016) .............15

Charles R. Lawrence III, *The Id, the Ego, and Equal Protection:*
    *Reckoning with Unconscious Racism*, 39 Stan. L. Rev. 317 (1987) ...............19

Consent Decree, *EEOC v. Activision Blizzard, Inc.*,
    No. 2:21-cv-07682 (C.D. Cal. Mar. 29, 2022), ECF No. 82 ..........................18

Consent Decree, *EEOC v. Trinity Health-Michigan, d/b/a Mercy*
    *Health St. Mary's,* No. 1:23-cv-00435 (W.D. Mich. Jan. 17,
    2024), ECF No. 18 ..........................................................................17

Consent Decree, *EEOC v. Whiting-Turner Contracting Co.*, No.
    3:21-cv-00753 (M.D. Tenn. May 3, 2023), ECF No. 323 ...............................18

EEOC Compl. Man., Race and Color Discrimination (April 19,
    2006) ................................................................................................18

EEOC Task Force Report, Best Practices of Private Sector
    Employers (1998) .............................................................................19

## STATEMENT OF INTEREST

Congress charged the Equal Employment Opportunity Commission (EEOC) with administering and enforcing Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* At issue in this case is whether unconscious bias trainings are inherently discriminatory and, if not, whether an employee must present evidence to demonstrate a reasonable basis for believing that a particular training was discriminatory based on its design, its execution, or other circumstances. Because the EEOC has a substantial interest in employers' use of anti-discrimination trainings, we file this brief pursuant to Federal Rule of Appellate Procedure 29(a).

## STATEMENT OF THE ISSUES

1. Whether anti-discrimination trainings, such as unconscious bias trainings, are inherently discriminatory.

2. Whether a plaintiff must proffer evidence to show, for purposes of a Title VII retaliation claim, that a reasonable person could believe a mandatory anti-discrimination training, such as an unconscious bias training, was discriminatory.

# STATEMENT OF THE CASE

## A.    Statement of the Facts[1]

Plaintiff-Appellant Charles Vavra, who is White, worked in Defendant-Appellee Honeywell International, Inc.'s Safety and Productivity Solutions ("SPS") unit. R.43-1 at 8.[2] At the end of Vavra's employment, he was a Principal Applications Engineer. *Id.* at 7.

On September 24, 2020, a day after a grand jury in Louisville, Kentucky decided not to indict two police officers who shot and killed a Black woman named Breonna Taylor, SPS's President and CEO John Waldron sent an email to SPS employees with the subject line "Continue to Fight for Social Justice." R.43-5 at 2. Waldron discussed the non-indictment decision in his email, noting in part that:

> [e]ach time these situations occur, they highlight how far we must go to create an equal and just society where all people have the same opportunities to succeed. Racial bias is real … Each of us has

---

[1] Because this appeal is from a summary-judgment decision, we recount the record facts in the light most favorable to Vavra, the nonmoving party. *See generally Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

[2] Citations take the following form: Appx.___ (District court opinion included in the Plaintiff-Appellant's short appendix); Appellant Br. (Plaintiff-Appellant's opening brief); R.__ at ___ (District court docket entries, where the first number refers to the district-court docket entry and the second number refers to the CM/ECF-assigned page numbers).

unconscious bias within us. When these biases compound, they can evolve into institutional biases.

*Id.* at 2-3. He then called for "tangible actions to make a difference" and noted SPS's efforts to take such actions. *Id.* Waldron concluded with "[m]y hands and heart are open to each of our Black, Hispanic, Asian, and LGBTQ colleagues. I stand with you." *Id.* at 3.

In November 2020, Honeywell announced an online Unconscious Bias Awareness Training ("Training") and required employees to complete it by the end of February 2021. R.43-1 at 22-28; R.43-6 at 2. The consequence of non-completion was termination, as it was for other mandatory Honeywell trainings. R.43-7 at 8, 16-17. An email accompanying a link to the training explained:

> While it's human nature to have biases, we must strive to overcome them to create an environment that values everyone's perspectives — a workplace based on trust, respect, and open communication. This training aims to equip you with the insights and tools needed to help spot and challenge the ways biases prevent us from creating an inclusive environment. When we work to eliminate our implicit biases, we not only treat each other better, but we become a better company. Combating unconscious bias allows us to build a culture that supports better customer service, stronger business results, and a more engaged workforce.

R.43-6 at 2. Vavra did not take—or even open—the Training. R.43-1 at 29-30.

3

Honeywell sent numerous reminders both before and after the Training deadline to Vavra and other employees who had not taken it. R.43-1 at 31-32; R.43-8 at 2-16. In addition, several Honeywell employees personally reminded Vavra to complete the Training, including Vavra's direct manager, Jeffrey Cortez, and Brian Swinkola, Cortez's manager. R.43-1 at 10, 49-50; R.43-8 at 17; R.43-9; R.43-10; R.43-11. Cortez understood Vavra's objection to the Training to be a concern that Honeywell was "pushing in political correctness issues." R.43-4 at 13.

On March 2, Human Resources Director Katie Decker emailed an undisclosed list of employees, including Vavra, to encourage them to complete the Training and to let her know if any issues prevented completion. R.43-12 at 20. Vavra replied that he was having issues with completion, and Decker prompted him to explain the issues. *Id.* at 19.

Vavra replied with a seven-page email stating his objections to the Training and to Waldron's September 24 email, along with his views on other political and cultural events. *Id.* at 12-19. He stated, among other things, that the Training was "ridiculous" and "doesn't work" and that Waldron was a "race-baiter" because he was "only concerned with our BLACK colleagues['] feelings," believed the Taylor killing was racially

4

motivated, and portrayed White people as the "villains." *Id.* He opined that "so-called 'systemic racism' is just another manufactured crisis to keep people at odds with each other and 'unconscious bias' training is the decades old joke of a solution to a problem that doesn't even exist to anywhere near the extent they make it out to." *Id.* Vavra also emphasized that neither "Waldron nor anybody else gets to tell me I have unconscious bias," and that Waldron had failed to list his White colleagues as a group that "his heart goes out to." *Id.* He concluded that Honeywell could "do whatever it is you feel you have to do to deal with my non-compliance" but that he was "not a sellout" and that he would be awaiting Waldron's "apology." *Id.* Becker stated she would review his response. *Id.* at 12. She testified that she communicated Vavra's concerns to other individuals within Human Resources. R.43-7 at 13.

Cortez explained to Vavra that he did not see anything racist about the Training and mentioned that it contained an example where an employee held an unconscious bias against a White man because the employee assumed that a woman would be more capable of doing a specific task. R.43-4 at 13-14. Cortez also testified that he took the Training and considered it to be a "relatively simple" and "innocuous"—a "pretty

balanced training about unconscious bias." *Id.* at 13-14, 31. It was

approximately 20-30 minutes long and contained short videos and quizzes

about various scenarios. *Id.* at 29-30. Participants were not required to sign

a document stating that they agreed with the contents. *Id.* at 30.

Vavra continued to receive automated daily Training reminders.

R.43-1 at 59; R.43-8 at 6-16. On March 19, Vice President of Engineering

Chris Maines met with Vavra to convince him to take the Training and to

remind him that not doing so was insubordination. R.43-1 at 61-64; R.43-13.

Vavra then found an Implicit Association Test on a Harvard website

and took it multiple times to "entertain myself." R.43-12 at 10. He received

inconsistent results, confirming his belief that such trainings were

"unreliable" and "incapable of validation." R.43-12 at 10; R.43-1 at 74.

Vavra testified, however, that he did not know if Honeywell's Training

would be similar because he never took it and did not know its contents.

R.43-1 at 77-78. Nevertheless, he testified that based on Waldron's email, he

assumed "it was going to try to make me feel guilty for the color of my

skin, that it was going to make people of color feel like victims for the color

of their skin." R.43-1 at 78.

Maines prompted Vavra via email for his thoughts, and Vavra sent him a five-page email and forwarded it to Becker. R.43-14; R.43-12 at 6-11. The email stated, among other things, that Vavra believed the Training was "developed … in concert with nothing but lies and manipulation by the media and corrupt public servants" and that he "found John Waldron's 9/24 [email] incredibly offensive, discriminatory and racist and I don't want to be 'trained' to be someone like that." R.43-12 at 6-11. Vavra concluded: "I referenced John Waldron's discriminatory remarks in his 9/24 email in my last letter to HR. I am referencing it again today. I don't know what would be considered an 'official' discrimination claim, but both should be considered as such. I am still expecting an apology from John Waldron." *Id.* A week later, Vavra emailed Becker with a YouTube video link, stating that it "very eloquently explains why I have taken such a strong stance on not taking the unconscious bias training." R.43-12 at 2-3. Vavra, however, had still not opened the Training to review its contents. R.43-1 at 29-30, 77-78.

Becker, Cortez, and Vavra met just over a week after Vavra's last email. R.43-1 at 68-70; R.43-4 at 8-9; R.43-7 at 9. Cortez stated that he understood how Vavra felt about the Training but emphasized "the bottom

7

line" was that Vavra had to take it or be terminated. R.43-1 at 70. Vavra confirmed that he would not take the Training. *Id.* at 73. Becker then terminated Vavra's employment. *Id.*

Vavra filed suit, alleging in relevant part that Honeywell's decision to terminate him because he opposed the Training "*based on his conclusion that it was inherently racist*" constituted retaliation in violation of the Illinois Human Rights Act (IHRA) and Title VII. R.10 at 9-10 (emphasis in original).

## B.  District Court's Decision

The district court granted summary judgment to Honeywell on Vavra's retaliation claims. It first laid out the elements of a Title VII retaliation claim—"that (1) [plaintiff] engaged in protected activity and (2) suffered an adverse employment action, and that (3) there is a causal link between the two"—and noted that the parties disputed only the first and third elements. Appx. at 14 (quoting *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016)).

The court agreed with Honeywell that Vavra's "refusal to take the UBA [Unconscious Bias Awareness] Training" was not protected activity. *Id.* at 14, 17. It acknowledged that Honeywell conceded that Vavra's complaint emails were protected activity but noted that "an employee's

8

complaint about something that is not proscribed by Title VII would not constitute protected activity for the same reasons" that the refusal to take the Training did not constitute protected activity. *Id.* at 14, 17 n.2.

The court explained that to engage in statutorily protected activity, Vavra must have "a subjective (sincere, good faith) belief that he opposed an unlawful practice" and that "belief must also be objectively reasonable.'" *Id.* at 15 (quoting *Logan v. City of Chi.*, 4 F.4th 529, 538 (7th Cir. 2021)). It surmised that Vavra likely failed the subjective prong because he "admits that he had no knowledge of the actual contents of the Training" and because his "stated objections to the Training seemed to have more to do with his belief that the Training would be ineffective" and "divisive" rather than "racist." *Id.* at 15-16. But even if he subjectively believed the training violated Title VII, the court reasoned, "his belief was not objectively reasonable." *Id.* at 16.

The court recognized that "[t]he objective reasonableness of the plaintiff's belief is not assessed by examining whether the employer's conduct was persistent or severe enough to be unlawful, but merely whether it falls into the category of conduct prohibited by the statute." *Id.* at 16 (quoting *Logan*, 4 F.4th at 538) (cleaned up). But it held that Vavra

9

failed to meet this standard—that is, he failed to adduce evidence that "the Training, or Defendant's requirement that all U.S. employees take the Training, was racially discriminatory" and thus failed to identify conduct that "fall[s] into any category of conduct prohibited by Title VII." *Id.* at 17. The court recounted that the only evidence before it was that the "video was vetted and approved by [Honeywell's Diversity, Equity and Inclusion office] and the Law Department in an attempt to promote an inclusive environment," "that all U.S. employees were required to watch it," and that Vavra "lacks knowledge of [its] content[s]." *Id.* at 16.

Because Honeywell had conceded that Vavra's emails complaining about the Training and Waldron's September 24 email were protected activity, the court next addressed causation—*i.e.*, whether Vavra was terminated because he engaged in protected activity (the complaint emails), rather than for refusing to take the mandatory Training. *Id.* at 17-18. The court explained that the only evidence of causation Vavra adduced was the timing of his termination, which was insufficient standing alone. *Id.* at 18-20. It rejected for lack of evidence Vavra's assertion that Honeywell departed from established policies with respect to his termination, and also noted that Vavra had failed to proffer any evidence

to "permit [the court] to second-guess [Honeywell's] mandatory training requirements." *Id.* The court thus concluded that Vavra "has not come forward with sufficient evidence to permit a factfinder to conclude that [he] would not have been terminated but for his discrimination complaints." *Id.* at 20.

## ARGUMENT

Title VII protects individuals from retaliation for, in relevant part, opposing any "unlawful employment practice," 42 U.S.C. § 2000e–3(a), including those that "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race," *id.* § 2000e–2(a)(1). A retaliation claim brought under the opposition clause "isn't doomed simply because the complained-of conduct was not in fact an unlawful employment practice; rather, the plaintiff must have a sincere and *reasonable* belief that he is opposing an unlawful practice." *Lord*, 839 F.3d at 563 (cleaned up). A retaliation claim fails the objective prong if it "rest[s] on facts that no reasonable person possibly could have construed as a case of discrimination." *Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 752 (7th Cir. 2002). "The objective reasonableness of the belief is not assessed by examining whether the

conduct was … [actually] unlawful, but merely whether it falls into the category of conduct prohibited by the statute." *Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 771 (7th Cir. 2008).

Vavra argues that in refusing to take the Training, he "was objecting to the type of activity that, under some circumstances, supports a charge of racial discrimination, *i.e.*, the [d]iscriminatory preference for *any* [racial] group, *minority* or *majority*." Appellant Br. at 33-34 (cleaned up). Pointing to other cases involving what he describes as "diversity trainings," he argues that "the fact that other courts have considered similar claims as racial discrimination demonstrates that Vavra's objection to the training was not 'utterly baseless.'" *Id.* at 34-35.

But Vavra has not pointed to anything "similar" about the trainings in other cases beyond the fact that they all arguably fall under the umbrella of "diversity trainings." To the extent Vavra's argument suggests that his objection to Honeywell's Training was reasonable simply because some courts, considering particular facts regarding other "diversity trainings," have ruled for plaintiffs, that theory is wrong.

Diversity trainings—the term Vavra uses—can encompass a wide swath of anti-discrimination trainings.[3] Anti-discrimination trainings, including unconscious bias trainings, are not discriminatory *per se*. Contrary to Vavra's argument, nothing about them inherently involves a "preference" for any group. Indeed, such trainings can serve as vital measures to prevent or remediate workplace discrimination. They are therefore not categorically the "type of activity" that would support a discrimination claim.

Because anti-discrimination trainings are not inherently discriminatory, the belief that such a training constitutes an unlawful employment practice is objectively reasonable only if the plaintiff provides evidence to show how the particular training could be discriminatory in content, application, or context.

---

[3] *See* Alex Lindsey, et al., *The Impact of Method, Motivation, and Empathy on Diversity Training Effectiveness*, J. Bus. Psych. (Nov. 2014) ("Diversity training can be defined as any program designed to facilitate positive intergroup interaction, reduce prejudice and discrimination, and generally teach dissimilar others how to work together effectively."), available at https://www.mikkihebl.com/uploads/9/0/2/3/90238177/79.pdf. Unconscious bias trainings are a type of anti-discrimination training, as explained infra pp.18-19.

## I.   Anti-discrimination trainings, including unconscious bias trainings, are not *per se* discriminatory and may serve as vital measures to prevent or remediate workplace discrimination.

Vavra alleged that he opposed Honeywell's Training "*based on his conclusion that it was inherently racist.*" Compl., R.10 at 10 (emphasis in original). But multiple courts have rejected the theory that anti-discrimination trainings categorically violate Title VII. *See, e.g., Norgren v. Minn. Dep't of Hum. Servs.*, No. 22-cv-00489, 2023 WL 35903, at *1, 7 (D. Minn. Jan. 4, 2023) (holding that plaintiff did not engage in protected activity by refusing to take a gender identity training based simply on his assertion that "he views the concept of nonbinary gender to be 'contrary to his sincerely held religious belief'" because "being required to attend across-the-board diversity training is not a discriminatory practice under Title VII"), *appeal docketed*, No. 23-1208 (8th Cir. Feb. 3, 2023); *De Piero v. Pa. State Univ.* No. 23-cv-2281, 2024 WL 128209, at *8 (E.D. Pa. Jan. 11, 2024) (noting that discussing and providing trainings on "implicit bias," particularly "in the aftermath of very real instances of racialized violence like the murder of George Floyd does not violate Title VII ...."); *Young v. Colo. Dep't of Corr.*, No. 22-cv-00145, 2023 WL 1437894, at *8 (D. Colo. Feb. 1, 2023) (a "general challenge to the contents of" an "Equity, Diversity, and

Inclusion Training" was insufficient to show a hostile work environment), *appeal docketed,* No. 23-1063 (10th Cir. March 7, 2023).

To the contrary, courts have held that anti-discrimination trainings can play a key role in preventing discrimination. The Supreme Court has held that Title VII's "primary objective was a prophylactic one." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417 (1975); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 805–06 (1998) (holding that Title VII's primary goal "is not to provide redress but to avoid harm"); *Erickson v. Wisc. Dep't. of Corrs.*, 469 F.3d 600, 605 (7th Cir. 2006) (same). Trainings, courts recognize, further Title VII's primary goal. *See, e.g., Erickson*, 469 F.3d at 605–06 (noting that employers should prevent harassment with "proactive steps such as … training employees"); *Hunt v. Wal-Mart Stores, Inc.*, 931 F.3d 624, 629 (7th Cir. 2019) (same); *see also* Chai R. Feldblum & Victoria A. Lipnic, EEOC, *Select Task Force on the Study of Harassment in the Workplace*, at 44-54 (June 2016) (finding that regular trainings have proven effective in preventing and addressing harassment). [4] Indeed, in line with Title VII's

---

[4] Available at
https://www.eeoc.gov/sites/default/files/migrated_files/eeoc/task_force/harassment/report.pdf.

"basic policies of encouraging forethought by employers," the Supreme
Court crafted the *Faragher-Ellerth* affirmative defense to certain supervisory
harassment,[5] encouraging employers to take a proactive approach to
preventing harassment, including by implementing training. *Faragher*, 524
U.S. at 807; *Ellerth*, 524 U.S. at 764–65; *EEOC v. Mgmt. Hosp. of Racine, Inc.*,
666 F.3d 422, 435–36 (7th Cir. 2012) (affirming jury's rejection of *Faragher-
Ellerth* defense where "evidence at trial suggested that the [anti-
harassment] training was inadequate").

 In addition to serving as a method to prevent discrimination,
mandatory trainings can help ensure Title VII compliance where litigation
has highlighted a particular form of workplace discrimination. Courts have
approved trainings as remedial injunctive measures to address a wide
range of discriminatory practices, policies, and behaviors. *See*, *e.g.*, *EEOC v.
Boh Bros. Constr. Co.*, 731 F.3d 444, 470 (5th Cir. 2013) (en banc) (affirming

---

[5] "The [*Faragher-Ellerth*] defense comprises two necessary elements: (a) that
the employer exercised reasonable care to prevent and correct promptly
any sexually harassing behavior, and (b) that the plaintiff employee
unreasonably failed to take advantage of any preventive or corrective
opportunities provided by the employer or to avoid harm otherwise."
*Faragher*, 524 U.S. at 807; *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765
(1998).

injunction, finding such measures to be "reasonably tailored to address deficiencies in [employer's] sexual harassment policies, inform and train employees regarding the relevant law, and prevent similar conduct from recurring"); *EEOC v. N. Star Hosp.*, No. 12-cv-214, 2014 WL 282026, at *4, 6 (W.D. Wis. Jan. 27, 2014) (granting injunctive relief requiring training of company managers and holding that training was "tailored to the deficiencies identified in defendants' operations"), *aff'd on other grounds*, 777 F.3d 898 (7th Cir. 2015); *EEOC v. Wal-Mart Stores, Inc.*, 11 F. Supp. 2d 1313, 1331 (D.N.M. 1998) (requiring Walmart to conduct ADA compliance training and post notice to employees), *aff'd*, 202 F.3d 281 (10th Cir. 1999); *EEOC v. Gurnee Inn Corp.*, No. 87 C 0888, 1988 WL 129329, at *1–2 (N.D. Ill. Nov. 28, 1988), *aff'd*, 914 F.2d 815 (7th Cir. 1990) (entering injunction ordering employer to, among other measures, adopt anti-harassment training program for supervisors).

In addition, in EEOC cases, courts regularly approve proposed consent decrees requiring anti-discrimination training, sometimes including implicit bias training. *See, e.g.*, Consent Decree at 6-7, *EEOC v. Trinity Health-Michigan, d/b/a Mercy Health St. Mary's,* No. 1:23-cv-00435 (W.D. Mich. Jan. 17, 2024), ECF No. 18 (requiring employer to train human

resources and senior leadership team members annually on Title VII's

religious protections for applicants and employees); Consent Decree at 5-7,

*EEOC v. Whiting-Turner Contracting Co.,* No. 3:21-cv-00753 (M.D. Tenn. May

3, 2023), ECF No. 323 (requiring annual training on discrimination,

harassment, and retaliation under Title VII); Consent Decree at 40, *EEOC v.*

*Activision Blizzard, Inc.,* No. 2:21-cv-07682 (C.D. Cal. Mar. 29, 2022), ECF No.

82 ("Defendants represent that they have created and enhanced an array of

training programs regarding non-discrimination, anti-harassment,

antiretaliation and related subjects including implicit bias, bystander

intervention, equity and diversity, and inclusive leadership training.").

The fact that anti-discrimination trainings may focus on identifying

unconscious bias does not change the calculus; such trainings, like other

anti-discrimination trainings, are not inherently problematic. As the

EEOC's guidance on "Race and Color Discrimination" explains, "[r]acially

biased decisionmaking and treatment … are not always conscious. [Title

VII] thus covers not only decisions driven by racial animosity, but also

decisions infected by stereotyped thinking or other forms of less conscious

bias." EEOC Compl. Man., Race and Color Discrimination § 15-V.A.1 &

n.37 (April 19, 2006)[6] (citing *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 42,

59–61 (1st Cir. 1999) (holding layoff could be found unlawful where

performance evaluations on which layoffs were based were racially biased,

and discussing the longstanding recognition that unlawful discrimination

can stem from stereotyping and cognitive bias, as well as from conscious

animus), and Charles R. Lawrence III, *The Id, the Ego, and Equal Protection:*

*Reckoning with Unconscious Racism*, 39 Stan. L. Rev. 317 (1987)). The

Compliance Manual elaborates:

> It is an axiom of human nature that people often like to associate with
> other people who are like themselves. This enhances a comfort level
> in working relationships. Such 'like me' bias may be conscious or
> unconscious. Nevertheless, the 'like me' syndrome can lead to a
> tendency to employ and work with people like oneself ….

*Id.* at § 15-IX n.161 (quoting EEOC Task Force Report, Best Practices of

Private Sector Employers (1998), https://www.eeoc.gov/best-practices-

private-sector-employers); *see also De Piero,* 2024 WL 128209, at *8

(recognizing importance of concepts like implicit bias in workplace anti-

discrimination trainings).

---

[6] Available at https://www.eeoc.gov/laws/guidance/section-15-race-and-color-discrimination.

In sum, to the extent Vavra suggests that it is reasonable to believe that anti-discrimination trainings in general (or unconscious bias trainings specifically) are inherently discriminatory, he misses the mark.

## II. Opposition to an anti-discrimination training, such as an unconscious bias training, may constitute protected activity where the plaintiff provides a fact-specific basis for his belief that the training violated Title VII.

Courts have held that where the complained-of conduct is not inherently discriminatory, a plaintiff must provide a fact-specific basis for his belief that the conduct violated Title VII in order to show that his belief is objectively reasonable. *See Byers v. Dall. Morning News*, 209 F.3d 419, 428-29 (5th Cir. 2000) (ruling that employee's belief that performance evaluation was discriminatory was objectively unreasonable absent any supporting evidence); *Isbell v. Baxter Healthcare, Corp.*, 273 F. Supp. 3d 965, 980 (N.D. Ill. 2017) (concluding that it was not objectively reasonable to construe complained-of materials and comments as harassment where they were "not inherently sexual harassment" and where plaintiff had failed to provide evidence of how they were, for instance, "demeaning toward women"); *see also Taylor v. Exxon Mobil Corp.*, No. 1:07-cv-03172, 2009 WL 458610, at *10 (N.D. Ill. Feb. 24, 2009) (concluding that simply labeling

comments as "racist" was insufficient at summary judgment for hostile-
work-environment claim where comments themselves were "not
inherently racist").

The same rule applies when an employee complains that an anti-
discrimination training is discriminatory: a plaintiff would need to show
how the training could be discriminatory—for example, in design or
execution. In discrimination cases involving anti-discrimination trainings,
courts have ruled in favor of plaintiffs who present this type of evidence or,
at the motion-to-dismiss stage, who make plausible allegations that explain
how the training was discriminatory. For instance, in *Hartman v. Pena*, 914
F. Supp. 225 (N.D. Ill. 1995) (cited in Appellant Br. 34), the employer
required its employees to complete a cultural diversity workshop that
involved a "'role-reversal' exercise." *Id.* at 227. Plaintiff participated after
"[o]thers voiced their disdain" for his initial reluctance. *Id.* As part of the
exercise, he walked between two rows of women who "touched his
genitalia and other parts of his body, while the preceding male participants
laughed and derided him." *Id.* Then the "men were numerically rated with
their names on a chart … illustrat[ing] human penises in various states of
arousal. The participants rated [plaintiff] the lowest." *Id.* The court held

that "a reasonable person might find such an environment hostile … where one is ridiculed for being unwilling to participate in an exercise of walking between rows of co-employees, then groped in a sexual manner by the co-employees forming the lines, and later humiliated by subscribing one's name to a graphic of a small, flaccid human penis." *Id.* at 229.

Similarly, in *De Piero*, 2024 WL 128209, at *7, the court held that a writing professor had plausibly alleged a hostile-work-environment claim, emphasizing that his allegations were "specific." The professor had identified, among other things, the specific content of and statements made during recurring trainings addressing racial issues, which consistently and categorically disparaged White people. *Id.* at *1–2, 7. The court concluded that although discussions about race are permitted under Title VII—and indeed, could "contribute positively to nuanced, important conversations about how to form a healthy and inclusive working environment … the way these conversations are carried out in the workplace matters: When employers talk about race—any race—with a constant drumbeat of essentialist, deterministic, and negative language, they risk liability under federal law." *Id.* at *8 (citation omitted).

But where a plaintiff fails to make plausible allegations (at the motion-to-dismiss stage) or provide evidence that a particular training could be discriminatory—for instance, in content or implementation—courts have rejected their claims. *See Norgren*, 2023 WL 35903, at *1, 7 (rejecting plaintiff's retaliation claim where failed to allege facts showing that the diversity training he experienced could constitute an unlawful employment practice); *cf. Young*, 2023 WL 1437894, at *7 (holding that allegations that diversity trainings "created a racially hostile environment" could not survive a motion to dismiss because they were "conclusory" and "unaccompanied by sufficient supporting factual allegations"—"[plaintiff] does not actually allege any specific facts describing the nature, contents, or frequency of the mandatory training"); *Shannon v. Cherry Creek Sch. Dist.*, No. 20-cv-3469, 2022 WL 4364151, at *3, 7 (D. Colo. Sept. 21, 2022) (rejecting plaintiff's claim that equity trainings subjected her to a racially hostile work environment where, according to the magistrate judge, she proffered no competent evidence regarding the content of the training or discussion surrounding the training and where, instead, "the undisputed evidence demonstrates that the equity trainings adhere to the policy designed to promote workplace equity and nondiscrimination").

In sum, in the absence of such additional evidence, the mere fact that
an employer requires employees to participate in an anti-discrimination
training is not enough to show that the training falls into a category of
conduct prohibited by Title VII.

## CONCLUSION

For the foregoing reasons, the Court should analyze Vavra's appeal
using the standards set forth above.

Respectfully submitted,

KARLA GILBRIDE
Acting General Counsel

JENNIFER S. GOLDSTEIN
Associate General Counsel

DARA S. SMITH
Assistant General Counsel

s/*Tara Patel*
TARA PATEL
Attorney
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Floor
Washington, D.C. 20507
202-921-2770
tara.patel@eeoc.gov

February 6, 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Circuit Rule 29 because it contains 4,679 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Circuit Rule 32 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Book Antiqua 14 point.

s/*Tara Patel*
TARA PATEL
Attorney
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Floor
Washington, D.C. 20507
202-921-2770
tara.patel@eeoc.gov

February 6, 2024

## CERTIFICATE OF SERVICE

I certify that on February 6, 2024, I electronically filed the foregoing brief in PDF format with the Clerk of Court via the appellate CM/ECF system. I certify that all counsel of record are registered CM/ECF users, and service will be accomplished via the appellate CM/ECF system.

I further certify that I caused fifteen paper copies of the foregoing brief to be mailed to the Clerk of Court.

s/ *Tara Patel*
TARA PATEL
Attorney
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Floor
Washington, D.C. 20507
202-921-2770
tara.patel@eeoc.gov