# NO. 23-2823

# In the
# United States Court of Appeals
# for the Seventh Circuit

CHARLES VAVRA,

*Plaintiff-Appellant,*

v.

HONEYWELL INTERNATIONAL INC., A DELAWARE
CORPORATION D/B/A HONEYWELL INTELLIGRATED,

*Defendant-Appellee.*

Appeal from the United States District Court for the N.D. Ill.,
the Eastern Division, Case No. 1:21-cv-06847

## REPLY BRIEF OF PLAINTIFF-APPELLANT
## CHARLES VAVRA

Alec J. Beck (#201133)
PARKER DANIELS KIBORT
888 Colwell Building
1213 North Third Street
Minneapolis, MN 55401
(612) 355-4119
beck@parkerdk.com

James V.F. Dickey (#393613)
UPPER MIDWEST LAW CENTER
8421 Wayzata Boulevard, Suite 300
Golden Valley, MN 55426
(612) 428-7000
james.dickey@umlc.org

*Attorneys for Plaintiff-Appellant
Charles Vavra*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................... ii

REPLY ARGUMENT ................................................................................................................... 1

    **I.**  VAVRA'S OBJECTION TO THE UNCONSCIOUS BIAS TRAINING WAS PROTECTED ACTIVITY UNDER THE ACT, AND HE WAS TERMINATED BECAUSE OF IT. ......................................................................................... 3

        A.  Vavra's sincere belief that the training was racially discriminatory is apparent from the record. ........................... 5

        B.  Vavra's sincere belief that the training was racially discriminatory, and therefore unlawful under Title VII, was also objectively reasonable. ............................................................................................................... 8

    **II.**  A REASONABLE JURY COULD INFER THAT VAVRA'S EMPLOYMENT WAS TERMINATED BECAUSE OF HIS OFFICIAL DISCRIMINATION COMPLAINT. ..... 16

        A.  The timing of Vavra's termination after his discrimination complaint is suspicious enough to establish a prima facie case of retaliation. ............................................................................................................. 17

        B.  Honeywell took *no* action, in violation of its own policy, in response to Vavra's complaint. .............................. 23

        C.  Honeywell's motive for terminating Vavra is still in dispute, making summary judgment inappropriate. ........... 26

CONCLUSION ........................................................................................................................... 28

CERTIFICATE OF COMPLIANCE .......................................................................................... 30

# TABLE OF AUTHORITIES

## STATUTES

42 U.S.C. § 2000e-2e .......................................................................... 11

42 U.S.C. § 2000e-3 ........................................................................... 1,3

## CASES

*Alexander v. Wis. Dep't of Health & Family Servs.*,
    263 F.3d 673 (7th Cir. 2001) ................................................. 26

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ............................................................... 3, 8

*Baines v. Walgreen Co.*,
    863 F.3d 656 (7th Cir. 2017) ............................................. 17, 24

*Bourgeois v. United States Coast Guard*,
    151 F. Supp. 3d 726 (W.D. La. 2015) ................................... 14

*Carlson v. CSX Transp., Inc.*,
    758 F.3d 819 (7th Cir. 2014) ................................................... 1

*Castro v. DeVry Univ., Inc.*,
    786 F.3d 559 (7th Cir. 2015) ................................................. 27

*Chaney v. Plainfield Healthcare Ctr.*,
    612 F.3d 908 (7th Cir. 2010) ................................................. 25

*Devine v. Pittsburg Bd. of Pub. Educ., No. 2:13-CV-220*,
    2015 U.S. Dist. LEXIS 74988 (W.D. Pa. June 10, 2016) ................ 11

*Fine v. Ryan Int'l Airlines*,
    305 F.3d 746 (7th Cir. 2002) ................................................... 8

*Fourteenth Amendment. Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007) ................................................................. 6

*Gracia v. SigmaTron Int'l, Inc.*,
    842 F.3d 1010 (7th Cir. 2016) ................................................. 2

*Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*,
    224 F.3d 701–07 (7th Cir. 2000) ......................................... 1, 3

*Hartman v. Pena,*
    914 F. Supp. 225 (N.D. Ill. 1995) ........................................................ 10, 15, 25

*Holland v. Jefferson National Life Insurance Co.*, 883 F.2d 1307 (7th Cir. 1989)
    ............................................................................................................. *passim*

*Hudson v. Chi. Transit Auth.*,
    375 F.3d 552 (7th Cir. 2004) ......................................................................... 26

*Joseph Norgren v. Minnesota Department of Human Services*,
    No. 22-489, 2023 U.S. Dist. LEXIS 786 (D. Minn. Jan. 4, 2023) .............. 13, 14

*Kidwell v. Eisenhauer,*
    679 F.3d 957 (7th Cir. 2012) ........................................................ 16, 23, 24, 28

*Kulumani v. Blue Cross Blue Shield Ass'n,*
    224 F.3d 681 (7th Cir. 2000) ......................................................................... 24

*Lang v. Ill. Dep't of Children and Family Servs.*,
    361 F.3d 416 (7th Cir. 2004) ......................................................................... 20

*Lesiv v. Ill. Cent. R.R. Co.,*
    39 F.4th 903 (7th Cir. 2022) ........................................................................... 2

*Lord v. High Voltage Software, Inc.,*
    839 F.3d 556 (7th Cir. 2016) ........................................................... 1, 3, 10, 16

*Loudermilk v. Best Pallet Co., LLC,*
    636 F.3d 312 (7th Cir. 2011) ............................................................. 16, 17, 18

*Magyar v. St. Joseph Reg'l Med. Ctr.,*
    544 F.3d 766 (7th Cir. 2008) .................................................................. *passim*

*McClendon v. Ind. Sugars, Inc.,*
    108 F.3d 789 (7th Cir. 1997) ......................................................................... 20

*McGraw-Edison Co. v. Walt Disney Prods.,*
    787 F.2d 1163 (7th Cir. 1986) ......................................................................... 3

*Miller v. Am. Family Mut. Ins. Co.,*
    203 F.3d 997 (7th Cir. 2000) ......................................................................... 12

*Owens v. Old Wis. Sausage Co.,*
    870 F.3d 662 (7th Cir. 2017) ........................................................................... 4

iii

*Perez v. Staples Contract & Commer. LLC*,
  31 F.4th 560 (7th Cir. 2022) .............................................................. 21

*Riley v. City of Kokomo*,
  909 F.3d 182 (7th Cir. 2018) ................................................................7

*Roth v. Lutheran Gen Hosp.*,
  57 F.3d 1446 (7th Cir. 1995) ............................................................... 8

*Rucker v. Higher Educ. Aids. Bd.*,
  669 F.2d 1179 (7th Cir. 1982) ........................................................... 15

*Scheidler v. Indiana*,
  914 F.3d 535 (7th Cir. 2019) ............................................................... 7

*Silk v. Bd. of Trs.*,
  795 F.3d 698 (7th Cir. 2015) ............................................................. 20

*Smith v. Bray*,
  681 F.3d 888 ..................................................................................... 25

*Daza v. Indiana*,
  331 F. Supp. 3d 810 (S.D. Ind. 2018) ......................................... 12, 13

*Stone v. City of Indianapolis Public Utilities Division*,
  281 F.3d 640 (7th Cir. 2002) ............................................................. 18

*Stumph v. Thomas & Skinner, Inc.*,
  770 F.2d 93 (7th Cir. 1985) ............................................................... 26

*Talanda v. KFC Nat'l Mgmt. Co.*,
  140 F.3d 1090 (7th Cir. 1998) ............................................................. 5

*Tank v. T-Mobile USA, Inc.*,
  758 F.3d 800 (7th Cir. 2014) ............................................................. 24

*Title VII. Logan v. City of Chicago*,
  4 F.4th 529 (7th Cir. 2021) ...................................................... *passim*

*Univ. of Texas Sw. Med. Ctr. v. Nassar*,
  570 U.S. 338 (2013) ............................................................................ 2

## OTHER AUTHORITIES

EEOC ..................................................................................................... 11

Fed. R. App. P. 32 ................................................................................................. 30

## REPLY ARGUMENT

Charles Vavra's termination from Honeywell "would not have happened without the [protected] activity." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 n.1 (7th Cir. 2014); *see* 42 U.S.C. § 2000e-3(a) (making it illegal "to discriminate against any individual . . . because he has opposed any practice made an unlawful unemployment practice by the subchapter"). There are two ways to evaluate Vavra's protected activity.  Under either view, the district court was wrong to grant summary judgment.

First, Honeywell claims that it terminated Vavra only because of his refusal to take the Unconscious Bias Training. But even in that case, Vavra was still engaged in protected activity because he sincerely and reasonably believed the training was unlawful under Title VII. A "retaliation claim isn't doomed simply because the com-plained-of-conduct was not in fact an unlawful employment practice;" rather, Vavra need only show "a sincere and *reasonable* belief that he [was] opposing an unlawful practice." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) (quoting *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 706–07 (7th Cir. 2000)).

In this case, Vavra sincerely and reasonably believed that he was opposing Honeywell's decision to favor certain races at the expense of others, and make white employees feel guilty. Such race-based distinctions certainly "fall[] into the category

1

of conduct prohibited by [Title VII]," making Vavra's sincere belief reasonable. *Id.* (quoting *Magyar v. St. Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 771 (7th Cir. 2008)).

In the alternative, Vavra engaged in protected activity when he emailed Honeywell reporting discrimination in John Waldron's email and in the training requirement. There is ample circumstantial evidence that Vavra was terminated not for his refusal to take the training, but in retaliation for his emails. *See Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 915 (7th Cir. 2022)(explaining that if "a retaliatory motive [is] a 'but-for cause'" of an employee's termination, the employer violated Title VII) (quoting *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1019 (7th Cir. 2016)). As the *Lesiv* Court noted, proof of a but-for cause requires evidence "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful actions of the employer." *Id.* (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

The record clearly shows that the unlawful retaliation against Vavra occurred only because and after Honeywell engaged in discrimination, which led to Vavra reporting it. It was not until *after* Vavra sent his first email that Honeywell threatened him with termination. Further, Honeywell violated its own policy by, *as it admitted in its brief*, not investigating or responding to Vavra's good-faith discrimination complaint at all. This circumstantial evidence would allow a reasonable jury to conclude that Vavra was terminated because of his protected activity.

2

The district court therefore erred by granting summary judgment, and this Court should reverse.

## I.   Vavra's Objection to the Unconscious Bias Training Was Protected Activity Under the Act, and He Was Terminated Because of It

For a Title VII retaliation claim, Vavra must show that he "suffered an adverse employment action because of his statutorily protected activity." *Lord*, 839 F.3d at 563. Courts do not accept as true a summary-judgment movant's claimed reason for terminating a Title VII plaintiff; rather, they do the opposite and take all inferences in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). But even if the Court were to credit Honeywell's version of the facts and hold that Vavra's refusal to complete the Unconscious Bias Training was Honeywell's reason for terminating him, he was still terminated because of statutorily protected activity because his refusal to take the training was in "oppos[ition] [to] a[] practice made an unlawful employment practice by" Title VII. 42 U.S.C. § 2000e-3(a). To prevail then, all Vavra must show is that he had "a sincere and *reasonable* belief that he [was] opposing an unlawful practice." *Lord*, 839 F.3d at 563 (quoting *Hamner*, 224 F.3d at 706–07). Honeywell's arguments to the contrary fail.

First, Honeywell wrongly claims that Vavra was not acting in good faith because he could not have possibly believed what he himself said about the training. Appellee Br. 26. This credibility argument is inappropriate at this stage of the litigation. *See McGraw-Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163 (7th Cir. 1986)

3

("Subjective issues such as good faith are singularly inappropriate for determination on summary judgment"). Honeywell's argument flies in the face of the requirement to take all justifiable inferences in the nonmovant's favor. Honeywell even admits that the district court assumed Vavra's sincerity below, which it had to on summary judgment. Appellee Br. 25.

Second, Honeywell wrongly argues that Vavra's objection to the training was unreasonable. But in doing so, Honeywell necessarily demands that Vavra prove to his employer that he is objecting to an employment practice that has been conclusively shown to be unlawful. That is not remotely the correct standard, as Honeywell tacitly acknowledges – "Title VII allows for an employee's activity to have the *potential* to be protected." Appellee Br. 28 (emphasis added). This is correct so far, but Honeywell then radically distorts case law to require much more. This Court has rejected such attempts to increase employees' Title VII burden. *See Owens v. Old Wis. Sausage Co.*, 870 F.3d 662, 668 (7th Cir. 2017)("A protected activity can include some step in opposition to a form of discrimination protected under the statute, and the employee needs only a good-faith and reasonable belief that the conduct she is opposing is unlawful."). Finally, Honeywell fails to undercut the reasonableness of Vavra's belief.

4

## A. Vavra's sincere belief that the training was racially discriminatory is apparent from the record

Honeywell argues that Vavra could not have had a sincere belief that the Unconscious Bias Training was racially discriminatory because he did not know enough about it. This Title VII does not, however, demand that employees have perfect knowledge before filing a discrimination complaint. Indeed, the entire point of a Title VII retaliation claim is that employers cannot retaliate against employees for protected activity *even if they end up being wrong. See Talanda v. KFC Nat'l Mgmt. Co.*, 140 F.3d 1090, 1096 (7th Cir. 1998) ("[I]n retaliation cases . . . 'it is good faith and reasonableness, not the fact of discrimination, that is the critical inquiry.'"). To require more would be to force employees to subject themselves to all sorts of unlawful treatment just to finally be able to complain about it later.

Furthermore, Honeywell has no answer for what Vavra *did* conclude about the training, based on what he *did* know. Vavra's concerns about the training were based on the email sent by John Waldron. *See* ECF 43, p. 11; SOF ¶ 29 ("To be honest, if John Waldron's 9/24 email below hadn't preceded the training mandate a couple months earlier I probably would have just taken it. . . ."); ECF 43-1, Ex. A p. 78; Vavra Dep. p. 132:3–12. Vavra explicitly stated his belief that Waldron's email was "incredibly offensive, discriminatory and racist," and as a result, he did not "want to be 'trained' to be someone like that." ECF 43-12, Ex. L p. 8. Because Waldron's email drew distinctions about what Honeywell employees were supposed to

feel and believe *based on race*, Vavra thought the training would do the same. In-
deed, he believed "it was going to try to make me feel guilty for the color of my skin,
that it was going to make people of color feel like victims for the color of their skin."
ECF 43-1, Ex. A p. 78; Vavra Dep. p. 132:7–8. That belief "was based on the content
of John Waldron's email." *Id.* at 132:10–12.

At bottom, in his official discrimination complaint and subsequent deposition,
Vavra made clear that he believed the training was discriminatory and explained
why he thought so. Vavra's belief that discrimination based on race is something to
which he could reasonably object is not surprising—the United States Supreme
Court has made it clear for decades that "discrimination on the basis of race" is un-
lawful and violates the Fourteenth Amendment. *Parents Involved in Cmty. Sch. v.
Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007)("The way to stop discrimination
on the basis of race is to stop discriminating on the basis of race.").

Honeywell, however, claims it is "ludicrous" that Vavra would have believed
what he himself said. Appellee Br. 26. After all, Honeywell claims the intent of the
training was "to overcome [biases] to create an environment that values everyone's
perspectives." *Id.*  No doubt Honeywell can come up with innocuous descriptions
for its training programs.  However, there is no requirement that Vavra had to (or
even should) take Honeywell's word for it. Instead, the critical question is whether
Vavra "subjectively believed" that the training was racially discriminatory-conduct

prohibited by Title VII. *Logan v. City of Chicago*, 4 F.4th 529, 538 (7th Cir. 2021). There is no serious argument that he did not; the record evidence amply demonstrates that Vavra made up his mind about the training based on John Waldron's earlier email. And Vavra was not alone—other employees agreed with him. ECF 10, p. 5; Am. Compl. ¶ 13. What Honeywell later said to justify its training does not control.

What is actually "ludicrous" is Honeywell's position. It is unreasonable to conclude that Vavra would have filed an official discrimination claim, written lengthy justifications for his beliefs on multiple occasions, and eventually lost his job all so he could claim that the training was discriminatory when he himself did not believe it was. As in *Holland v. Jefferson National Life Insurance Co.*, 883 F.2d 1307, 1315 (7th Cir. 1989), "the sincerity of [Vavra's] belief is amply supported" by the fact that he "did in fact subsequently" file a discrimination claim.

*Only* in cases where plaintiffs have openly admitted to having ulterior motives has this Court concluded, at the summary judgment stage, that a plaintiff was insincere. *See Scheidler v. Indiana*, 914 F.3d 535, 543 (7th Cir. 2019)(affirming grant of summary judgment on Title VII retaliation claim, in part, because Plaintiff admitted that "she did not think her comment was sexual," so it could not be a statutorily protected complaint of sexual discrimination); *Riley v. City of Kokomo*, 909 F.3d 182, 192 (7th Cir. 2018)(affirming grant of summary judgment on Title VII retaliation claim, in part, because Plaintiff admitted in her deposition to reporting her

supervisor for failing to follow procedures, not a discriminatory practice); *see also Roth v. Lutheran Gen Hosp.*, 57 F.3d 1446 (7th Cir. 1995)(affirming the denial of a preliminary injunction, in part, because district court could have concluded that Plaintiff was not sincere based on his "repeated[] attempt[s] to circumvent and/or manipulate the system by using his alleged disability to gain competitive advantage"). Given the absence of similarly contradictory evidence in this case, only a jury can determine if Vavra meant what he said. *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

Finally, Honeywell has no answer for what *it said* about Vavra's complaint. Honeywell's own policy states that "[m]aking a report in 'good faith' means your report is honest, sincere, and complete." ECF 43, p. 3; SOF ¶ 6. And "Honeywell did not question whether Vavra made his objections to the Training in 'good faith.'" ECF 42, p. 7; Def.'s Mem. for Summ. J. at p. 7. Good faith is all that is required here, and Honeywell has already admitted as much. *See Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 752 (7th Cir. 2002) ("All that is required is that '[]he reasonably believed in good faith that the practice []he opposed violated Title VII.'").

### B. Vavra's sincere belief that the training was racially discriminatory, and therefore unlawful under Title VII, was also objectively reasonable

Honeywell radically distorts case law in an attempt to raise the standard for a plaintiff to prevail in a Title VII retaliation claim. According to Honeywell, Vavra "does not point to any cases in support of the notion that so long as the *type* of activity he complained of *could* be discriminatory in an entirely different context, that is enough to make his refusal to undergo the UBA training objectively reasonable." Appellee Br. 28.

To be clear, Vavra pointed to what *was*, not what *could be*, and plenty of it. *See* Appellant Br. 33–34.

But beyond Honeywell's distortion of the record, Honeywell's problem is not with Vavra's arguments, but with this Court's on-point precedent. In fact, Honeywell's claim above grossly misrepresents the law in this Circuit. This Court has repeatedly held that complaints about "types" of activities meet the "objectively reasonable" standard. *Compare* Appellee Br. 27–28 *with Holland*, 883 F.2d at 1315 (explaining that Plaintiff's belief was objectively reasonable because the complained-of conduct was "the *type of activity* that, *under some circumstances*, supports a charge of sexual harassment" (emphasis added)); *Magyar*, 544 F.3d at 772 (concluding that reported conduct was "the *type of occurrence* that, *if it happened often enough, could* constitute sexual harassment" (emphasis added)); *see also Logan*, 4 F.4th at 538 ("The objective reasonableness of the [plaintiff's] belief is not assessed by examining whether the conduct was persistent or severe enough to be

9

unlawful, but merely whether it falls into the category of conduct prohibited by the statute." (quoting *Lord*, 839 F.3d at 563).

Furthermore, Vavra is not arguing that Honeywell's actions "could be discriminatory in an entirely different context." Appellee Br. 28. Rather, Vavra has demonstrated that workplace trainings, the *exact context at issue* in this case, can "fall[] into the category of conduct prohibited" by Title VII. *Logan*, 4 F.4th at 538 (quoting *Lord*, 839 F.3d at 563). *Hartman v. Pena*, 914 F. Supp. 225 (N.D. Ill. 1995), makes this clear. There, the district court denied summary judgment to defendants because the workplace sensitivity training program, likely implemented with good intentions, was "humiliating objectively" for male participants. *Id.* at 230. In response, Honeywell claims that the training in *Hartman* was "vastly different than that at issue here" and, as a result, Honeywell's training did not amount to an "unlawful employment practice proscribed by Title VII." Appellee Br. 31–32.

These arguments, however, entirely miss the point of a Title VII retaliation claim. "[T]o succeed on a retaliation claim," Vavra need not demonstrate that the racially discriminatory nature of Honeywell's training program was "actually serious enough to constitute a Title VII violation." *Magyar*, 544 F.3d at 771. Instead, Vavra reasonably believed that the program would treat different races differently.

Vavra had good reason for this belief. John Waldron's email singled out "how our Black colleagues our feeling" based on current events, promised to bring in

interview candidates based on diversity, and opened up his "hands and heart" to "Black, Hispanic, Asian, and LGBTQ colleagues"—*only*. ECF 43, p. 4–5; SOF ¶ 12; *see* 42 U.S.C. § 2000e-2e(a)(2) ("It shall be an unlawful employment practice for an employer to . . . classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities . . . because of such individual's race . . . ."). It is not unreasonable to suspect that one of the "other actions [Honeywell] will be taking"—promised in John Waldron's email—would similarly make race-based distinctions. ECF 43, p. 4–5; SOF ¶ 12. That is the type of conduct Title VII prohibits, *see Devine v. Pittsburg Bd. of Pub. Educ.*, No. 2:13-CV-220, 2015 U.S. Dist. LEXIS 74988 (W.D. Pa. June 10, 2016), and it applies just as forcefully to workplace trainings, *see* EEOC, Questions and Answers about Race and Color Discrimination in Employment, (April 19, 2006), https://www.eeoc.gov/laws/guidance/questions-and-answers-about-race-and-color-discrimination-employment ("Title VII prohibits race and color discrimination in *every aspect of employment*, including . . . *training* . . . and any other term, condition, or privilege of employment." (emphasis added)).

Honeywell claims that *Devine* is not supportive based on a complete misreading of the case. In *Devine*, a white teacher claimed she was subjected to different treatment than black teachers based on a principal's focus on eliminating "white privilege" at the school. *Devine*, 2015 U.S. LEXIS 74988 at *2–6. The court made

clear that the principal's alleged favoring of black teachers at the expense of the white plaintiff-teacher was "cognizable" under Title VII. *Id.* at *9. Summary judgment was denied because "Plaintiff is able to point to evidence which, when viewed in the light most favorable to her, could permit a reasonable jury to conclude that Defendants' cited reasons for her [Employee Improvement Plan] and unfavorable review were a pretext for race discrimination." *Id.* at *14–15. To be sure, there were some facts that "undercut" the "Plaintiff's theory of anti-white bias," *id.* at *19–20, but it was "the role of the jury to determine which version of events to believe," *id.* at *20. The point still stands that allegedly disparate treatment based on "white privilege" presents the "type[] of discrimination [Title VII] prohibits." *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000). And that is exactly what Vavra reasonably believed was going on when he opposed Honeywell's Unconscious Bias Training.

The remaining cases Honeywell relies on do nothing to change this fact. Start with *Daza v. Indiana*, 331 F. Supp. 3d 810 (S.D. Ind. 2018). As in this case, *Daza* concerned a company policy that the plaintiff alleged was racially discriminatory. *Id.* at 841. The similarities stop there. The company policy at issue in *Daza* was the Indiana Department of Transportation's Core4 Principles—respect, teamwork, accountability, and excellence—and the plaintiff was terminated for not complying with them through numerous instances of unprofessionalism, including by

remarking to a coworker that a training program was "f#ing gay." *Id.* at 830, 835. It is no surprise that the plaintiff's later argument that it was "racially discriminatory" for the Department to expect him to act with respect, teamwork, accountability, and excellence, was "a non-starter." *Id.* at 844. Here, however, Vavra's employment record was flawless. ECF 10, p. 4; Am. Compl. ¶ 11; ECF 43-4, Ex. D p. 6; Cortez Dep. at p. 15:13–14. And the court in *Daza* never reached plaintiff's retaliation claim, what is at issue in this case, due to a failure to exhaust administrative remedies. *Daza*, 331 F. Supp. 3d at 849.

Similarly, in *Joseph Norgren v. Minnesota Department of Human Services*, No. 22-489, 2023 U.S. Dist. LEXIS 786 (D. Minn. Jan. 4, 2023), *appeal filed* 8th Cir. Nos. 23-1207, 23-1208, the Court dismissed the plaintiff's retaliation claim because, it claimed, "the Amended Complaint d[id] not include any factual allegations showing that Norgren 'voiced dissent'" or otherwise engaged in protected activity, and there were insufficient facts for the district court to conclude that the plaintiff "suffered a materially adverse employment action." *Id.* at *17. The district court in that case was plainly wrong, because Joseph Norgren explicitly alleged in the Amended Complaint that he "specifically voiced his objection to the gender identity training on September 10, 2020, to Supervisor Ploog," "sought an exemption from Supervisor Ploog," and then, after he was denied, emailed another supervisor, saying "[y]our decision . . . created a hostile and uncomfortable work environment with the

implementation and propagation of "Critical [Race] Theory" . . . ." *Joseph Norgren v. Minn. Dep't of Human Servs.*, D. Minn. No. 22-cv-489-ADM-HB, ECF No. 15, Am. Compl. ¶¶ 20, 23, 32 (Apr. 20, 2022).  Of course, unlike in *Norgren*, Vavra voiced his objections clearly and unmistakenly.

Further, the *Norgren* court was dealing with a hostile work environment claim (unlike here), and held that "[r]equiring all employees to undergo diversity training does not amount to abusive working conditions." 2023 U.S. Dist. LEXIS 786, at *10. Other than this passing statement, there was no meaningful discussion of whether a diversity training *could* violate Title VII. *See id.* This is not, as Honeywell claims, proof that Vavra's argument fails. *See* Appellee Br. at 30. Instead, it only underscores that a diversity training, without more, usually does not create a hostile work environment. That says nothing about whether a diversity training which treats different races differently is "the type of activity that, under some circumstances," violates Title VII. *Holland*, 883 F.2d at 1315.

Finally, Honeywell cites to *Bourgeois v. United States Coast Guard*, 151 F. Supp. 3d 726 (W.D. La. 2015). That case is, yet again, fundamentally different. In *Bourgeois*, the plaintiff claimed that the adverse employment action at issue *was* the diversity training he was ordered to attend. While the court credited the Coast Guard's intent to "rectify potential harassment" through the training in passing, the crux of its holding was that watching training videos did not amount to an adverse

employment action, thus dooming the retaliation claim. *Id.* at 740. In this case, it is undisputed that Vavra suffered an adverse employment action through his termination. And passing statements about good intentions do not save Honeywell in any event. *See Hartman*, 914 F. Supp. at 227, 230 (explaining that a training exercise designed to make male employees experience what female employees encountered could still violate Title VII).

In sum, none of the cases cited by Honeywell demonstrate that Vavra's objection to the Unconscious Bias Training was "utterly baseless." *Holland*, 883 F.2d at 1216 (quoting *Rucker v. Higher Educ. Aids. Bd.*, 669 F.2d 1179, 1182 (7th Cir. 1982)). Instead, Vavra reasonably believed the training was racially discriminatory. By purporting to terminate his employment for refusing to complete that same training, Honeywell retaliated against Vavra in violation of Title VII.

This conclusion does not, contrary to Honeywell's assertions (Appellee Br. 32–33) lead to absurd results. What would be absurd, however, is to require employees to undergo treatment they suspect violates the very protections to which they are entitled in Title VII to bring a meritorious lawsuit after the fact. Instead, employees are free to use the information they already have to make a discrimination claim, even if they end up being wrong. *See Magyar*, 544 F.3d at 771 (holding that plaintiff's "need not prove that the underlying conduct . . . was serious enough to constitute a Title VII violation").

15

Vavra had good reason to do so here. As discussed above, John Waldron's original email made distinctions based on race in how employees were addressed and how prospective employees would be treated. It is not unreasonable to suspect that a training program foreshadowed in that same email would do so again. As a result, this is not a case where an employee is just refusing to complete a routine training program and depending on Title VII to get away with insubordination, so a reversal would not open the floodgates to baseless litigation. All Honeywell had to do was not retaliate against Vavra for his reasonable objection.

## II.    A Reasonable Jury Could Infer that Vavra's Employment was Terminated Because of his Official Discrimination Complaint

There is no dispute that Vavra's discrimination-complaint emails were protected activity or that he suffered adverse employment action through his termination shortly after. To survive summary judgment, Vavra only needs to "produce sufficient evidence to show that his purportedly protected speech was at least a motivating factor in the defendants' alleged retaliatory employment actions taken against him." *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012). The burden then shifts to Honeywell to rebut the causal inference. *Id.*

Vavra carried his burden, but Honeywell did not carry its own. First, Vavra has submitted sufficient circumstantial evidence "from which a trier of fact may infer that retaliation occurred." *Lord*, 839 F.3d at 563. Vavra's termination came "on the heels" of his discrimination-complaint emails. *Loudermilk v. Best Pallet Co., LLC*,

16

636 F.3d 312, 315 (7th Cir. 2011) (explaining that when "an adverse action comes

so close on the heels of a protected act . . . an inference of causation is sensible").

Honeywell threatened termination only *after* he sent those emails.

Furthermore, it is clear that Honeywell never investigated or responded to

Vavra's complaints, despite its initial claim that it did so. *See* ECF 14, p. 21; Answer

¶ 6. Honeywell made an unusual departure from its policy to provide a "prompt[]

and thorough[]" investigation, *see* ECF 43-2, Ex. B p. 16.  It further neglected a

discrimination complaint which admittedly was made in "good faith," ECF 42, p. 7;

Def.'s Mem. for Summ. J. at p. 7.  Plaintiff's failure to follow policy raises serious

suspicion of retaliatory motive.  *See Baines v. Walgreen Co.*, 863 F.3d 656, 664 (7th

Cir. 2017)(An employer's unusual deviation from standard procedures can serve as

circumstantial evidence of discrimination.").

In sum, given the timing of events and Honeywell's failure to follow its own

policies, a jury could easily conclude that Vavra's emails and subsequent communi-

cations factored into his termination.

> ### A.   The timing of Vavra's termination after his discrimi-nation complaint is suspicious enough to establish a *prima facie* case of retaliation.

Both Honeywell and the district ignore the maxim that sometimes "an adverse

action comes so close on the heels of a protected act that an inference of causation

is sensible." *Loudermilk*, 636 F.3d at 315. The district court went out of its way to

aggressively ignore the suspicious timing in the case. The court cited *Stone v. City of Indianapolis Public Utilities Division*, 281 F.3d 640, 644 (7th Cir. 2002), for the proposition that timing "will *rarely* be sufficient in and of itself to create a triable issue." App. 18 (quoting *id.* at 644 (emphasis added)). But the court then went even further by ignoring context and stating the holding differently: "suspicious timing . . . alone is not enough." App. 18.

In doing so, the district court ignored the instruction from *Loudermilk* to examine context to determine if an inference of causation was sensible. 636 F.3d at 315 ("Deciding when the inference is appropriate cannot be resolved by a legal rule; the answer depends on context . . . ."). Such a decision is "untenable" because "[a] jury, not a judge, should decide whether the inference is appropriate." *Id.*

And, contrary to Honeywell's characterization of the case, there is ample reason for a jury to conclude that "an interference of causation would be reasonable here." *Id.* Timing makes clear that it was Vavra's complaint emails that triggered Honeywell's decision to terminate him. Vavra's first discrimination complaint was sent on March 8. ECF 43, p. 10–16; SOF ¶ 29. His second was sent on March 23, ECF 43, Ex. L p. 6–11, and the next day he forwarded both emails to HR, reaffirming that both should be treated as "***an 'official' discrimination claim***," *Id.*; ECF 43, p. 18–19; SOF ¶ 38 (emphasis added). Vavra's final communication was on March 30 when he sent another email to HR Representative Katie Becker sharing a YouTube

video in support of his position and asking for an update on "where things stand." ECF 43, p. 19–20; SOF ¶ 40. After that final message, where Vavra politely requested a follow-up to his discrimination complaint, Honeywell turned around and scheduled his termination meeting just two days later. *Id.*; ECF 43, p. 20; SOF ¶ 41. In sum, that termination came only eight days after Vavra's final email, fourteen days after Vavra's official-complaint email, and one month after his initial complaint.

Honeywell instead wishes to characterize Vavra's termination as a months-long process. Again, Honeywell's characterization is contrary to this Court's analytical framework. As the court explained in *Magyar*, when there is an initial complaint and follow-up communications, the correct approach at summary judgment "is to assume that the suspicious-timing clock was restarted" with the subsequent communications. 544 F.3d at 772. As a result, Honeywell is simply incorrect to assert that "Vavra's March 8, 2021 e-mail constitutes his first protected activity, and he was not terminated until April 7, 2023. Therefore, according to his own analysis, the length of time between these two events does not support an inference of causation." Appellee Br. 37–38. Rather, under this Court's framework, only eight days had elapsed, and an inference of causation is proper. *See Holland*, 883 F.3d at 1315, 1315 n.3 (holding that adverse employment action about one week later was a "'telling' temporal sequence demonstrat[ing] a causal link").

Nevertheless, even using *Honeywell's own analysis*, "a month [is] short enough to reinforce an inference of retaliation." *Magyar*, 544 F.3d at 772 (citing *Lang v. Ill. Dep't of Children and Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004)).[1] Honeywell's attempt to twist and then avoid *Magyar* is meritless. Contrary to Honeywell's characterization, the time period at issue in *Magyar* was even longer than in this case. The plaintiff informally reported an incident of sexual harassment to her boss in August. *Magyar*, 544 F.3d at 768. Her boss apparently spoke with the perpetrator but never followed up with the plaintiff. *Id.* In September, she made an official complaint with HR. *Id.* The allegedly retaliatory response came in October when the plaintiff's new position suddenly disappeared and she received a new part time job, and then in April of the following year when she was eventually terminated. *Id.* at 772. As the court explained, it *could have* considered the entire 10-month time period in its analysis. *Id.* But that would have been "[t]he way most favorable to the [employer]." *Id.* In considering the case on summary judgment, the court determined

---

[1] To be sure, some of this Court's cases have confirmed that shorter amounts of time were sufficiently suspicious to warrant an inference of causation. *See, e.g.*, *McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789 (7th Cir. 1997). But none of these cases held that a greater amount of time could not support the inference, and Vavra's termination just a few days after his follow-up emails is obviously much closer to the permissible line of cases. And it's also important to consider that this Court has only refused to find an inference of causation *coupled with* legitimate and nondiscriminatory reasons for termination *unrelated* to the objection itself. *See, e.g.*, *Silk v. Bd. of Trs.*, 795 F.3d 698, 710 (7th Cir. 2015) (holding that a *few weeks* was insufficient for an inference of causation in the face of multiple reasons for termination unrelated to the report of discrimination).

"that the approach most favorable to [the plaintiff] [was] to assume that the suspicious-timing clock was restarted on September 17" when the plaintiff complained to HR. *Id.* Similarly, as summary judgment requires the Court to construe the facts in the light most favorable to Vavra, *see Perez v. Staples Contract & Commer. LLC*, 31 F.4th 560, 571 (7th Cir. 2022), the date of his renewed complaint emails should govern.

Honeywell's attempt to distinguish this case from *Holland* is also unsuccessful. There, a plaintiff informed her employer that she would need to go on maternity leave in March. *Holland*, 883 F.2d at 1309. According to the plaintiff's version of events, the company had no problem with this decision and initially made preparation to have other employees cover her responsibilities during the maternity leave. *Id.* The company suddenly changed tone in August when an incident occurred, and the plaintiff threatened to contact the EEOC. *Id.* at 1309–10. One week after her threat, the plaintiff was told her job would not be waiting for her after maternity leave. *Id.* at 1310.

Vavra's termination followed a similar path. When he first missed the deadline to complete the Unconscious Bias training, Vavra received automated reminder emails and a few polite emails requesting he complete the task. None of these communications informed Vavra that his failure to complete the training would be considered insubordination or amount to his termination. It was not until *after* Vavra

sent his email complaint that he had his first Teams meeting with a higher-up at Honeywell for not completing the training. ECF 43, p. 17; SOF ¶ 32. It was during that call with Chris Maines, Vice President of Engineering, that Vavra was first threatened with insubordination. *Id.* And it was only after Vavra's third email that Honeywell scheduled a Teams call with him about the subject. ECF 43, p. 19–20; SOF ¶¶ 40, 41. Like in *Holland*, it was Vavra's discrimination complaint, not a different circumstance, that led to a suspicious change in how he was treated by Honeywell.

It is unreasonable to think that Honeywell was just trying to gain compliance with the training the entire time. If that were true, Honeywell would have informed Vavra, before he filed a discrimination complaint, that his termination was possible. Obviously, the threat of termination is much more effective than an automated email. Vavra's own statements that Honeywell could "[d]o whatever it is you feel you have to do to deal with my non-compliance," do nothing to undercut this fact. ECF 43 p. 16; SOF ¶ 29. There is no evidence that Vavra knew termination was on the table when he made these statements, evidenced by the fact that he had to confer with his wife during the Teams meeting with Jeff Cortez in April 2021 in the moments before he was terminated. ECF 43, p. 20; SOF ¶ 42.

The fact that Cortez and Maines "attempted to gain Vavra's compliance," before he was terminated does not make Honeywell's position any more reasonable

either. Appellee Br. 38. The reason why is simple: Vavra's discrimination complaint was about the training. If he had changed his mind and was willing to take the training, then obviously he would stop pursuing the discrimination complaint. Rather, when Vavra confirmed that he was still taking his discrimination complaint seriously, it became clear that he "was not going to let the subject drop." *Magyar*, 544 F.3d at 772. As the court in *Magyar* made clear, it is appropriate to infer causation when adverse employment action follows so closely on the heels of that determination. *See id.* at 772–73.

### B. In violation of its own policy, Honeywell took *no* action in response to Vavra's complaint.

Suspicious timing is not all Vavra has. Honeywell's refusal to ever respond to Vavra's complaint demonstrates that it "depart[ed] from established procedures" thus "evinc[ing] a retaliatory motive." *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012). Although Honeywell argues that its "policies do not require it to conduct a specific type of investigation," Appellee Br. at 39, that does not mean Honeywell was free to do *nothing* in response to a discrimination complaint made in good faith. Indeed, even if the *type* of investigation was not mandated in policy, there still had to be a "prompt[] and thorough[]" one. ECF 43, Ex. B p. 16. The easy inference is that Honeywell never took Vavra's complaint seriously and instead looked for a way to fire him.

Honeywell's initial response to Vavra's complaint sheds light on its usual operating procedures. When Vavra first emailed his complaint, he was promised that Honeywell would "review and get back to you." ECF 43, p. 16–17; SOF ¶ 30. Similarly, Katie Becker acknowledged that she initially "communicated [Vavra's concerns] up the flagpole." ECF 43-7, Ex. G p. 13; Becker Dep. 43:15–17. And, below, Honeywell asserted that it "undertook a prompt investigation and made an appropriate remedial response." ECF 14, p. 21; Answer ¶ 6. These initial statements demonstrate how Honeywell would normally handle discrimination complaints: by reviewing, investigating, and responding. Yet it is undisputed that Honeywell never provided a response, an "unusual deviation from standard procedure[] that can serve as circumstantial evidence of discrimination." *Baines*, 863 F.3d at 664.

Honeywell has now admitted that it did not complete the "prompt investigation" it initially claimed to have completed or issued any "remedial response." *See* Appellee Br. 40–42. This sudden change in tone is further evidence of discriminatory animus towards Vavra. *See Kidwell*, 679 F.3d at 969 (explaining that a "dishonest explanation" is evidence of retaliation (quoting *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000)). Honeywell once asserted that its response was sufficient, but now claims that Vavra was never entitled to one. Moreover, Honeywell's acknowledged failure to investigate can be evidence of retaliatory motive. *See Tank v. T-Mobile USA, Inc.*, 758 F.3d 800 (7th Cir. 2014) ("We have said that a

24

supervisor standing by while an employee complained of race discrimination could be evidence of discriminatory animus."); *Smith v. Bray*, 681 F.3d 888, 906 ("If [the defendant] had stood idly by while [the plaintiff] complaint to [the defendant] of race discrimination, this might provide evidence of [the defendant's] own discriminatory animus.").

Finally, Honeywell claims there was nothing to review because the training had already been "vetted and approved by Honeywell's Diversity, Equity and Inclusion Department, as well as the Law Department." Appellee Br. 40. This argument, if taken to its logical conclusion, insulates all company policies from Title VII liability as long as *someone* in the company first approved the policy. Precedent is entirely to the contrary. For example, the training program at issue in *Hartman*, which the Federal Aviation Administration "paid for and encouraged its employees to" attend, still could violate Title VII. *Hartman*, 914 F. Supp. at 227. The same was true of a nursing home policy which "honor[ed] the racial preferences of its residents in assigning health care providers." *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 910 (7th Cir. 2010). Although the nursing home asserted that it developed the policy as "a reasonable and good-faith effort to comply with Indiana law," this Court still reversed the district court's grant of summary judgment for the nursing home. *Id.* at 913, 916. Simply because Honeywell internally approved the training program does not insulate it from its obligations under Title VII.

### C. Honeywell's motive for terminating Vavra is still in dispute, making summary judgment inappropriate

"Summary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles." *Alexander v. Wis. Dep't of Health & Family Servs.*, 263 F.3d 673, 681 (7th Cir. 2001) (quoting *Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93, 97 (7th Cir. 1985)). Here, the unanswered question is whether Honeywell's "non-invidious reason" for terminating Vavra "is pretext for retaliation." *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 559 (7th Cir. 2004) (explaining that summary judgment is inappropriate in this context).

There is a serious factual and legal dispute as to whether Honeywell's claimed reason for Vavra's termination—his refusal to take the training—is in fact the same as terminating him for objecting to the training. This makes it impossible to determine motive or allocate responsibility without making a conclusion about Honeywell's intent. For example, Honeywell claims that Vavra was terminated for not taking the training because he said as much to a former colleague. Appellee Br. 45. The problem with this argument, however, is that Vavra's refusal to take the training cannot be separated from his discrimination complaint. If he was terminated for not taking the training, he may have also been terminated for his emails laying out his reasons for not taking the training. As this Court has explained:

26

Employers cannot retaliate against employees who complain about violations of Title VII under the ruse that the employee was being 'disloyal' or 'insubordinate' by opposing the unlawful activity.

*Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 569 (7th Cir. 2015). Honeywell mistakenly attempts to distinguish *Castro* on the facts. Appellee Br. at 44. Actually, this Court held that the damning statements in *Castro*, that employees should not go "running off to HR" and those who "went to HR no longer work here," were in and of themselves *insufficient* to create an issue of material fact. 786 F.3d at 569. However, the Court held that one employee's retaliation claim did survive summary judgment because the evidence "call[ed] into question the honesty" of the employer's account. *Id.* at 570-71. The same is true here: Honeywell originally claimed that it *did* investigate and respond to Vavra's discrimination complaint, but now has changed its story. *See* Appellee Br. at 40–42. As in *Castro*, the fact that there is "evidence casting doubt on the honesty" of Honeywell's preferred reason for terminating Vavra means "a reasonable trier of fact could find [Honeywell's] stated reasons unworthy of belief and conclude that unlawful retaliation is the more likely explanation for its decision." *Castro*, 786 F.3d at 575. "[S]ummary judgment is not a tool for deciding questions of credibility," *id.* at 571, and only a jury can determine if Honeywell intended to terminate Vavra for an unlawful reason.

Further, Honeywell's attempt to eliminate all credibility issues fails. *See* Appellee Br. 45. There was no "gradual and natural progression of Honeywell's

escalating response to an employee who continued to be noncompliant with mandatory training." *Id.* Rather, there was a sudden escalation after Vavra made an official discrimination complaint. As Vavra stated in his deposition, Honeywell's response was unlike how it normally treated noncompliance with trainings. *See* ECF 42-1, Ex. A p. 30–31; Vavra Dep. at p. 51:21–24, 52:1 (answering that the follow-up communications he had received in the past were "[n]ot like this," in comparison to the follow-ups he received regarding the Unconscious Bias Training). And, as discussed in Section II.B, *supra*, Honeywell failed to investigate or respond to Vavra's discrimination complaint, despite its later assurances that it did. *See* ECF 14, p. 21; Answer ¶ 6. Honeywell's unsupported assertion that its treatment of Vavra was just "business as usual" fails to carry its burden to rebut the causal inference of discrimination. *See Kidwell*, 679 F.3d at 965.

## CONCLUSION

For the reasons set forth herein, Appellant Charles Vavra respectfully requests that this Court reverse the district court's grant of Appellee's motion for summary judgment and remand for further proceedings.

Dated:  March 1, 2024

                                             */s/ Alec J. Beck*
                                             Alec J. Beck (MN #201133)
                                             *Counsel of record*
                                             **PARKER DANIELS KIBORT**
                                             888 Colwell Building
                                             123 North Third Street
                                             Minneapolis, MN 55401
                                             (612) 355-4119

beck@parkerdk.com

James V. F. Dickey (MN #393613)
**UPPER MIDWEST LAW CENTER**
8421 Wayzata Blvd., Suite 300
Golden Valley, Minnesota 55426
james.dickey@umlc.org
(612) 428-7000

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 7,000 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word Version 2209 in Times New Roman font, 14-point.

3. The brief has been scanned for viruses and are virus free.

Dated:  March 1, 2024                    */s/ Alec J. Beck*
                                     Alec J. Beck (MN #201133)
                                     *Counsel of record*
                                     **PARKER DANIELS KIBORT**
                                     888 Colwell Building
                                     123 North Third Street
                                     Minneapolis, MN 55401
                                     (612) 355-4119
                                     beck@parkerdk.com

**CERTIFICATE OF SERVICE**

I hereby certify that on March 1, 2024, I electronically filed the within brief and appendix with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service has been accomplished by the CM/ECF system.

Dated:  March 1, 2024

        */s/ Alec J. Beck*
        Alec J. Beck (MN #201133)
        *Counsel of record*
        **PARKER DANIELS KIBORT**
        888 Colwell Building
        123 North Third Street
        Minneapolis, MN 55401
        (612) 355-4119
        beck@parkerdk.com